UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN – NORTHERN DIVISION

JASON S. WHITE and AMY WHITE,

Plaintiffs,

v.

O-N MINERALS (MICHIGAN) COMPANY d/b/a CARMEUSE LIME & STONE,

Defendant.

Case No. 2:09-cv 265

Hon. R. Allan Edgar

Mag. Timothy P. Greeley

EARDLEY LAW OFFICES, P.C.
EUGENIE B. EARDLEY (P48615)
Attorneys for Plaintiffs
P.O. Box 830
Cannonsburg, MI 49317
(616) 874-2647

LIPSON, NEILSON, COLE, SELTZER & GARIN, P.C.
BY: JOSEPH A. STARR (P47253)
KIRSTEN E. GRAMZOW (P52134)
Attorneys for Defendant
3910 Telegraph Road, Suite 200
Bloomfield Hills, Michigan 48302
(248) 593-5000

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, PURSUANT TO FED. R. CIV. P. 56**

Defendant, by and through its attorneys, hereby moves this Court for Summary Judgment, pursuant to Fed. R. Civ. P. 56, for the reasons set forth in the attached brief and supporting documents.[1]

Respectfully submitted,

By: s/ Kirsten E. Gramzow
Lipson, Neilson, Cole, Seltzer & Garin, P.C.
Attorneys for Defendant
3910 Telegraph Road, Suite 200
Bloomfield Hills, MI 48302
(248) 593-5000
kgramzow@lipsonneilson.com
P52134

Dated: December 8, 2010.

[1] On December 8, 2010, Defendant's counsel contacted Plaintiffs' counsel *via* email for purposes of obtaining concurrence in the subject motion, which concurrence in the relief sought counsel did not obtain.

BH229961.WPD

LIPSON, NEILSON, COLE, SELTZER & GARIN, P.C., 3910 TELEGRAPH RD., SUITE 200, BLOOMFIELD HILLS, MI 48302 (248) 593-5000

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN – NORTHERN DIVISION

JASON S. WHITE and AMY WHITE,

Plaintiffs,

v.

O-N MINERALS (MICHIGAN) COMPANY
d/b/a CARMEUSE LIME & STONE,

Defendant.

Case No. 2:09-cv 265

Hon. R. Allan Edgar

Mag. Timothy P. Greeley

/

EARDLEY LAW OFFICES, P.C.
EUGENIE B. EARDLEY (P48615)
Attorneys for Plaintiffs
P.O. Box 830
Cannonsburg, MI 49317
(616) 874-2647

LIPSON, NEILSON, COLE, SELTZER & GARIN, P.C.
BY: JOSEPH A. STARR (P47253)
KIRSTEN E. GRAMZOW (P52134)
Attorneys for Defendant
3910 Telegraph Road, Suite 200
Bloomfield Hills, Michigan 48302
(248) 593-5000

/

**BRIEF IN SUPPORT OF
DEFENDANT O-N MINERALS (MICHIGAN) COMPANY
d/b/a CARMEUSE LIME & STONE
MOTION FOR SUMMARY JUDGMENT, PURSUANT TO FED. R. CIV. P. 56**

**ORAL ARGUMENT REQUESTED**

BH229961.WPD

LIPSON, NEILSON, COLE, SELTZER & GARIN, P.C., 3910 TELEGRAPH RD., SUITE 200, BLOOMFIELD HILLS, MI 48302 (248) 593-5000

# TABLE OF CONTENTS

INDEX OF AUTHORITIES . . . . . . . . . . iii

STATEMENT OF QUESTIONS PRESENTED . . . . . . . . . . v

I. INTRODUCTION . . . . . . . . . . 1

II. STATEMENT OF UNDISPUTED MATERIAL FACTS . . . . . . . . . . 2

A. The Parties . . . . . . . . . . 2

B. Plaintiff Jason's History At the Port Inland Plant. . . . . . . . . . . 3

C. In January 2006, Doctors Diagnosed Plaintiffs' 17-month Old Daughter (Savannah White) with Leukemia . . . . . . . . . . 4

D. In Februar y 2008, Carmeuse Lime and Stone, Inc. Acquires Oglebay Norton Company (Including its Subsidiaries) and Defendant Carmeuse Begins Operations at the Port Inland Plant . . . . . . . . . . 5

E. In August 2008, Defendant Carmeuse Discovered Plaintiff Jason Violated The Team Member Performance Expectations By Falsifying His Time Card Requesting Payment For Hours In Which He Did Not Work . . . . . . . . . . 6

F. On August 25, 2008, Defendant Carmeuse Terminated Plaintiff Jason's Employment For Theft Due to Falsification of His Time Card . . . . . . . . . . 9

III. STANDARD OF REVIEW . . . . . . . . . . 11

IV. LEGAL ARGUMENT . . . . . . . . . . 12

A. SUMMARY JUDGMENT IS APPROPRIATE AS TO PLAINTIFF JASON'S AMERICANS WITH DISABILITIES ACT ("ADA") CLAIM, PURSUANT TO FED. R. CIV. P. 56. . . . . . . . . . . 12

1. Plaintiff Jason Cannot Establish a *Prima Facie* Case of "Association Discrimination" under the ADA. . . . . . . . . . . 12

2. Assuming Plaintiff Jason Establishes a *Prima Facie* Case of "Association Discrimination" under the ADA, Defendant Carmeuse Articulated a Legitimate, Non-Discriminatory Reason for Terminating Plaintiff Jason's Employment. . . . . . . . . . . 17

LIPSON, NEILSON, COLE, SELTZER & GARIN, P.C., 3910 TELEGRAPH RD., SUITE 200, BLOOMFIELD HILLS, MI 48302 (248) 593-5000

B. SUMMARY JUDGMENT IS APPROPRIATE AS TO PLAINTIFF JASON'S EMPLOYEE RETIREMENT INCOME SECURITY ACT ("ERISA") CLAIM, PURSUANT TO FED. R. CIV. P. 56. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

C. SUMMARY JUDGMENT IS APPROPRIATE AS TO PLAINTIFF AMY'S CLAIM FOR LOSS OF CONSORTIUM, PURSUANT TO FED. R. CIV. P. 56 . . . . . . 23

V. CONCLUSION & REQUESTED RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

LIPSON, NEILSON, COLE, SELTZER & GARIN, P.C., 3910 TELEGRAPH RD., SUITE 200, BLOOMFIELD HILLS, MI 48302 (248) 593-5000

# INDEX OF AUTHORITIES

## Court Rules

Fed. R. Civ. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 12, 13, 20, 23, 24, 25

## Case Law Authority

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) . . . . . . 12

Anthony v. United Telephone Co. of Ohio, 277 F.Supp.2d 763 (N.D. Ohio 2002) . . . . . . . . . . 14

Brenneman v. Medcentral Health Sys., 366 F.3d 412 (6th Cir. 2004) . . . . . . . . . . . . . . . 13, 14, 20

Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) . . . . . . . . . . . . 12

Cole v. Knoll, Inc., 984 F. Supp 1117, 1136 (W.D. Mich. 1997) . . . . . . . . . . . . . . . . . . . . . . . . 24

Den Hartog v. Wasatch Acad., 129 F.3d. 1076 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . 14, 15, 17

Hamlin v. Flint Twp., 942 F. Supp. 1129 (E.D. Mich. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Hilburn v. Murata Elecs. N. Am., Inc., 181 F.3d 1220 (11th Cir. 1999) . . . . . . . . . . . . . . . . . . 14

Humphreys v. Bellaire Corp., 966 F.2d 1037 (6th Cir. 1992) . . . . . . . . . . . . . . . . . . . . 21, 22, 23

Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp., 176 F.3d 921 (6th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Johnson v. Kroger Co., 319 F.3d 858 (6th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Larimer v. IBM Corp., 370 F.3d 698 (7th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Long v. Chelsea Community Hosp., 219 Mich. App. 578, 557 N.W.2d 157 (1996) . . . . . . . . . 24

Loper v. Computer Network Technology Corp., 128 F.Supp.2d 1061 (E.D. Mich. 2001) . . . . 24

Kohler v. North Star Steel Co., Inc., 408 F.Supp.2d 380 (E.D. Mich. 2005) . . . . . . . . . . . . . 3, 24

Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Mattei v. Mattei, 126 F.3d 794 (6th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

LIPSON, NEILSON, COLE, SELTZER & GARIN, P.C., 3910 TELEGRAPH RD., SUITE 200, BLOOMFIELD HILLS, MI 48302 (248) 593-5000

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) . . . . . . . . . . 13

Overley v. Covenant Transport. Inc., No. 05-5280, 2006 WL 1133292 (6th Cir. April 27, 2006) . . . . . . . . . . 14, 15, 17

Schweitzer v. Teamster Local 100, 413 F.3d 533 (6th Cir. 2005) . . . . . . . . . . 21, 22, 23

Street v. J.C. Bradford & Co., 886 F.2d 1472 (6th Cir. 1989) . . . . . . . . . . 12

Wesley v. Stanley Door Systems, Inc., 986 F. Supp. 433 (E.D. Mich 1997) . . . . . . . . . . 14

Wixson v. Dowagiac Nursing Home, 866 F. Supp. 1047 (W.D. Mich. 1994) . . . . . . . . . . 24

**Statutory Authority**

29 U.S.C. §1001 . . . . . . . . . . 21

29 U.S.C. §1004(a) . . . . . . . . . . 24

29 U.S.C. §1144(a) . . . . . . . . . . 24

42 U.S.C. §12101 . . . . . . . . . . 13

42 U.S.C. §12112(a) . . . . . . . . . . 13

42 U.S.C. §12112(b)(4) . . . . . . . . . . 13

LIPSON, NEILSON, COLE, SELTZER & GARIN, P.C., 3910 TELEGRAPH RD., SUITE 200, BLOOMFIELD HILLS, MI 48302 (248) 593-5000

## STATEMENT OF QUESTION PRESENTED

**WHETHER PLAINTIFF JASON HAS ESTABLISHED DISABILITY DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT OF 1990 ("ADA") BY DEFENDANT CARMEUSE.**

Defendant Carmeuse answers "NO."

Plaintiff Jason answers "YES."

**WHETHER PLAINTIFF JASON HAS ESTABLISHED A VIOLATION OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT ("ERISA") BY DEFENDANT CARMEUSE.**

Defendant Carmeuse answers "NO."

Plaintiff Jason answers "YES."

**WHETHER PLAINTIFF AMY HAS ESTABLISHED A CLAIM FOR LOSS OF CONSORTIUM AGAINST DEFENDANT CARMEUSE.**

Defendant Carmeuse answers "NO."

Plaintiff Amy answers "YES."

LIPSON, NEILSON, COLE, SELTZER & GARIN, P.C., 3910 TELEGRAPH RD., SUITE 200, BLOOMFIELD HILLS, MI 48302 (248) 593-5000

Defendant O-N MINERALS (MICHIGAN) COMPANY d/b/a CARMEUSE LIME & STONE ("Carmeuse"), through its undersigned counsel, seeks an Order granting Defendant Carmeuse summary judgment, pursuant to Fed. R. Civ. P. 56, states as follows:

## I. INTRODUCTION

This lawsuit arises out of Plaintiff Jason White's ("Plaintiff Jason") employment at the Port Inland Plant in Gulliver/Port Inland, Michigan. In 2002, Plaintiff Jason began working as an Operations Associate in the Boat End Department of the Port Inland Plant for its *then owner*, Oglebay Norton Company. In February 2008, Carmeuse Lime and Stone, Inc. acquired Oglebay Norton Company (and its subsidiaries), including O-N Minerals (Michigan) Company (Plaintiff Jason's then employer). Subsequent to this acquisition, O-N Minerals (Michigan) Company d/b/a Carmeuse Lime and Stone ("Defendant Carmeuse") began operating the Port Inland Plant, and Plaintiff Jason became Defendant Carmeuse's employee, accordingly.

Approximately six months later, on August 11, 2008, Defendant Carmeuse discovered (following a complaint by his co-workers to their Production Manager (Dave Mickelson) that Plaintiff Jason submitted a falsified time card to Defendant Carmeuse seeking payment for hours which Plaintiff Jason did not work. Upon further investigation, Manager Mickelson discovered evidence which suggested this had not been the first time Plaintiff Jason had submitted a falsified time card to his new employer, Defendant Carmeuse.

Given the recent acquisition, Port Inland Plant's Site Operations Manager (Jeffrey Himes) contacted Defendant Carmeuse's corporate office in Pittsburgh, Pennsylvania for direction relative to Plaintiff Jason's dishonest and fraudulent conduct. Upon inquiry, Defendant Carmeuse's Vice President of Operations (Paul Tunnicliffe) directed Site Operations Manager Himes to terminate Plaintiff Jason's employment, which subsequently occurred on August 25, 2008.

LIPSON, NEILSON, COLE, SELTZER & GARIN, P.C., 3910 TELEGRAPH RD., SUITE 200, BLOOMFIELD HILLS, MI 48302 (248) 593-5000

Rather than take accountability for his actions, Plaintiff Jason claimed Defendant Carmeuse terminated his employment because his daughter (Savannah White), who had been diagnosed with leukemia two years earlier in January 2006 (and in remission since March 2006), had been recently hospitalized in August 2008. Plaintiff Jason claimed that the alleged high costs of health care related to Plaintiff Jason's daughter constituted the "real reason" for his termination, rather than Plaintiff Jason's blatant fraud, theft and dishonesty. As a result, on December 15, 2009, Plaintiffs filed the instant litigation against Defendant Carmeuse alleging: (1) disability "by association" discrimination in violation of the Americans with Disabilities Act of 1990 ("ADA") (Plaintiff Jason only); (2) intentional interference with Plaintiff Jason's health care benefits in violation of Employee Retirement Income Security Act ("ERISA") (Plaintiff Jason only); and (3) loss of consortium (Plaintiff Amy only). (Plaintiffs' Complaint).

LIPSON, NEILSON, COLE, SELTZER & GARIN, P.C., 3910 TELEGRAPH RD., SUITE 200, BLOOMFIELD HILLS, MI 48302 (248) 593-5000

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS

### A. The Parties

Plaintiff Jason White ("Plaintiff Jason") and Plaintiff Amy White ("Plaintiff Amy") reside in Manistique, Michigan. (**Exh A**, Jason, p. 11; **Exh B**, Amy, p. 26). On March 13, 2006, Plaintiff Jason and Plaintiff Amy married. (**Exh C**, Marriage Certificate).[2] On August 12, 2004, Plaintiffs celebrated the birth of a daughter (Savannah White), and on May 7, 2009, a second daughter (Jayda White). (**Exh A**, Jason, pp. 12-13; **Exh B**, Amy, p. 12).[3]

---

[2] Although Plaintiff Jason testified he married Plaintiff Amy on March 13, 2007 (**Exh A**, Jason, pp. 11-12), Plaintiffs' marriage certificate evidences the fact Plaintiff Jason actually married Plaintiff Amy on March 13, 2006. (**Exh C**, Marriage Certificate; see also **Exh B**, Amy, p. 11).

[3] Plaintiff Amy also had a daughter (Alexandra Lakosky, born April 27, 2001) during the term of her first marriage to David Lakosky (1999 to May 25, 2004). (**Exh B**, Amy, p. 12). Although Plaintiff Amy testified that her first marriage lasted from 1999 to 2002/2003, Plaintiff actually was married to her first husband until May 25, 2004, during which time period Plaintiffs Jason and Amy

Global Carmeuse Group ("Carmeuse Group") is a 1.3 billion Euro company dedicated to excellence in industrial minerals products and technology. Founded in Belgium in 1860, the Carmeuse Group operates in excess of 90 production facilities in 13 countries worldwide, which contribute to producing 13 million tons of lime and 33 million tons of limestone and aggregates annually. In North America, Carmeuse Lime and Stone, Inc. (a subsidiary of Carmeuse Group) operates 32 manufacturing facilities, employing in excess of 2,400 employees, and supplying and serving 33 states and provinces in the eastern USA and Canada.[4]

In February 2008, Carmeuse Lime and Stone, Inc. acquired Oglebay Norton Company (and its subsidiaries), including Defendant O-N Minerals (Michigan) Company d/b/a Carmeuse Lime and Stone ("Defendant Carmeuse"), which operates the limestone and dolomite facilities located in Gulliver/Port Inland, Michigan, commonly referred to as the "Port Inland Plant". (**Exh E**, Tunnicliffe Affidavit, ¶2; and **Exh A**, Jason, pp. 18-19).

**B. Plaintiff Jason's History at the Port Inland Plant**

For two decades or more, the Port Inland Plant in Gulliver/Port Inland, Michigan has changed owners *many* times. (**Exh A**, Jason, p. 21). During the Summer months of 1994 and 1995, *then plant owner* Specialty Minerals, Inc. (a subsidiary of Minerals Technologies, Inc.) hired Plaintiff Jason to work as a part-time Summer Student at the Port Inland Plant at the rate of $8.00 per hour (Summer of 1994) and $9.00 per hour (Summer of 1995). (**Exh A**, Jason, pp. 20, 118; **Exh F**, Forms dated 05/11/94 and 05/11/95).

LIPSON, NEILSON, COLE, SELTZER & GARIN, P.C., 3910 TELEGRAPH RD., SUITE 200, BLOOMFIELD HILLS, MI 48302 (248) 593-5000

---

conceived their daughter, Savannah. (**Exh B**, Amy, pp. 9-10, 14; **Exh D**, Judgment of Divorce dated 05/25/04).

[4] http://www.carmeusena.com/page.asp?id=68&langue=EN.

In or around 1998, Oglebay Norton Company acquired the Port Inland Plant from Minerals Technologies, Inc.[5] On July 1, 2002, *then plant owner* Oglebay Norton Company hired Plaintiff Jason to work as a full-time Laborer (called "Operations Associate") in the Boat End Department ("Boat End") at the Port Inland Plant. (**Exh A**, Jason, pp. 20-21). In this position, Plaintiff Jason reported to Production Manager, Dave Mickelson. (**Exh A**, Jason, pp. 31, 173; **Exh H**, Mickelson, p. 5).

As a full-time Laborer in the Boat End, Plaintiff Jason utilized heavy equipment to load stone and/or other product onto freighters on Lake Michigan for transport to other locations, cleaned and/or otherwise maintained tunnels carrying product out to the freighters in Lake Michigan, and also performed various safety measures relative to the Boat End. (**Exh A**, Jason, pp. 23-27).[6] Initially, Plaintiff Jason earned $14.65 per hour; however, upon completion of his 90-day probationary period, on October 1, 2002, Plaintiff Jason received an increase in his rate of pay to $17.65, as well as *annual* increases in his rate of pay thereafter. (**Exh A**, Jason, pp. 38-39; **Exh I**, New Hire Form dated 07/01/2002); **Exh J**, Transaction Form dated 09/09/02).

**C. In January 2006, Doctors Diagnosed Plaintiffs' 17-month Old Daughter (Savannah White) with Leukemia.**

On January 11, 2006, Plaintiffs learned that their then 17-month old daughter (Savannah White) had been diagnosed with leukemia. (**Exh A**, Jason, pp. 76-77; **Exh B**, Amy, p. 29).

---

5 http://www.thefreelibrary.com/Oglebay+Norton+Announces+Acquisitions+in+Limestone,+Industrial+Sands...-a020375013; see also **Exh G**, Himes, p. 23.

6 During slower periods, Plaintiff Jason also performed work in other areas of the Port Inland Plant, including the Dolomite Department, a primary and secondary crushing system. (**Exh A**, Jason, p. 27).

LIPSON, NEILSON, COLE, SELTZER & GARIN, P.C., 3910 TELEGRAPH RD., SUITE 200, BLOOMFIELD HILLS, MI 48302 (248) 593-5000

Thankfully, within 45 days of Savannah having been diagnosed with leukemia, in March 2006, Savannah's leukemia went into remission. (**Exh B**, Amy, p. 29).

On February 14, 2006, Oglebay Norton Company (operating as O-N Minerals (Michigan) Company) donated $500.00 to Northwoods Airlifeline in honor of Savannah White in appreciation for the travel services it provides to those with medical issues. (**Exh K**, Correspondence dated 02/14/06). On March 21, 2006, Oglebay Norton Company (operating as O-N Minerals (Michigan) Company donated at a fund-raising event for Savannah White an additional $500.00 towards the medical and/or other expenses incurred by Plaintiff Jason (and/or his family) relative to Savannah White's medical issues. (**Exh L**, Port Inland Plant 2005 Donations/Contributions). While in remission, over the next two and one-half years, Savannah underwent chemotherapy and radiation treatments. (**Exh B**, Amy, p. 29).

LIPSON, NEILSON, COLE, SELTZER & GARIN, P.C., 3910 TELEGRAPH RD., SUITE 200, BLOOMFIELD HILLS, MI 48302 (248) 593-5000

**D. In February 2008, Carmeuse Lime and Stone, Inc. Acquires Oglebay Norton Company (Including its Subsidiaries) and Defendant Carmeuse Begins Operations at the Port Inland Plant.**

On or around February 13, 2008, Carmeuse Lime and Stone, Inc. acquired Oglebay Norton Company (and its subsidiaries), including O-N Minerals (Michigan) Company, which operates the limestone and dolomite facilities at the Port Inland Plant employing Plaintiff Jason. (**Exh E**, Tunnicliffe Affidavit, ¶2). Simultaneous with this acquisition, O-N Minerals (Michigan) Company began doing business as Carmeuse Lime and Stone ("Defendant Carmeuse"). (**Exh E**, Tunnicliffe Affidavit, ¶3).

On that same date, Defendant Carmeuse formally notified the employees of the Port Inland Plant about Defendant Carmeuse's acquisition of the Port Inland Plant and welcomed them as new

employees to Defendant Carmeuse. (**Exh M**, Correspondence dated 02/13/08; **Exh A**, Jason, pp. 29-30, 33-34).

Plaintiff Jason experienced no break in his employment at the Port Inland Plant, continuing to work in the Boat End for his *new* owner and employer, Defendant Carmeuse. (**Exh A**, Jason, pp. 33-34). In fact, less than one month later, on March 3, 2008, Plaintiff Jason received a merit increase from Defendant Carmeuse, increasing Plaintiff Jason's rate of pay from $20.40 per hour to $21.02 per hour. (**Exh A**, Jason, pp. 40-41, 121; **Exh N**, Status Change Form dated 03/03/08).

**E. In August 2008, Defendant Carmeuse Discovered Plaintiff Jason Violated The Team Member Performance Expectations By Falsifying His Time Card Requesting Payment For Hours In Which He Did Not Work.**

Defendant Carmeuse operates under Self Directed Work Teams ("SDWT") meaning that the employees generally manage themselves at the Port Inland Plant on a daily basis, consulting with managers only as they deem necessary. (**Exh A**, Jason, pp. 106-09). Admittedly, Plaintiff testified that by using SDWTs, Defendant Carmeuse trusted its employees a great deal. (**Exh A**, Jason, pp. 108-09).[7]

On the evening of Friday, August 8, 2008, Manager Mickelson contacted the Boat End during the night shift[8] to request that the team change the load for the boat in port at Defendant Carmeuse

---

[7] With respect to the trust bestowed upon the Port Inland Plant employees, SOM Himes testified, "Trust is an absolutely fundamental component of the how we manage Port Inland. Employees have to know that we trust them, and the employees have to behave in a trustworthy fashion, because **there are no direct supervisors or anybody looking over their shoulder making sure they're doing what they're supposed to be doing**." (**Exh G**, Himes, pp. 106-07) (emphasis added).

[8] The Boat End typically assigns four team members to two 12-hour shifts (i.e., the day shift from 7:00 a.m. to 7 p.m., and the night shift from 7:00 p.m. to 7:00 a.m.). (**Exh A**, Pl Jason, pp. 48-49, 67-68).

LIPSON, NEILSON, COLE, SELTZER & GARIN, P.C., 3910 TELEGRAPH RD., SUITE 200, BLOOMFIELD HILLS, MI 48302 (248) 593-5000

in order to expedite the loading and departure of the boat. (**Exh H**, Mickelson, pp. 58-59).[9] At that time, Manager Mickelson learned from one of the four Boat End crew members scheduled to work that evening that the team could not accomplish this task because they were short handed due to a team member (Plaintiff Jason) having "called in" for work that evening. (**Exh H**, Mickelson, pp. 58-60, 64).[10] According to Manager Mickelson, it is not uncommon for a Boat End team to accommodate a crew member who is unable to make it to work, regardless of the reason, and Manager Mickelson did not take issue with this behavior. (**Exh H**, Mickelson, pp. 60-61).

On or around Sunday, August 10, 2008,[11] Plaintiff Jason submitted his handwritten time card for week ending August 10, 2008. (**Exh O**, Time Card dated 08/10/08). The next morning, the four Boat End Department crew members on duty that morning informed Manager Mickelson that they believed a co-worker had been dishonest with respect to his time card, reporting time which had not been worked by the employee. (**Exh H**, Mickelson, p. 56).[12] Upon inquiry, the four crew members

LIPSON, NEILSON, COLE, SELTZER & GARIN, P.C., 3910 TELEGRAPH RD., SUITE 200, BLOOMFIELD HILLS, MI 48302 (248) 593-5000

---

[9] Specifically, Mickelson requested that the Boat End team scheduled for the night shift to utilize an additional tunnel (for loading product) to expedite the boat departure from Defendant Carmeuse's port. (**Exh H**, Mickelson, p. 59).

[10] Plaintiff testified he called Defendant Carmeuse and spoke with one of his team members about his inability to report for work as scheduled; however, Plaintiff Jason does not recall who he spoke with, or what day he called in as unavailable for work. (**Exh A**, Jason, pp. 164-65). Although Manager Mickelson is not certain, Manager Mickelson believes crew member John Chandler answered the Boat End telephone that evening and reported Plaintiff Jason's absence to him. (**Exh H**, Mickelson, pp. 58-60, 64).

[11] Plaintiff Jason testified that Defendant Carmeuse required the Boat End team members to complete their respective time cards at the end of their shift, and submit them to the office for payment on Sunday evening, or at the latest Monday morning. (**Exh A**, Jason, pp. 46-47).

[12] Although Mickelson testified that all four members of the crew mentioned this information to him, Mickelson recalls the names of only three of the four Boat End crew members on duty that morning, including, Mike Burkholder, Greg Turan and Loren Windsor. (**Exh H**, Mickelson, pp. 56-57).

refused to provide the name of the employee to Manager Mickelson; rather, crew member Loren Winsor commented that Manager Mickelson already had all the information necessary to figure out the employee's identity without their assistance. (**Exh H**, Mickelson, pp. 57-58).

At that point, Manager Mickelson proceeded to review all of the Boat End time cards submitted for payment by Defendant Carmeuse's Boat End crew for week ending August 10, 2008. (**Exh H**, Mickelson, pp. 58, 62-64). Upon doing so, Manager Mickelson noted a discrepancy related to the time card of Plaintiff Jason. (**Exh H**, Mickelson, pp. 58, 64). In particular, Supervisor Mickelson noted that Plaintiff Jason reported he had worked 12 hours on Friday, August 8, 2008 (from 7:00 p.m. to 7:00 a.m.), including the specific tasks he completed for those 12 hours (despite having called in to his co-workers as unavailable to work that evening). (**Exh H**, Mickelson, p. 58; **Exh O**, Time Card dated 08/10/08).

After discovering this discrepancy, Manager Mickelson contacted the same Boat End crew members who reported the incident to him, and confirmed with the crew members that Plaintiff Jason had been the dishonest employee to whom they had referred. (**Exh H**, Mickelson, p. 69). At that point, the same crew members also suggested to Manager Mickelson that this had not been the first occasion where Plaintiff Jason had been dishonest on his time card, but they could not provide any details to Manager Mickelson. (**Exh H**, Mickelson, p. 73).[13]

Unsure on how to proceed, Manager Mickelson contacted his supervisor, Defendant Carmeuse's Site Operations Manager ("SOM") Jeffrey Himes, to discuss with him what he had learned and ask him how he should handle the situation. (**Exh H**, Mickelson, pp. 69-70; **Exh G**,

---

13 A crew member of Plaintiff Jason's at the Boat End (Mike Burkholder) testified that he saw Plaintiff Jason falsify his time cards at Defendant Carmeuse on *more than one occasion* in 2008 by writing down hours on his time card that he did not work. (**Exh P**, Burkholder, pp. 7-8).

LIPSON, NEILSON, COLE, SELTZER & GARIN, P.C., 3910 TELEGRAPH RD., SUITE 200, BLOOMFIELD HILLS, MI 48302 (248) 593-5000

Himes, pp. 23, 93-94, 121-23). Given the suggestion that Plaintiff Jason had falsified his time cards prior to August 8, 2008, SOM Himes requested that Manager Mickelson review all of Plaintiff Jason's time cards for the year 2008. (**Exh H**, Mickelson, p. 73). Upon doing so, Manager Mickelson discovered two other occasions where it appeared Plaintiff had falsified his time card, which Manager Mickelson reported back to SOM Himes. (**Exh H**, Mickelson, pp. 76-77; **Exh G**, Himes, pp. 123-25).[14]

LIPSON, NEILSON, COLE, SELTZER & GARIN, P.C., 3910 TELEGRAPH RD., SUITE 200, BLOOMFIELD HILLS, MI 48302 (248) 593-5000

**F. On August 25, 2008, Defendant Carmeuse Terminated Plaintiff Jason's Employment For Theft Due to Falsification of His Time Card.**

At the next management meeting at the Port Inland Plant, Manager Mickelson discussed the results of his investigation involving Plaintiff Jason's falsification of his time card for the week ending August 10, 2008 (as well as prior questionable instances in 2008). (**Exh H**, Mickelson, pp. 90-91, 98-99; **Exh G**, Himes, pp. 132-33). Although the management team agreed Plaintiff Jason's behavior violated Defendant Carmeuse's "Team Member Performance Expectations" which clearly provide this type of behavior could result in termination,[15] the management team at the Port Inland

---

[14] The first incident occurred on May 17, 2008 when Plaintiff Jason reported to Defendant Carmeuse that he had worked from 7:00 p.m. to 3:00 a.m. when it appeared the security cameras showed Plaintiff's vehicle leaving the premises at 12:00 a.m. (**Exh H**, Mickelson, pp. 79, 89; **Exh G**, Himes, pp. 123-25; **Exh Q**, Time Card dated 05/18/08; **Exh R**, Photo dated 05/17/08). The second incident occurred on July 12, 2008, Plaintiff Jason reported to Defendant Carmeuse that he had worked from 7:00 p.m. to 4:00 a.m. when his three team members that night reported that went home at 2:00 a.m., and the security cameras showed cars leaving the premises and the lights turned off at the Boat End Department with no new cars appearing until 7:00 a.m. for the the day shift the next morning. (**Exh H**, Mickelson, pp. 82-83, 89, 125; **Exh G**, Himes, pp. 126; **Exh S**, Time Card dated 07/13/08).

[15] Plaintiff Jason testified that he understood Defendant Carmeuse's Team Performance Expectations required that Plaintiff Jason "[c]omplete company records accurately and honestly (including time cards)" and, furthermore, that "certain offenses, including theft, assault, sale and dispensing of illegal drugs, sabotage, gross misconduct, etc. could result in immediate termination." (**Exh A**, Jason, pp. 51-53; **Exh T**, Team Member Performance Expectations, §E; **Exh G**, Himes, pp. 223-24) (emphasis added).

Plant had very little experience and/or knowledge of how its new employer, Defendant Carmeuse, wanted these type of issues handled at Port Inland Plant. (**Exh H**, Mickelson, pp. 91-93, 128-29; **Exh G**, Himes, pp. 132-34). Because of this, the management team agreed that SOM Himes should contact his boss at Defendant Carmeuse's corporate office for direction (i.e., Vice President of Operations, Paul Tunnicliffe). (**Exh H**, Mickelson, pp. 91-93, 128-29; **Exh G**, Himes, pp. 70, 132-34).

At that point, SOM Himes contacted (via telephone) Defendant Carmeuse's VP of Operations Tunnicliffe at Defendant Carmeuse's headquarters in Pittsburgh, Pennsylvania. (**Exh G**, Himes, p. 134; **Exh E**, Tunnicliffe Affidavit, ¶4). Upon learning that Plaintiff Jason had submitted a falsified time card for payment by Defendant Carmeuse, VP of Operations Tunnicliffe informed SOM Himes that Defendant Carmeuse considered this to be theft and directed that Plaintiff Jason be terminated from his employment with Defendant Carmeuse. (**Exh G**, Himes, pp. 134-35, 224-25; **Exh E**, Tunnicliffe Affidavit, ¶5, 6).

On August 25, 2008, SOM Himes, Manager Mickelson, and then HR/Quality Manager Rhonda Schneider confronted Plaintiff Jason regarding his falsified time card and terminated his employment. (**Exh A**, Jason, pp. 80-82; **Exh H**, Mickelson, pp. 101-02; **Exh G**, Himes, pp. 161, 180). Plaintiff Jason testified he actually has *no idea* whether he worked on August 8, 2008 (**Exh A**, Jason, pp. 176-77, 179); however, most recently, Plaintiff Jason admitted that he did not work on August 8, 2008 (see Pls' Motion to Compel Discovery, p. 5). During this meeting, Plaintiff Jason did not deny he had submitted a falsified time card for payment from Defendant Carmeuse; rather, Plaintiff Jason stated he could not believe he had falsified his time card, but if he had done so, he

LIPSON, NEILSON, COLE, SELTZER & GARIN, P.C., 3910 TELEGRAPH RD., SUITE 200, BLOOMFIELD HILLS, MI 48302 (248) 593-5000

simply "made a mistake". (**Exh A**, Jason, pp. 81, 87, 116; **Exh G**, Himes, p. 162; **Exh U**, Termination Meeting Notes dated 08/25/08).[16]

Given the *significant details* Plaintiff Jason gave relative to the tasks he completed during his manufactured 12-hour work shift, Manager Mickelson and SOM Himes did not find Plaintiff Jason's "mistake" explanation credible.[17] (**Exh H**, Mickelson, pp. 124-25; **Exh G**, Himes, pp. 162-63). Plaintiff Jason attempted to explain the significant detail on his time card by stating that he *copied* the time card of another team member (John Chandler); however, Plaintiff Jason admitted signing his time card for week ending August 10, 2008, which requires certification to Defendant Carmeuse "**[t]he information on this timecard is honest and correct**." (**Exh A**, Jason, pp. 76, 87; **Exh O**, Time Card dated 08/10/08; **Exh U**, Termination Meeting Notes dated 08/25/08) (emphasis in original, underline added). Plaintiff Jason suggested Defendant Carmeuse simply not pay him for those 12 hours, but SOM Himes informed him he had no alternative but to terminate his employment. (**Exh A**, Jason, p. 81; **Exh G**, Himes, pp. 164-65; **Exh U**, Termination Meeting Notes dated 08/25/08).

On December 15, 2009, Plaintiffs filed the instant litigation against Defendant Carmeuse alleging: (1) disability discrimination in violation of the Americans with Disabilities Act of 1990 ("ADA") (Plaintiff Jason only); (2) intentional interference in violation of Employee Retirement Income Security Act ("ERISA") (Plaintiff Jason only); and (3) loss of consortium (Plaintiff Amy

LIPSON, NEILSON, COLE, SELTZER & GARIN, P.C., 3910 TELEGRAPH RD., SUITE 200, BLOOMFIELD HILLS, MI 48302 (248) 593-5000

---

16 During Plaintiff Jason's termination meeting, Plaintiff Jason stated, "This is bad, this is stealing, but I never did it on purpose." (**Exh G**, Himes, p. 162; **Exh U**, Termination Meeting Notes dated 08/25/08) (emphasis added). Plaintiff Jason does not deny making this statement; he simply does not remember making the statement. (**Exh A**, Jason, pp. 91-92).

17 Plaintiff Jason's time card stated that for his alleged 12-hour work shift on Friday, August 8, 2008, that Plaintiff Jason completed the following tasks: (1) tunnel work for four hours; (2) housekeeping work for six hours; and (3) self-direction work for two hours. (**Exh O**, Time Card dated 08/10/08).

only). (Plaintiffs' Complaint). Defendant Carmeuse now moves this Court for summary judgment, as to Plaintiffs' entire Complaint, pursuant to Fed. R. Civ. P. 56.

## III. STANDARD OF REVIEW

Summary judgment under Fed. R. Civ. P. 56 will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is appropriate however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), cert. den. 484 U.S. 1066 (1988); see also, Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The Sixth Circuit has recognized that Anderson, Celotex and Matsushita have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. Street v. J.C. Bradford & Co., 886 F.2d 1472, 1476 (6th Cir. 1989).

In responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.' " Id. (quoting Anderson, supra at 257). The nonmoving party must adduce more than a mere scintilla of evidence in order to overcome the summary judgment motion. Id. It is not sufficient for the nonmoving party to merely " 'show that there is some metaphysical doubt as to the material facts.' " Id. (quoting Matsushita, supra at 586).

LIPSON, NEILSON, COLE, SELTZER & GARIN, P.C., 3910 TELEGRAPH RD., SUITE 200, BLOOMFIELD HILLS, MI 48302 (248) 593-5000

## IV. LEGAL ARGUMENT

### A. SUMMARY JUDGMENT IS APPROPRIATE AS TO PLAINTIFF JASON'S AMERICANS WITH DISABILITIES ACT ("ADA") CLAIM, PURSUANT TO FED. R. CIV. P. 56.

#### 1. Plaintiff Jason Cannot Establish a *Prima Facie* Case of "Association Discrimination" under the ADA.

Initially, Plaintiff Jason alleges that the Defendant violated the ADA, 42 U.S.C. § 12101, et seq. by terminating his employment "under circumstances which give rise to a reasonable inference that the disability of the relative or associate (Savannah Rose White) was a determining factor in Defendant employer's decision to terminate for the timecard error." (Plaintiffs' Complaint, ¶58).

The ADA provides:

> No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment. 42 U.S.C. §12112(a) (emphasis added).

As used in this section, the term "discriminate" includes, inter alia, "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association". 42 U.S.C. §12112(b)(4) (emphasis added).

In the absence of any direct evidence of disability discrimination, courts analyze ADA cases under the McDonnell Douglas Corp.[18] burden-shifting paradigm. Brenneman v. Medcentral Health Sys., 366 F.3d 412, 417 (6th Cir. 2004). Under this approach, Plaintiffs bear the initial burden of establishing a *prima facie* case of disability discrimination. Brenneman, supra.

---

[18] McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802; 93 S. Ct. 1817; 36 L.Ed.2d 668 (1973)

LIPSON, NEILSON, COLE, SELTZER & GARIN, P.C., 3910 TELEGRAPH RD., SUITE 200, BLOOMFIELD HILLS, MI 48302 (248) 593-5000

To establish his prima facie case of "association discrimination" in violation of the ADA, Plaintiff Jason must prove: (1) he was qualified for the job at the time of the adverse employment action; (2) he was subjected to an adverse employment action; (3) he was known by Defendant at the time of the adverse employment action to have a relative or associate with a disability; and (4) the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was the determining factor in the Defendant's decision. Overley v. Covenant Transport, Inc., No. 05-5280, 2006 WL 1133292, at *5 (6th Cir. April 27, 2006) (relying upon Den Hartog v. Wasatch Acad., 129 F.3d. 1076, 1085 (10th Cir. 1997); Larimer v. IBM Corp., 370 F.3d 698, 701-02 (7th Cir. 2004); and Hilburn v. Murata Elecs. N. Am., Inc., 181 F.3d 1220, 1230-31 (11th Cir. 1999)). See also, Wesley v. Stanley Door Systems, Inc., 986 F. Supp. 433, 435 (E.D. Mich. 1997); and Anthony v. United Telephone Co. of Ohio, 277 F. Supp. 2d 763, 775 (N.D. Ohio 2002). If Plaintiff Jason establishes a *prima facie* case of "association discrimination", Defendant Carmeuse must then articulate a legitimate, non-discriminatory reason for the contested decision. Brenneman, supra. If a legitimate reason for Defendant Carmeuse's actions is articulated, Plaintiff Jason is required to prove by a preponderance of the evidence that the employer's reason was a pretext for discrimination. Id. at 417-18.

For purposes of this motion *only*, Defendant Carmuese will not dispute the existence of elements one, two or three of the *prima facie* case for "association discrimination", including (1) Plaintiff Jason was qualified to work in the position of a Boat End Operations Associate at Defendant Carmeuse, (2) Plaintiff Jason was subjected to an adverse employment action (i.e., his termination from employment with Defendant Carmeuse on August 25, 2008), and (3) at the time of his termination, Plaintiff Jason had a relative (his daughter, Savannah White) with a disability. Overley,

LIPSON, NEILSON, COLE, SELTZER & GARIN, P.C., 3910 TELEGRAPH RD., SUITE 200, BLOOMFIELD HILLS, MI 48302 (248) 593-5000

supra; Den Hartog, supra. However, no evidence exists to establish the fourth element of the *prima facie* case, i.e., that Plaintiff Jason's termination from employment with Defendant Carmeuse "occurred under circumstances raising a reasonable inference that the disability of the relative or associate was the determining factor in the Defendant's decision." Overley, supra; Den Hartog, supra.

As previously stated herein, on February 13, 2008, Carmeuse Lime and Stone, Inc. acquired Oglebay Norton Company (and its subsidiaries), including O-N Minerals (Michigan) Company. (**Exh E**, Tunnicliffe Affidavit, ¶2). At the time of its acquisition, an "Administrative Services Agreement" ("ASA") and "Stop Loss Agreement" ("SLA") existed between Oglebay Norton Company and Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield ("Anthem"), effective January 1, 2008 through December 31, 2008. (**Exh V**, ASA; **Exh W**, SLA).

The terms and conditions of the ASA provided that Defendant Carmeuse (as the new employer under Article 3, §m) act as the Sponsor of a self-insured Group Health Plan providing, among other things, health care benefits to certain eligible employees and their qualified dependents. (**Exh V**, ASA, pp. 1, 8). In turn, Anthem agreed to act as Defendant Carmeuse's independent contractor to administer certain elements of the Group Health Plan. (**Exh V**, ASA, p. 1).

Generally speaking, the ASA required Defendant Carmeuse to reimburse Anthem for all qualified health care claims submitted to and paid by Anthem from Defendant Carmeuse's employees (as well as their qualified dependents) up to a certain threshold dollar amount of paid claims (called the "Aggregate Stop Loss Limit"). (**Exh V**, ASA, Article 4; **Exh W**, SLA, Articles 1 and 3). Upon reaching the Aggregate Stop Loss Limit, Anthem became financially responsible for all qualified health care claims submitted to Anthem from Defendant Carmeuse's employees (as well as their qualified dependents) up to a certain maximum amount (called the "Aggregate Stop Loss

LIPSON, NEILSON, COLE, SELTZER & GARIN, P.C., 3910 TELEGRAPH RD., SUITE 200, BLOOMFIELD HILLS, MI 48302 (248) 593-5000

Maximum"). (**Exh W**, SLA, Articles 1 and 3). The subject Anthem Agreements provided $200,000 per subscriber (including eligible dependents) as the Stop Loss Limit, and $2,000,000 per subscriber (including eligible dependents) as the Stop Loss Maximum. (**Exh W**, SLA, Schedule to SLA).

At that time, for the purpose of record-keeping, Defendant Carmeuse's Human Resources Benefits Department (then located in Cleveland, Ohio as it relates to the Port Inland Plant) generated monthly "Stop Loss" reports to record the names of employees (including eligible dependents) who may be reaching the $200,000 Stop Loss Limit. (**Exh X**, Wiley Affidavit, ¶4). Neither Plaintiff Jason's name nor his daughter's (Savannah White) name appeared on any "Stop Loss" reports generated during the entire term of Plaintiff Jason's employment with the Defendant (i.e., February 13, 2008 through August 25, 2008). (**Exh X**, Wiley Affidavit, ¶5). Moreover, during the term of Plaintiff Jason's employment with Defendant Carmeuse, the monthly "Stop Loss" reports were not available and/or accessible to anyone located at the Port Inland Plant (in Gulliver, Michigan) or Defendant Carmeuse's headquarters (in Pittsburgh, Pennsylvania). (**Exh X**, Wiley Affidavit, ¶7). At that time, Defendant Carmeuse maintained these "Stop Loss" Reports solely at its former Human Resources Benefits Department located in Cleveland, Ohio. (**Exh X**, Wiley Affidavit, ¶6).

**Furthermore, even assuming arguendo Plaintiff Jason's name had made the "Stop Loss" list in 2006 or 2007 (while employed by the prior owner of the plant), or in 2008 (while employed by Defendant Carmeuse), due to claims paid on behalf of his dependent, Savannah White, the individuals who participated in and/or made the decision to terminate Plaintiff Jason's employment in Gulliver, Michigan and/or Pittsburgh, Pennsylvania would have had NO knowledge of this fact given the inaccessibility and unavailability of these reports.** (**Exh X**, Wiley Affidavit, ¶7). In the absence of any evidence that the alleged disability of Plaintiff Jason's

LIPSON, NEILSON, COLE, SELTZER & GARIN, P.C., 3910 TELEGRAPH RD., SUITE 200, BLOOMFIELD HILLS, MI 48302 (248) 593-5000

daughter (Savannah White) was the **determining factor** in Defendant Carmeuse's decision, Plaintiff Jason is unable to establish a *prima facie* case of association discrimination under the ADA. Overley v. Covenant Transport, Inc., No. 05-5280, 2006 WL 1133292, at *5 (6th Cir. April 27, 2006) (relying upon Den Hartog v. Wasatch Acad., 129 F.3d. 1076, 1085 (10th Cir. 1997).

**2. Assuming Plaintiff Jason Establishes a *Prima Facie* Case of "Association Discrimination" under the ADA, Defendant Carmeuse Articulated a Legitimate, Non-Discriminatory Reason for Terminating Plaintiff Jason's Employment.**

Assuming Plaintiff Jason can establish a *prima facie* case of "association discrimination", Defendant Carmeuse articulated a legitimate, non-discriminatory reason for termination (i.e., Plaintiff Jason falsified his time cards for payment by the Defendant Carmeuse).

Here, on Monday, August 11, 2008, Plaintiff Jason's co-workers reported to their supervisor (Manager Mickelson) that a co-worker had been dishonest with respect to his time card, reporting time which had not been worked by the employee. (**Exh H**, Mickelson, p. 56). This report prompted Manager Mickelson to review the time cards for all Boat End employees for the week ending Sunday, August 10, 2008. (**Exh H**, Mickelson, pp. 58, 62-64). Upon doing so, Manager Mickelson discovered that Plaintiff Jason reported working a 12-hour night shift on Friday, August 8, 2008, which he actually did not work. (**Exh H**, Mickelson, pp. 58, 64; **Exh O**, Time Card dated 08/10/08). Manager Mickelson knew that Plaintiff Jason had not worked on Friday, August 8, 2008 because he had called the Boat End that evening and learned that Plaintiff Jason did not report to work as scheduled that evening. (**Exh H**, Mickelson, pp. 58-60, 64).

Once Manager Mickelson confirmed with Plaintiff Jason's co-workers that they had been referring to Plaintiff Jason, Manager Mickelson then learned from Plaintiff Jason's co-workers that he had falsified *prior* time cards with Defendant Carmeuse. (**Exh H**, Mickelson, pp. 69, 73; see also

LIPSON, NEILSON, COLE, SELTZER & GARIN, P.C., 3910 TELEGRAPH RD., SUITE 200, BLOOMFIELD HILLS, MI 48302 (248) 593-5000

**Exh P**, Burkholder, pp. 7-8). Upon further investigation, Manager Mickelson discovered *two other occasions* in May 2008 and July 2008 where it appeared Plaintiff had falsified his time card. (**Exh H**, Mickelson, pp. 76-77; **Exh G**, Himes, pp. 123-25).[19]

Plaintiff Jason's submission of the false time card constitutes fraud/theft upon the company in direct violation of the Team Member Performance Expectations, which requires all employees to "[c]omplete company records accurately and honestly (including time cards)." (**Exh T**, Team Member Performance Expectations, §E). Indeed, the Team Member Performance Expectations specifically provides:

> **This list is not all inclusive, but serves to highlight minimum performance expectations required to protect the interest of individuals, teams and our business. Each employee infraction will be evaluation according to degree of severity; certain offenses (theft, assault, sale and dispensing of illegal drugs, sabotage, gross misconduct, etc.) could result in immediate termination.**

(**Exh T**, Team Member Performance Expectations) (emphasis in original, underline added). Moreover, Plaintiff Jason admittedly signed his time card for week ending August 10, 2008 stating, "**I certify that the information on this timecard is honest and correct**." (**Exh A**, Jason, pp. 76, 87; **Exh O**, Time Card dated 08/10/08) (emphasis in original, underline added).

Despite the foregoing evidence, Plaintiff Jason testified that he "believes" Defendant Carmeuse terminated his employment due to the cost of health care for his daughter because "that's the only thing [he] could figure." (**Exh A**, Jason, pp. 99, 100). **This, despite the fact that, all of the evidence establishes to the contrary, as testified to by Plaintiff**:

- No one ever told him that he was terminated as a result of the cost of health insurance for Savannah White. (**Exh A**, Jason, p. 104);

---

[19] See Footnote 14, supra.

LIPSON, NEILSON, COLE, SELTZER & GARIN, P.C., 3910 TELEGRAPH RD., SUITE 200, BLOOMFIELD HILLS, MI 48302 (248) 593-5000

- Plaintiff Jason has never heard anyone mention high health care costs as a possibility for the reason Defendant Carmeuse terminated his employment until Plaintiff first thought of it. (**Exh A**, Jason, p. 104);

- No evidence exists that Defendant Carmeuse terminated him for any other reason than for falsification of his time card. (**Exh A**, Jason, pp. 115-16);

- Plaintiff Jason has no recollection of discussing Savannah's medical expenses with anyone at Defendant Carmeuse. (**Exh A**, Jason, p. 104);

- No documents exist establishing high health care costs for his daughter (Savannah White) paid by Defendant Carmeuse. (**Exh A**, Jason, p. 100);

- No one ever discussed with him (at the plant OR corporate level) any of the costs associated with Savannah White's health care expenses. (**Exh A**, Jason, p. 101);

- During his termination meeting, no one mentioned Plaintiff Jason's daughter, or Plaintiff Jason's employee benefits, including medical benefits (with the exception of the availability of COBRA). (**Exh A**, Jason, pp. 98-99);

- Plaintiff Jason has no knowledge as to where Defendant Carmeuse maintains records relative health care expenses of its employees (and/or their dependents), or who has access to any such records. (**Exh A**, Jason, pp. 105-06);

- Plaintiff Jason has no knowledge of anyone else at the Port Inland Plant ever stating they worked on a particular day when in actuality they did not do so. (**Exh A**, Jason, p. 157).[20]

Consistent with this testimony, Manager Mickelson and SOM Himes testified they have never seen any documents related to an employee's health care claims either while employed with Oglebay Norton Company or Defendant Carmuese. (**Exh H**, Mickelson, p. 130; **Exh G**, Himes, pp. 225-26). Similarly, Defendant Carmeuse's VP of Operations Tunnicliffe has no knowledge as to what amount, if any, Defendant Carmeuse (and/or the predecessor owner of the Port Inland Plant) paid for qualified

[20] SOM Himes also testified he has no knowledge (while employed by either Oglebay Norton Company and/or Defendant Carmeuse) of any other employee having submitted a falsified time card requesting payment for hours in which the employee did not work. (**Exh G**, Himes, p. 226).

LIPSON, NEILSON, COLE, SELTZER & GARIN, P.C., 3910 TELEGRAPH RD., SUITE 200, BLOOMFIELD HILLS, MI 48302 (248) 593-5000

health care claims submitted by Carmeuse's employees (as well as their qualified dependents), including Jason White and/or his qualified dependants, if any. Moreover, during the term of Plaintiff Jason's employment with Defendant Carmeuse, no employee at the Port Inland Plant (in Gulliver, Michigan) or Defendant Carmeuse's headquarters (in Pittsburgh, Pennsylvania) had access to any Port Inland Plant's employees' medical claims given their location (at that time) *solely* at Defendant Carmeuse's *former* HR Benefits office located in Cleveland, Ohio. (**Exh X**, Wiley Affidavit, ¶13-14).[21]

Although Plaintiff Jason testified he believed he deserved a "second chance" (**Exh A**, Jason, p. 147), Plaintiff Jason's falsification of his time card, including violation of Defendant Carmeuse's Team Member Performance Expectations, clearly constitutes a legitimate, non-discriminatory reason for terminating Plaintiff Jason's employment for which absolutely no evidence exists to show that this reason was a pretext for retaliation. Brenneman v. Medcentral Health Sys., 366 F.3d 412, 417-18 (6th Cir. 2004). Thus, Plaintiff Jason's claim of "association discrimination" in violation of the ADA is without merit, pursuant to Fed. R. Civ. P. 56.

LIPSON, NEILSON, COLE, SELTZER & GARIN, P.C., 3910 TELEGRAPH RD., SUITE 200, BLOOMFIELD HILLS, MI 48302 (248) 593-5000

**B. SUMMARY JUDGMENT IS APPROPRIATE AS TO PLAINTIFF JASON'S EMPLOYEE RETIREMENT INCOME SECURITY ACT ("ERISA") CLAIM, PURSUANT TO FED. R. CIV. P. 56.**

Next, Plaintiff Jason alleges Defendant violated ERISA by "intentionally terminat[ing] Plaintiff Jason S. White for the purpose of interfering in his family's access to, and right to health care insurance benefits of this ERISA employment benefit plan." (Plaintiffs' Complaint, ¶64).

ERISA, 29 U.S.C. § 1001, et seq., provides, in pertinent part, as follows:

[21] SOM Himes indeed testified he has no knowledge as to where any such information and/or documentation is maintained, either by his former employer, Oglebay Norton Company and/or his current employer, Defendant Carmeuse. (**Exh G**, Himes, p. 226).

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, section 1201 of this title, or the Welfare and Pension Plans Disclosure Act [29 U.S.C.A. § 301 et seq.], or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter, or the Welfare and Pension Plans Disclosure Act. . . . (29 U.S.C. § 1140) (emphasis added).

To state a claim for interference under ERISA, Plaintiff Jason shall prove Defendant Carmeuse's "specific intent to violate ERISA through either direct or circumstantial evidence." Schweitzer v. Teamster Local 100, 413 F.3d 533, 537 (6th Cir. 2005). Direct evidence is defined as "that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." Id. citing Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp., 176 F.3d 921, 926 (6th Cir. 1999). "[D]irect evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice." Schweitzer, supra, citing Johnson v. Kroger Co., 319 F.3d 858, 865 (6th Cir. 2003).

In the absence of any "direct evidence," Plaintiff Jason is required to prove a *prima facie* case of interference by showing: (1) prohibited employer conduct; (2) taken for the purpose of interfering; and (3) with the attainment of any right to which the employer may become entitled. Schweitzer, supra. If Plaintiffs prove a *prima facie* case of interference, the Defendant has the burden of introducing admissible evidence of a "legitimate, nondiscriminatory reason for its challenged action" to rebut the presumption of impermissible action. Humphreys v. Bellaire Corp., 966 F.2d 1037, 1043 (6th Cir. 1992) (citations omitted). If successful, the presumption of wrongful action drops from the case, and Plaintiff Jason must either prove that the interference with Plaintiff Jason's benefits was a

LIPSON, NEILSON, COLE, SELTZER & GARIN, P.C., 3910 TELEGRAPH RD., SUITE 200, BLOOMFIELD HILLS, MI 48302 (248) 593-5000

"motivating factor" in the Defendant's decision or that the Defendant's "proffered reason is unworthy of credence." Id. (citations omitted).

Additionally, Plaintiff Jason also must demonstrate a "causal link" between the decision to terminate his employment and the loss of benefits. Schweitzer, supra. In other words, Plaintiff Jason must present evidence that a reasonable jury could find that the Defendant Carmeuse's intent to avoid payment of Plaintiff Jason's benefits constituted a determining factor in Plaintiff Jason's discharge. Schweitzer, supra; Humphreys, supra at 1044. See also Mattei v. Mattei, 126 F.3d 794, 808 (6th Cir. 1997).

In support of Count II, Plaintiff Jason alleges that Defendant Carmeuse "knew that Plaintiff Jason's dependent child was in need of ongoing health care treatment which would be covered by its health insurance plan, and intentionally interfered in access to the health care insurance provided by Defendant Carmeuse by terminating Plaintiff Jason's employment." (Plaintiffs' Complaint, ¶51). At his deposition, Plaintiff Jason testified that no one ever made the statement to him that Defendant Carmeuse terminated his employment to interfere with the payment of health care insurance. (**Exh A**, Jason, pp. 171-73). Plaintiff Jason believes he heard this statement "somewhere" before; however, he does not know who the individuals are who made the statement(s), or when any alleged statement(s) occurred. (**Exh A**, Jason, pp. 172-73).

Both Manager Mickelson and SOM Himes testified that they had no knowledge that Plaintiff Jason's daughter required medical care on or around the date of Plaintiff's termination in August 2008. (**Exh H**, Mickelson, p. 97; **Exh G**, Himes, p. 171-73). Moreover, Manager Mickelson and SOM Himes also both testified they have never seen any documents related to an employee's health care claims either while employed with Oglebay Norton Company or Defendant Carmuese. (**Exh H**,

LIPSON, NEILSON, COLE, SELTZER & GARIN, P.C., 3910 TELEGRAPH RD., SUITE 200, BLOOMFIELD HILLS, MI 48302 (248) 593-5000

Mickelson, p. 130; **Exh G**, Himes, pp. 225-26). Thus, **Plaintiff is unable to establish a *prima facie* case of "interference" under ERISA where, as here, absolutely no evidence exists to show**: (1) any **prohibited employer conduct** taken for the purpose of interfering with the attainment of any right to which the employer may become entitled, Schweitzer v. Teamster Local 100, 413 F.3d 533, 537 (6th Cir. 2005), or (2) a **causal link between the decision to terminate Plaintiff Jason's employment and the loss of benefits** (i.e., that Defendant Carmeuse's alleged intent to avoid payment of Plaintiff Jason's benefits constituted a determining factor in Plaintiff Jason's discharge), Id.; Humphreys v. Bellaire Corp., 966 F.2d 1037, 1043-44 (6th Cir. 1992); and Mattei v. Mattei, 126 F.3d 794, 808 (6th Cir. 1997).

Additionally, as previously evidenced and argued in Legal Analysis, Section A(2) (above), **Plaintiff Jason's falsification of his time card, including violation of Defendant Carmeuse's Team Member Performance Expectations, clearly constitutes a legitimate, non-discriminatory reason for terminating Plaintiff Jason's employment** for which absolutely **no evidence exists** to show *either* (1) **the alleged interference with Plaintiff Jason's benefits was a "motivating factor" in the Defendant Carmeuse's decision**, or (2) Defendant Carmeuse's "**proffered reason is unworthy of credence**." Humphreys, supra at 1043. Thus, Plaintiff Jason's ERISA claim is without merit, pursuant to Fed. R. Civ. P. 56.

## C. SUMMARY JUDGMENT IS APPROPRIATE AS TO PLAINTIFF AMY'S CLAIM FOR LOSS OF CONSORTIUM, PURSUANT TO FED. R. CIV. P. 56.

Finally, Plaintiff Amy alleges a derivative claim for loss of consortium (i.e., loss of marital companionship, society and services of her husband, Plaintiff Jason) due to the "adverse employment actions" of the Defendant. (Plaintiffs' Complaint, ¶69). Specifically, Plaintiff Amy alleges that she has "suffered loss of consortium, i.e., marital companionship, society and services with her husband,

LIPSON, NEILSON, COLE, SELTZER & GARIN, P.C., 3910 TELEGRAPH RD., SUITE 200, BLOOMFIELD HILLS, MI 48302 (248) 593-5000

Jason S. White due to the adverse employment actions of Defendant as enumerated above, **under the ADA** . . . ." (Plaintiffs' Complaint, ¶69) (emphasis added).[22]

**It is well settled that "[a] derivative claim for loss of consortium stands or falls on the primary claims in the complaint**." Cole v. Knoll, Inc., 984 F. Supp 1117, 1136 (W.D. Mich. 1997), citing Long v. Chelsea Community Hosp., 219 Mich. App. 578, 557 N.W.2d 157 (1996) (emphasis added). See also, Wixson v. Dowagiac Nursing Home, 866 F. Supp. 1047, 1058 (W.D. Mich. 1994); Loper v. Computer Network Technology Corp., 128 F. Supp. 2d 1061, 1069 (E.D. Mich. 2001); Kohler v. North Star Steel Co., Inc., 408 F. Supp 2d 380, 386-87 (E.D. Mich. 2005); and Hamlin v. Flint Twp., 942 F. Supp. 1129, 1132n2 (E.D. Mich. 1996).

As evidenced herein, summary judgment is appropriate as to Plaintiff Jason's ADA claim against Defendant Carmeuse, pursuant to Fed. R. Civ. P. 56, where as here: (1) Plaintiff Jason cannot establish a *prima facie* case of "Association Discrimination" under the ADA against Defendant Carmeuse; and (2) even assuming Plaintiff Jason established a *prima facie* case of "association discrimination", Defendant Carmeuse articulated a legitimate, non-discriminatory reason for termination (i.e., Plaintiff Jason admittedly falsified his time cards for payment by the Defendant). Because Plaintiff Jason's claim for violation of the ADA by Defendant Carmeuse compels dismissal, Plaintiff Amy's claim for loss of consortium arising out of Plaintiff Jason's ADA claim compels dismissal as well, pursuant to Fed. R. Civ. P. 56.

LIPSON, NEILSON, COLE, SELTZER & GARIN, P.C., 3910 TELEGRAPH RD., SUITE 200, BLOOMFIELD HILLS, MI 48302 (248) 593-5000

---

[22] Although Plaintiff Amy's claim originally also sought damages from Defendant Carmeuse arising out of Defendant Carmeuse's alleged violation of ERISA (under Count III), on April 20, 2010, the Court entered a Stipulated Order *amending* Plaintiffs' Complaint to strike any and all allegations in Count III (Loss of Consortium) seeking damages by Plaintiff Amy for loss of consortium arising out of Count II (Violation of ERISA) given that these allegations are preempted by ERISA. See, Cromwell v. Equicor-Equitable HCA Corp., 944 F.2d 1272, 1275-76 (6th Cir. 1991); 29 U.S.C. §1144(a) and 29 U.S.C. §1004(a). (Order dated 04/20/10).

## V. RELIEF REQUESTED

WHEREFORE, Defendant O-N MINERALS (MICHIGAN) COMPANY d/b/a CARMEUSE LIME & STONE ("Carmeuse") respectfully requests that this Honorable Court enter an Order granting Defendant Carmeuse's Motion for Summary Judgment, Pursuant to Fed. R. Civ. P. 56.

Respectfully submitted,

By: s/ Kirsten E. Gramzow
Lipson, Neilson, Cole, Seltzer & Garin, P.C.
Attorneys for Defendant
3910 Telegraph Road, Suite 200
Bloomfield Hills, MI 48302
(248) 593-5000
kgramzow@lipsonneilson.com
P52134

Dated: December 8, 2010.

LIPSON, NEILSON, COLE, SELTZER & GARIN, P.C., 3910 TELEGRAPH RD., SUITE 200, BLOOMFIELD HILLS, MI 48302 (248) 593-5000

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN - NORTHERN DIVISION

JASON S. WHITE and AMY WHITE,

Plaintiffs,

v.

Case No. 2:09-cv 265
Hon. R. Allan Edgar

O-N MINERALS (MICHIGAN) COMPANY d/b/a CARMEUSE LIME & STONE,

Defendant.

---

EARDLEY LAW OFFICES, P.C.
EUGENIE B. EARDLEY (P48615)
Attorneys for Plaintiffs
P.O. Box 830
Cannonsburg, MI 49317
(616) 874-2647

LIPSON, NEILSON, COLE, SELTZER & GARIN, P.C.
BY: JOSEPH A. STARR (P47253)
KIRSTEN E. GRAMZOW (P52134)
Attorneys for Defendant
3910 Telegraph Road, Suite 200
Bloomfield Hills, Michigan 48302
(248) 593-5000

---

## CERTIFICATE OF SERVICE

The undersigned says that she has caused to be served a copy of the following documents in the above captioned matter with the Clerk of the Court using the electronic filing system which will send notification of such filing to the following:

DOCUMENTS: Defendant's Motion for Summary Judgment, Pursuant to Fed. R. Civ. P. 56, Brief in Support (including attached exhibits), and this Certificate of Service

DATE: December 8, 2010

TO: Eugenie B. Eardley
Eardley Law Offices, P.C.
P.O. Box 830
Cannonsburg, MI 49317
genieb@eardleylaw.com

I declare that the above statements are true and correct to the best of my knowledge, information and belief.

s/ Yolunder Amos
Yolunder Amos

BH232004.WPD

LIPSON, NEILSON, COLE, SELTZER & GARIN, P.C., 3910 TELEGRAPH RD., SUITE 200, BLOOMFIELD HILLS, MI 48302 (248) 593-5000

EXHIBIT "A"

ORIGINAL

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JASON S. WHITE and AMY WHITE,

Plaintiffs,

-vs-

Case No. 2:09-cv 265

Hon. R. Allan Edgar

O-N MINERALS (MICHIGAN) COMPANY
d/b/a CARMEUSE LIME & STONE,

Defendant.

_______________________________/.

DEPOSITION OF JASON STEVEN WHITE

Taken by the Defendant on the 30th day of September, 2010, at the Comfort Inn, 617 East Lakeshore Drive, Manistique, Michigan, at 9:38 a.m.

HUDSON REPORTING & VIDEO 1-800-310-1769

education?

A. Uh-huh. Yes.

MS. EARDLEY: There you go. Try to stick with yes and no.

BY MS. GRAMZOW:

Q. And after you finished high school, you spent two years, '94 to '96, at Bay de Noc Community College as you've just described?

A. Yes.

Q. Okay. What year were you born?

A. 1975.

Q. And your birth date?

A. 10/6 of '75. October 6th.

Q. And your address? Do you still live at 1656 North Beckman Road, Manistique, Michigan?

A. Yes.

Q. 49854?

A. Yep.

Q. Okay. Are you married, Mr. White?

A. Yes.

Q. Okay. To whom?

A. Amy White.

Q. And what year were you married?

MS. EARDLEY: This is always the hardest question, believe it or not.

MS. GRAMZOW: It is.

THE WITNESS: Oh, boy.

MS. EARDLEY: And you can't intervene.

MS. GRAMZOW: Yes. No. That's right.

THE WITNESS: I believe it was '07.

BY MS. GRAMZOW:

Q. Do you remember the date?

A. March 13th.

Q. Okay. And do you have any children, Mr. White?

A. Yes, I do.

Q. How many children?

A. Two of my own and three -- and one stepdaughter.

Q. And the two of your own, do you know their birth dates?

A. Yes.

Q. They are?

A. May 6th of '09.

Q. And that person's name is?

A. Jayda.

Q. Could you spell that for the record?

A. J-A-Y-D-A.

Q. Last name is White?

A. Yes.

Q. And your other child?

A. Savannah White.

Q. And the birth date, please?

A. 8/12 of '04.
Q. And your stepdaughter or stepson?
A. Alexandra Lakosky.
Q. Could you spell that for the record, please?
A. L-A-K-O-S-K-Y.
Q. And the -- the date of birth for Ms. -- for Alexandra?
A. Be 4/7 of '01.
Q. Okay. Have you ever been known by any other name?
A. (Witness shaking head.)
Q. Is that a "no"?
A. No.
Q. Did you -- have you kept any notes with regard to the allegations in your complaint at any time, handwritten or typewritten?
A. Just what Genie has.
Q. Okay. I'm not asking you, also, anything regarding what Genie's asked for, what you've spoken about, nothing --
MS. EARDLEY: Yeah. That would be privileged if it's just between us. But if she's asking about handwritten documents that you've given to me that we've turned over, --
MS. GRAMZOW: Right. Things that she --
MS. EARDLEY: -- that's what she's talking about.
THE WITNESS: Yeah. I've -- I have nothing.
BY MS. GRAMZOW:
Q. Okay. Do you have any audiotapes regarding the allegations



A. I won my case.

Q. You settled with the party, or the judge or jury made a ruling?

A. Judge made a ruling.

Q. Okay. I assume then -- was there any other case that you've either sued or been sued?

A. Uh-uh. No.

MS. EARDLEY: That was a "no"?

MS. GRAMZOW: No? You have to say --

MS. EARDLEY: No other case? You just kind of shook your head.

THE WITNESS: Yeah. Right. No. I meant to say no. I'm sorry.

BY MS. GRAMZOW:

Q. That's quite all right. Outside of the proceeding against Mr. Schwabach, have you -- and I'm sure I'm murdering that name -- have you ever testified in a court proceeding?

A. No.

Q. Okay. And I guess I assumed that, but -- I assume -- did you testify in Mr. -- in the Schwabach case?

A. Yes.

Q. Okay. What is Port Inland Port?

A. Port Inland Port?

Q. Or, I'm sorry, Port Inland plant.

A. What is the plant?



Q. Yeah. What is it?
A. It's a limestone plant.
Q. Okay. And is that the location where you've been previously employed?
A. Uh-huh.
MS. EARDLEY: That was a "yes"?
THE WITNESS: Yes.
MS. EARDLEY: We'll get you trained.
BY MS. GRAMZOW:
Q. By the time you go home, you will never do this to your wife. You will always say yes and no.
Okay. And what type of business is done, if you know, at the Port Inland plant?
A. They make big rocks into little rocks, ship them on a conveyor and -- over top of tunnels by size and ship them out onto ore boats.
Q. Boats meaning freighters on the Great Lakes?
A. Yes.
Q. Okay. And where is the Port Inland plant located?
A. Gulliver, Michigan.
Q. When did you first start working at the Port Inland plant, if you recall?
A. Full-time?
Q. Anytime.
A. Okay.



MS. EARDLEY: She means ever.

THE WITNESS: I believe I worked there in '95 as college help, and also '96 as college help.

BY MS. GRAMZOW:

Q. Okay.

A. And then I got hired on -- yeah. It was five interviews, and I got hired on in '02 full-time.

Q. As a college student, were you part-time then?

A. Yes.

Q. Okay. And was it part of school or is this a paid job?

A. It was a paid job.

Q. Okay. And you said there were five interviews. Do you recall who you interviewed with?

A. Oh, boy. No. I -- there were so many people in there at the time, five different people in there.

Q. For each interview?

A. Yeah.

Q. Okay. No problem. And when did you become full-time, then, at the Port Inland plant, if you recall? Would it have been '97, then, or . . .

A. July of '02.

Q. Oh, I'm sorry. You did say '02. I apologize. Okay. Do you know who owned or operated the plant -- and I'm going to continue, just because it's easier, instead of saying the Port Inland plant, --



A. Uh-huh.
Q. -- I'm just going to say the plant and -- for the rest of the deposition if that's okay with counsel as well. Can you tell me who owned or operated the plant when you were a college student in '95 you said?
MS. EARDLEY: If you know, obviously.
THE WITNESS: No.
BY MS. GRAMZOW:
Q. Okay. Do you know who owned it in '96 when you came back?
A. No.
Q. Do you know who owned or operated it when you became a full-time employee in July of '02?
A. Oglebay Norton.
Q. Oglebay.
A. There were so many different -- it's changed names so many times I had a hard time keeping up.
Q. Okay. And when you say "so many times," is that between July of 2002 when you became full-time and the time of your termination in August of 2008?
A. No. Between -- before that.
Q. Okay. What --
A. Before I got hired full-time.
Q. Oh, it changed names many times before July of '02?
A. Yes.
Q. I understand. Okay. Did the -- did the plant change

     Port Inland plant?

A. I was -- I worked at the boat end. Laborer I guess you would call it, helping out, filling in.

Q. Okay. What would you do at the boat -- in the boat end department specifically?

A. Clean, hose tunnels. When they needed me, I'd load a boat, help load boats. Lower chutes.

Q. Can you explain to us what a tunnel is?

A. Yeah. It's an underground -- it's a tunnel that goes underground and you have stone above you with a bunch of chutes and a conveyor system going through.

Q. Okay. Where do the tunnels lead?

A. There's tunnels going -- there's six of them going north and south, and there's one main one going down and then you'll hit -- I mean, out to -- a tail end.

Q. What's at the end is what I'm --

A. Daylight.

Q. Daylight?

A. Yeah. You can get --

Q. It's just dumped onto the ground?

A. No. The end of the tunnel?

Q. Uh-huh.

A. No. You -- the inside of the tunnel, the conveyor will end and then there's a door at the end of the tunnel.

Q. Okay. What's on the other side of the door?

A. Stone.
Q. Okay. So you -- you cleaned the tunnel that carried the stone to -- on end where there's just stone, is that what . . .
A. Yeah. The conveyor would lead out to where -- to where the boat's going, to -- out onto the boat.
Q. Okay. So the -- the beginning is the stone and the end is the boat?
A. Right.
Q. Okay. Thank you. I'm just trying to make sure I understand what you were doing. And is -- was that the -- is that essentially what your job was in '95 and '96 as college help?
A. In '95, I believe, yes, it was. And it was cleaning up, filling in, that kind of stuff, yes.
Q. Okay. And when you became a part-time -- or excuse me. Strike that -- a full-time employee in July of 2002, --
A. Uh-huh.
Q. -- did you have the same job?
A. Yes.
Q. Okay. What was your title, by the way, if you had one?
A. Boat end laborer.
Q. Okay. And did you have any added responsibilities when you became a full-time employee in July of 2002 for Oglebay Norton?



A. I then became -- yes. Had to start running equipment, heavy equipment. I was -- there was Star Teams, you know, safety. I was on safety.

Q. What is a Star Team?

A. There's like -- I believe there was five stars. One was a rep. Star rep was a -- I was safety. Then another guy would have been cost off the team, another guy would have been HR.

Q. Human resources?

A. Yes.

Q. Okay.

A. And production.

Q. I must be missing one. I have safety, cost, HR, production. You said there's five?

A. Yes. Quality.

Q. Quality. Okay. And what is the -- it's called a five-star team?

A. Uh-huh.

Q. What did the --

MS. EARDLEY: That was a "yes"?

THE WITNESS: Yes.

BY MS. GRAMZOW:

Q. What did the five-star team have to do with your responsibilities? Were you a member of the five-star team?

A. Yes. I was on safety.

Q. From 2002 to 2008?
A. Not -- from 2002 to -- for I think two or three years I was on safety.
Q. Is this something where you changed over time, you --
A. Yes.
Q. -- maybe --
A. Supposed to.
Q. Okay. So you -- is it possi -- did you work, then, on all of the five sections?
A. No, I didn't.
Q. Okay. Which sections did you work on over the years, do you recall?
A. Safety and quality.
Q. Do you remember when you worked on the quality Star Team?
A. No.
Q. Okay. Did you have any other responsibilities while you worked as a -- between 2002 and 2008 at the Port Inland plant besides what you've described here today?
A. To keep a safe -- safe work environment.
Q. Okay. So you said you -- you loaded the freighters, you cleaned the tunnels, you kept a safe environment and you participated on these two separate sections of the five-star team?
A. Yes.
Q. Okay. Does that accurate --

A. Also ran heavy equipment.
Q. Okay.
A. And there was other plants that we filled in for when we were slow at the boat end. We would be -- have to go to the dolomite, which is a primary and secondary crushing system.
Q. Crushing system for the -- for the rocks?
A. Yes.
Q. Okay. Which is different from the boat end, which essentially loads all of the freighters?
A. Right.
Q. Okay. And when you say plant, the dolomite plant, do you actually -- you mean the dolomite department or is it actually a completely separate plant?
A. It's a different department.
Q. Okay. It's still in the Port Inland plant?
A. Yes.
Q. Okay. Do you recall at any point working for a company called Michigan Limestone Operations, Inc., while at the plant?
A. Yes.
Q. Do you -- do you remember at what point you were employed for Michigan Limestone Operations?
A. No.
Q. Okay. Were they before Carmeuse Lime & Stone? I assume --
A. Yes.

Mr. Inman before working at the plant?

A. No.

Q. Okay. Did you work for anyone else simultaneously, at the same time, as when you were working at the plant?

A. I don't remember.

Q. Okay. Do you recall when you were first notified that Carmeuse Lime & Stone acquired the Port Inland plant, when you were first notified?

A. I believe so. Yes.

Q. Okay. And when was that?

A. That was in '08; beginning of '08, I believe; the season of '08.

Q. Do you remember how you were informed?

A. Guys talking in the lunchroom, I believe.

Q. Do you remember who those guys were?

A. No.

MS. GRAMZOW: I'll mark this Deposition Exhibit 2. I'm going to hand this to you and give you an extra for your attorney. There you go.

(Deposition Exhibit Number 2 was marked for identification at 10:07 a.m.)

BY MS. GRAMZOW:

Q. I'll give you a second to take a look at that. And if you could let me know once you're ready, I'll ask you a couple of questions about it.

A. (Witness reviewing document.) (Witness nodding head.)
Q. Yes?
A. Yes.
Q. You're good to go?
A. Yes.
Q. Okay. Have you seen this document before?
A. I believe so. Yes.
Q. Okay. And just for the record, it's -- it's got Carmeuse North America, Carmeuse at the top, dated February 13th, 2008, and it's signed by a Tom Buck, Chief Executive Officer, Carmeuse Lime & Stone. Do you know who Mr. Buck is?
A. No, I don't.
Q. Have you ever seen his name before?
A. Yes.
Q. Okay. Where have you seen his name?
A. On papers at -- at work while I worked.
Q. Okay. Anything -- can you name anything in particular that you saw his name on?
A. No.
Q. Okay. And where do you think you saw this letter before?
A. In my lunchroom.
Q. And when you say "in your lunchroom," where -- where exactly? Was it posted?
A. Yeah. At the boat end.

Q. And is there someplace in the lunchroom where information is posted for employees?
A. Yes. There's a couple bulletins.
Q. Okay. And is this a lunchroom just for the boat end department or is this for other departments?
A. Just for the boat end department.
Q. Okay. And who, if you know, who posts information on the bulletin board?
A. Usually Mr. Mickelson.
Q. Okay. And who is Mr. Mickelson?
A. Or Rhonda Schneider (pointing).
Q. You're pointing to the gentleman to my right?
A. Yep.
Q. And who is Mr. Mickelson to you at Carmeuse Lime & Stone?
A. He was my boat end supervisor.
Q. Okay. How long was he your supervisor?
A. Probably four of the six years.
Q. Would that be --
A. Possibly five because I crossed-trained a couple times to a different department.
Q. I'm sorry, you crossed . . .
A. Crossed-trained to a different department a couple times to the dolomite.
Q. Okay. Was Mr. Mickelson your supervisor at the boat end department as well as the dolomite department?

take a look at. Do you know if this was posted anywhere outside -- outside of your boat end department lunchroom?

A. I don't know.

Q. Okay. If you look in the last paragraph there, where it indicates that membership -- members of our leadership team and I will be making a scheduled trip to all newly acquired Oglebay sites, a team of CNA, Carmeuse North America, representatives will follow to conduct "Meet and Greet" sessions with you. We'll stop -- we'll start in Cleveland, and it continues that they're tentatively scheduled to visit Cleveland in February, end of February. But it looks like the whole schedule is not yet established, but be assured we'll make each site visit as soon as we can. Do you see that?

A. Yes.

Q. And I paraphrased a little bit. That wasn't an exact quote. Do you recall when -- if and when anyone visited from Carmeuse Lime & Stone?

A. I remember them being there. Never met them in person. And, again, I -- I may have had a day off or I could have been in Green Bay with my daughter when they showed up.

Q. Okay. Do you remember if it was in -- if this letter is dated February 13th, do you recall whether or not it was in February or that it was in March, or later?

A. I don't recall.

 Q. Okay. Was this letter your first indication that Carmeuse Lime & Stone had acquired the Port Inland plant?
A. I had heard previously that they were very interested in it, but this is probably the first time it was on paper that I seen that.
Q. Your first formal notification?
A. Yeah.
Q. Okay. And when you said you heard that they were interested in buying the plant, do you recall who you heard that from?
A. Just guys that I work with talking about it.
Q. Okay. Does this refresh your recollection, then, as to when you became a Carmeuse employee? Would it have been around this time, in February/March of '08?
A. I -- yeah. Yes.
Q. Thank you. Yes, that is correct?
A. (Witness nodding head.)
Q. February/March '08?
A. Yeah. Yes.
Q. Yes. Okay. I wasn't sure if you were answering yes to that. Okay. What else is posted in the lunchroom for the boat end department; what other materials, if you recall?
A. Vacations.
Q. For the boat end department's --
A. Yes.
Q. -- employees?

BY MS. GRAMZOW:

Q. And how do you know someone was there?

A. I heard through the guys talking in the lunchroom that somebody was going to be there from them.

Q. Okay. Can you think of any names that you heard that came from the corporate office?

A. No.

Q. All right. Did you receive -- do you recall what your -- we'll start right from your -- 2002, when you became a full-time employee, do you recall what you -- your initial wages were at the Port Inland plant?

A. I believe I started out at fourteen something; fourteen sixty-two.

Q. Okay. And did you receive any increases to that wage over the years?

A. Yes.

Q. Okay. Do you recall how often?

(Mrs. Amy White exited the deposition room.)

A. Once I got out of my -- what do you call that -- there's a 90-day thing, I believe it was. A tri -- or not trial, but . . .

Q. Probationary period?

A. Probationary period. And then after that, I received a little bit more. I don't know how much. And then yearly we would get so much.

Q. You would receive an annual increase --
A. Yeah.
Q. -- each year? Okay.
A. Normally.
Q. Okay. Do you recall any year when you did not receive a wage increase with the employers prior to Carmeuse?
A. I don't recall.
Q. Okay. Do you recall whether or not you received a wage increase after Carmeuse became your employer?
A. No.

MS. GRAMZOW: Okay. I'm going to mark this as Deposition Exhibit 3 and I'm going to give you one for you and as well as your attorney. If you could hand that to her and take a look at this.

(Deposition Exhibit Number 3 was marked for identification at 10:20 a.m.)

BY MS. GRAMZOW:
Q. This is titled "Status Change Form." You'll see at the top it has an effective date of 3/3. And at the bottom it looks like there's a date as well, the same date, 3/3/08. Do you see that, Mr. White?
A. 3/3 of '08?
Q. Yes. Do you see those two dates at the top and the bottom?
A. Yes.
Q. Okay. Have you seen this document before?

A. No.
Q. Okay. It's -- if you look in the current information section for salary, it says twenty forty, $20.40, and then right next to it it shows proposed information, an increase in salary from $21.02. Do you see that?
A. Yes.
(Mrs. Amy White reentered the deposition room.)
Q. Okay. Does -- does that number refresh your recollection as to the amount of money you were paid when you worked for Carmeuse Lime & Stone?
A. Yes.
Q. Okay. And does this refresh your recollection, then, as to whether or not you received a pay increase when you worked for Carmeuse Lime & Stone?
A. Can you rephrase that?
Q. Sure. Just a moment ago you said you weren't sure if you received any wage increases when you worked for Carmeuse?
THE WITNESS: Uh-huh.
MS. EARDLEY: That was a "yes"?
THE WITNESS: Yes.
BY MS. GRAMZOW:
Q. Does looking at this document now, does this make you recall whether or not you did receive one from Carmeuse Lime & Stone, given the date on this document?
A. It says "O-N." Yes.

Q. It does refresh your recollection?
A. (Witness nodding head.)
Q. Okay. So is that a "yes," you do believe you received a wage increase with Carmeuse in March of '08?
A. Yes.
Q. Okay. Was this your last rate of pay when you -- before your termination in August of '08?
MS. EARDLEY: When you say "this," you're referring to --
MS. GRAMZOW: The twenty-one oh two. Thank you, Eugenie.
THE WITNESS: Yes.
BY MS. GRAMZOW:
Q. It was. Okay. One more question, Mr. White, on that document, Exhibit 3. Did you routinely -- when you received annual wage increases, were they at the same time each year typically?
A. Typically.
Q. Okay. Does this March of '08, does that sound around the same time that you would have received your wage increases from the prior employers?
A. Yes.
MS. GRAMZOW: Okay. Thank you. I'm going to show you a document, which I'm going to mark as Deposition Exhibit 4. And, again, if you can provide this copy to your

your filled out final time sheet for them to take into the office on Monday.

Q. Okay. So each boat end department employee had their own slot?

A. Correct.

Q. And so when you completed your -- and I apologize. I did use clock, but I meant card. So when you completed your time card you would stick yours into your mailbox slot?

A. Yes.

Q. Okay. There wasn't one slot for all of the time cards?

A. No. Every -- each person had their own slot, and they got mixed up a lot or -- you know, because they're only slots that big, that far (indicating).

MS. EARDLEY: When you say -- about two inches with your fingers?

THE WITNESS: Yeah. At that -- two inches at the most.

BY MS. GRAMZOW:

Q. Okay. And when -- when would you complete -- when -- and I'm speaking only of the time period when you worked for Carmeuse in 2008. When would you complete your time cards? What was Carmeuse's requirements?

A. Normally it was at the end of your shift, but there was times where it went a day or two beyond.

Q. Okay. Was there a drop-dead date where you had to have



your -- your time card completed?
A. Yes.
Q. And when was that?
A. Sunday.
Q. Sunday nights?
A. Sunday night.
Q. Okay.
A. Or Monday morning.
Q. And am I to understand, then, that the time cards are completed weekly?
A. Yes.
Q. Okay. So on either Sunday night or Monday mornings you would put your last time information into your mailbox?
A. Correct.
Q. Okay. Do you know how they were collected, these -- these time cards?
A. Somebody from the team would -- usually the cost rep would grab -- grab the stack that were on top and look through them to make sure there was no mistakes and then hand them in to the office.
Q. And when you say "cost rep," do you -- do you mean cost representative?
A. Yes.
Q. And would that be the boat end department's cost representative to the cost team on the Star Team?





 A. Correct.
Q. I know that was a compound question. I don't know how to break that down. Okay. So do you remember who the cost rep was during the time period in 2008 when you worked for Carmeuse?
A. I think it was Mike Burkholder and John Chandler.
Q. So there were two representatives from the boat end department to the cost team?
A. Yeah. From each team.
Q. When you say "from each team," what do you mean?
A. The other team, the other shift, I guess, had two also, and I believe they were Billy Parrish and Greg Turan.
Q. Okay. So there were two shifts for the boat end department?
A. Yes.
Q. Okay. When was the first shift typically scheduled? And we'll -- I'm -- we'll still stick with towards the end of your employment just -- unless it's changed.
MS. EARDLEY: 2008.
BY MS. GRAMZOW:
Q. 2008. If there's a difference, you can let me know, but I'm sticking with 2008.
A. Okay. Can you repeat the question, please?
Q. Sure. What was -- what's the difference in the shifts, first shift and second shift, the times?
A. 7:00 a.m. to 7:00 p.m.; 7:00 p.m. to 7:00 a.m., unless there

was no boat or nothing else going on.
Q. No work, you mean?
A. Right.
Q. Okay. And which shift did Mr. Burkholder and Mr. Chandler work on?
A. My shift.
Q. Which was?
A. Whatever shift I was on at the time.
Q. Oh, I see. So --
A. We rotated shifts.
Q. Okay. So there wasn't a standard first shift and second shift?
A. Right.
Q. The same people every time?
A. Right.
Q. Okay. So sometimes you'd work the morning shift, sometimes you'd work the evening?
A. Yes.
Q. Okay. And when you testified a moment ago that the cost reps would look for mistakes on the time cards, how do you know that that was their responsibility?
A. If I remember correctly, there was a memo out on them, and I remember being at the dolomite where Lisa Hendrickson had to do it. She had to go through -- she was a coworker, and she happened to be on cost and she was going through everybody's

shift?

A. Yes.

Q. Okay. And what other mistakes were they supposed to look for?

MS. EARDLEY: You already said any mistakes. She wants you to detail any and all possible mistakes.

THE WITNESS: Any and all possible mistakes. If you were there and you weren't there, or vice versa, if you weren't there and you were there.

BY MS. GRAMZOW:

Q. Okay. Can you return to looking at Exhibit 4, that last page, CA01189? And did you have time to read that or did you want to look at it again?

A. I'll look at it again.

Q. Okay.

A. (Witness reviewing document.)

Q. Okay. And I understand earlier I had asked you whether or not you recall receiving this document, and I believe you said you didn't know.

A. I don't know.

Q. Okay. Were you aware of these performance expectations while you were employed by Carmeuse in 2008, even if you didn't -- don't recall seeing this actual document?

A. Some of them.

Q. Okay. Was there anything listed on this document that you

don't recall having seen or heard about while working for Carmeuse, that it was expected of you?

A. Under "DI," I don't remember that.

Q. DI. "I" says, "Do not record unexcused absences as vacation days"?

A. Right.

Q. Okay. You don't recall having heard or seeing that before?

A. No.

Q. All right. Anything else that you don't recall seeing or hearing before as a performance expectation for -- while working for Carmeuse?

A. No. That's it.

Q. Okay. So you were aware, then, under -- where it says, "E. Complete company records accurately and honestly (including time cards)," you were aware that Carmeuse expected that of you?

A. Yes.

Q. Okay. Did you have any -- outside of D1 that we mentioned earlier that you said you don't recall ever been having told about, did you have a problem with any of these performance expectations?

A. No.

Q. Okay. Do you see at the bottom the bolded information?

A. (Witness reviewing document.) (Witness nodding head.)

Q. Okay.

MS. EARDLEY: That was a "yes"?

THE WITNESS: Yes.

MS. EARDLEY: You just read it?

THE WITNESS: Yes.

BY MS. GRAMZOW:

Q. Okay. And you see there where it says that certain offenses, including theft, assault, sale and dispensing of illegal drugs, sabotage, gross misconduct, et cetera, could result in immediate termination?

A. Yes.

Q. Okay. And you understood that, that that's a possibility when you worked for Carmeuse?

A. Yes.

MS. GRAMZOW: Okay. I'm going to mark, as Deposition Exhibit Number 5, a document labeled "Carmeuse Lime & Stone, Boat End Time Card, week ending 5/18/08." One for your attorney, please.

(Deposition Exhibit Number 5 was marked for identification at 10:46 a.m.)

BY MS. GRAMZOW:

Q. Have you seen this document before?

A. Yes.

Q. Okay. And when did you see this?

A. The day they fired me.

Q. The day that Carmeuse fired you?

 BY MS. GRAMZOW:

Q. Okay.

A. Or, I'm sorry, be four, four of us.

Q. Normally four?

A. Yes.

Q. Okay. And you could be plus or minus depending upon workload?

A. Yes.

Q. Okay. And would typically those four individuals -- and, again, I'm just talking about the boat end, your shift that you worked --

A. Uh-huh.

Q. -- for Carmeuse. Did everyone, those four individuals, did they start at the same time and end at the same time?

A. Not always.

Q. Okay. In what situations would they not start and end at the same time?

A. If somebody had a basketball game where their kids -- they would come in a little later. If --

Q. So let me just stop you right there. So you're referring in that situation they might be an hour late?

A. Maybe.

Q. Okay.

A. Yeah.

Q. Anything more or less than that?

A. I don't remember.
Q. All right.
A. As far as that night, if there are certain people who like to sit around and get paid until 7 o'clock in the morning, they'd stick their 12 hours in. The rest do whatever they had to do and some people would leave.
Q. I -- I guess I don't understand. First, are you saying that you would typi -- typically be scheduled a 12-hour shift?
A. You're always scheduled 12.
Q. Are there circumstances when you would not be scheduled 12?
A. Yeah. If the budget -- it worked around the budget, I guess. I'm -- that's the way I gathered it from . . .
Q. Okay. Now, what did you mean a moment ago when you said some people would stick around until 12?
A. Some people would stick around for their 12-hour shift.
Q. Whether they were working or not?
A. Yes.
Q. So, for instance, you have four people on your shift, three people would go home and one person would stay there?
A. That's happened. Mostly it's two and two, or one would go home and three would stay.
Q. And why would they do that?
A. I don't know.
Q. Well, does Carmeuse permit you to do that?
A. To do what?

Q. Okay. Mr. White, let me show you what's being marked as deposition -- what's been marked as Deposition Exhibit Number 8. I'll hand you a copy for your attorney, as well. Have you seen this document before?
A. Yes.
Q. And what is it?
A. It's a time card.
Q. Okay. For the record, it says "Carmeuse Lime & Stone, Boat End Time Card, Week Ending 8/10/08." Is that your handwritten name at the top, "Jason White"?
A. Yes.
Q. Okay. And at the bottom, do you see there's a signature?
A. Yes.
Q. Is that your signature at the bottom?
A. It looks to be.
Q. Okay. Will you please take a look at this document and let me know if anything seems inaccurate on it?
A. (Witness reviewing document.) No. Nothing.
Q. Okay. Mr. White, I understand from the allegations in your complaint that you have a daughter who has suffered from leukemia?
A. Yes.
Q. Okay. And which daughter is that?
A. Savannah.
Q. Okay. And when was Savannah diagnosed with leukemia?

A. Seventeen months old.
Q. I also understand from your complaint that she is in remission?
A. Yes.
Q. And is she still today?
A. Yes.
Q. Very happy to hear that. Do you recall the week of 8/10/08 at Carmeuse or in your personal life?
A. In my personal life, some.
Q. Okay. What do you recall from the week of August 10th, 2008?
A. I believe it would be Thursday, we had to go see -- I'm not good with doctors' names -- a guy in Green Bay about my daughter's Port-A-Cath got splintered off into her lungs.
Q. And you said in Green Bay?
A. Yes.
Q. Is that Wisconsin?
A. Yes.
Q. Okay.
A. And that's as accurate as I can be on the date. I'm positive it was Thursday.
Q. Okay.
A. Because it's the week end 10th, right? 10th, 9th, 8th. I believe it would be 7th.
Q. Okay.

terminated with Carmeuse. Do you recall when that was?

A. August 25th.

Q. Can you tell me what happened that day?

A. Mr. Mickelson had called one of the guys to tell me to come up and see him, so I went up to see him, and I opened the door. He was carrying his lunch or whatever. And he said, "I told you 1 o'clock." Well, they never told me 1 o'clock. So I went back down to the lunchroom, and we were loading a boat.

Q. Can I stop you right here so I can clarify one thing? You said one of the guys told you?

A. Yes.

Q. Do you know who that guy was?

A. I don't recall.

Q. Okay. But someone told you that Mr. Mickelson wanted to see you?

A. Yes.

Q. Okay. Thank you. I'm sorry. Go ahead.

A. So I waited until 1 o'clock, went back up there. Him and Rhonda Schneider -- Dave, Rhonda Schneider brought me back into Jeff Himan's office and questioned me about this time card.

Q. When you say "this time card," are you referring to Exhibit --

A. Exhibit -- yeah. Exhibit 8.

Q. Exhibit 8?

A. Yes.

Q. Okay.

A. Saying I falsified a document, and I don't know how or where or what day. I -- I still don't understand it, if I made a mistake or what. I had to make a mistake. If -- otherwise I worked it. And they're saying they -- I didn't -- Jeff was mostly doing all the talking. And I begged them for my job, said I can't lose my job. I never -- you know, they've never had anything in my file, and I offered up a week's pay, I offered up a day's pay, I offered up anything and they weren't falling for it. They -- they wouldn't take anything from me. They just said, "I'm sorry, this is the way it's got to be," in a roundabout way.

And I said, "Well, for one, I know that guy right there, Dave Mickelson, has never liked me." And he just kind of looked at me.

And Jeff said, "Well, it has nothing to do with anybody liking anybody." And I figured right there -- in fact, I know it's got to be because of my daughter's illness as I was being escorted out of the place.

MS. EARDLEY: Okay. Why don't you wait for a question.

BY MS. GRAMZOW:

Q. Was there anyone else present besides those three

individuals you just mentioned: Mr. Himes, Mr. Mickelson and Mrs. Schneider?

A. In the office?

Q. During this meeting.

A. No.

Q. Do you know who Mr. Himes is?

A. Yes.

Q. What -- what is his title, if you know it, at that time?

A. Plant manager.

Q. Do you know what Mr. Mickelson's title was at that time?

A. Boat end supervisor.

Q. Okay. Can you tell me what you meant by "Dave never liked me"? And I assume you're referring to Mr. Mickelson?

A. Yes.

Q. Okay. Why -- why did you say that?

A. Well, because he -- it was pretty well known throughout the whole place and the way he treated me in front of people, belittling me, that he never, ever liked me for some reason, and I don't know what that reason is.

Q. Were you ever reprimanded by Mr. Mickelson at any point?

A. No.

Q. Can you tell me -- can you give me a specific time when Mr. Mickelson belittled you?

A. Yes. We were in a morning meeting, and I can't remember if I got sent to a production meeting or what it was, but I was

Q. Okay. Do you recall whether or not you gave an explanation about the date in which you were told you falsified your time card?
A. I don't recall. I -- I believe I said I couldn't believe that that's true. I must -- I made a mistake.
Q. Okay. Do you remember saying that you don't recall for sure what you did and that you looked off the time card of a coemployee?
A. Yes.
Q. Okay. Is that true?
A. That I have looked over employees' time cards?
Q. In that meeting you said it is true that you -- in that meeting you disclosed to Mr. Himes, Mickelson and Ms. Schneider that you didn't recall what you had done that week, the week in particular, 8/10/08, and that you had looked off another coemployee's time card to fill yours out?
A. Yes.
Q. You did make that statement?
A. Yes.
Q. Okay. And did you actually do that?
A. I believe so.
Q. Okay. And what -- and whose time card did you look off of to complete your own?
A. I believe it was John Chandler's.
Q. Are you permitted to complete your time cards based upon the

A. No, I don't recall making that statement. I don't recall -- it was kind of a blur to me.

Q. Okay. You don't deny making that statement, you just don't remember?

A. I don't remember making that statement.

Q. Okay. Did you refer to anyone during that termination meeting as having done something similar to this?

A. Yes.

Q. Yes. Okay. Can you tell me what you told Mr. Himes, Mr. Mickelson and Ms. Schneider about that at your termination meeting?

A. To the best I remember, I can. I know Jason Arnold.

Q. A-R --

A. But that he --

Q. A-R-N-O-L-D?

A. I believe so.

Q. Okay.

A. But that he was at work and he was out golfing.

MS. EARDLEY: Was that "golfing," did you say?

THE WITNESS: Golfing.

MS. EARDLEY: Okay.

BY MS. GRAMZOW:

Q. Okay. You informed this to the -- during -- the three individuals at the termination meeting?

A. Yes.

Q. Okay.

A. And Dave Lakosky had a sick daughter at home, and he called and asked one of the guys to put "sick" on his time card when his daughter was sick.

Q. Okay.

A. And I wasn't there at this time, but Jamie Jenerou and his dad, Butch, which is now passed away, was -- were trading hours. If one didn't have enough, the other one would give him some.

Q. Okay. Let's start from the top. Mr. Arnold. You stated that he's put on his time card that he was at work when he was really golfing?

A. The way I understood it, yes.

Q. Okay. First, where did you learn that information from?

A. At work.

Q. From whom?

A. I don't recall.

Q. And did you ever speak with Mr. Arnold about this?

A. No.

Q. Do you know when it allegedly occurred, when Mr. Arnold --

A. No, I don't.

Q. Was it in the year 2008?

A. No.

Q. So it happened sometime when you worked for another employer?

what I mean. Are you aware of anyone else having written that they worked a shift when they actually didn't?

A. A mistake or worked a shift where they actually didn't?

Q. Where they --

A. I --

Q. Where they wrote down on their time card that they had worked a shift when in actuality they had not. And let me limit it to the year 2008.

A. I'm not sure.

Q. You can't recall anyone?

A. I -- I'm not sure.

Q. As you sit here today, you don't know -- you can't tell me one name of anyone else in the year 2008 who, as I described, wrote down hours on their time card when they weren't actually there?

A. I'm not sure. I don't recall.

Q. All right.

MS. EARDLEY: Do you need a break? Are you okay?

THE WITNESS: Uh-huh

MS. GRAMZOW: Are you okay?

THE WITNESS: Uh-huh.

BY MS. GRAMZOW:

Q. Okay. During this termination meeting on August 25th, did anyone discuss your daughter, Savannah White?

A. No.

Q. Did anyone discuss anyone outside -- in your family outside of yourself?
A. No.
Q. Was there any discussion about your benefits, including your medical benefits, during that termination meeting?
A. Some -- Mr. Himes had said he would be sending me something in the mail explaining that.
Q. Was that about COBRA?
A. I believe so. Yes.
Q. Okay. You stated earlier that you believe that the termination -- your termination at Carmeuse came as a result of your daughter's illness; is that correct?
A. Yes.
Q. Okay. Why -- why do you feel that way?
A. Because of the insurance costing the company a lot of money, tons of money. And if I made a mistake, and this is the only mistake I made, and other people out there have made so many other mistakes, why would they fire you?
Q. Did you ever ask Mr. Himes or Mr. Mickelson or Ms. Schneider who made the decision to -- to terminate your employment?
A. Yes.
Q. Okay. Who did you ask?
A. Jeff.
Q. And what did Jeff say?
A. Jeff said himself.

 Q. Okay. And you indicated that it was costing Carmeuse lots of money, insur -- the cost of insurance was high for your daughter?
A. Uh-huh.
MS. EARDLEY: That was a "yes," right?
THE WITNESS: Yes. I'm sorry.
BY MS. GRAMZOW:
Q. And how do you know that?
A. That's the only thing I could figure, meaning I know how much it was costing us and we were getting what the insurance was paying back, paying versus what we were paying, so I knew it was costing them a lot of money.
Q. Okay. So -- but you're guessing it cost --
A. No, I'm not guessing.
Q. Okay. How do you know it was costing Carmeuse -- that your daughter Savannah White -- Mr. White, how do you know that your daughter's illness -- when I refer to your daughter, --
A. Uh-huh.
Q. -- Savannah, how do you know that her illness was costing Carmeuse any money?
A. Because we were insured through Carmeuse.
Q. Okay. Do you have any documents showing, outside of what you've produced through your attorney, any payments made by Carmeuse?
A. I don't. Not that I'm aware of, no.

 Q. Only what you've given to your attorney?
A. Yes.
Q. Okay. Okay. Did anyone discuss with you the cost of -- any costs associated with Savannah White's illness at Carmeuse?
A. No.
Q. That's both at the corporate office as well as at the plant location?
A. Correct.
Q. Okay. Did you ever discuss your daughter's illness at work?
A. Every day.
Q. And I'm -- I don't -- I don't want you to relive a terrible experience, so -- but I'm just wondering, how was your daughter feeling or what was going on in the year 2008?
A. She -- she went into remission, if I'm not mistaken. Or she was in remission, but we still had to go get her Port-A-Cath taken out in her chest and it was supposed to be --
Q. Her -- I'm sorry? Her --
A. Her port. She had a port to receive all of her medications and everything in her chest.
Q. Okay.
A. With a tube coming up. A Port-A-Cath is what I assumed it was called. It was supposed to be an easy, go in, take it out, be done, 20 minutes. I believe I worked a night shift and my wife had taken her with her aunt there.
Q. When you say "there," you're referring to --

Q. Okay. Has anyone ever told you that you were terminated as a result of the cost of health insurance for your daughter at Carmeuse?
A. No.
Q. And when I say "has anyone," I'm referring to anyone at all, not just a Carmeuse employee or a Carmeuse supervisor. Have you heard that from anyone, that that was the reason for your termination?
A. A lot of people thought that might have been -- outside of here thought that that -- not before I thought that, but a lot of people figured if you made a mistake, you made a mistake on your time card. But a lot of people make mistakes.
Q. Did you ever discuss Savannah's medical bills with anyone at Carmeuse?
A. I don't recall.
Q. You don't recall doing it?
A. I don't recall any bills.
MS. GRAMZOW: This is probably a good time to take a break.
(A lunch recess was taken from 12:15 p.m. to 1:03 p.m.)
MS. GRAMZOW: Back on the record.
BY MS. GRAMZOW:
Q. Mr. White, you understand that we're back on the record now



and everything you say is under oath and you need to tell the truth?

A. Yes.

Q. Okay. When we left, we were talking a little bit about your -- your daughter's medical issues in the year 2008 and, just prior to that, the termination meeting at Carmeuse. I have just a couple of questions about -- I want to go back to something you had said at the termination meeting. When you -- earlier you said that Jeff Himes had said that he made the decision to terminate you; is that true?

A. Uh-huh.

Q. Yes?

MS. EARDLEY: That's a "yes"?

THE WITNESS: Yes. Yes.

BY MS. GRAMZOW:

Q. We have to remember the same rules apply, yes and no verbally. Did he say those exact words or did he say something else? Are you paraphrasing or . . .

A. I believe he said them same words.

Q. He didn't say to you that it was his job to hire and fire at Carmeuse?

A. I don't recall him saying anything like that.

Q. Okay. Is it possible he may have said it?

A. It's possible.

Q. Okay. Do you know where employees' medical benefits or

information is kept at Carmeuse?
A. (Witness shaking head.)
Q. For instance, do you know if it's even -- you have to say no --
A. No, I don't.
Q. Okay. For instance, do you know if -- where employees, if at all, it's kept at the Port Inland plant?
A. I'm not sure.
Q. Okay. You don't have any knowledge one way or another?
A. No.
Q. Okay. Do you know whether or not anyone at the Carmeuse location at Port Inland, if -- do you know if anyone has access to those types of records of employees?
A. I don't know.
Q. Okay. Have you ever heard of the -- the letterings S -- let's see, SDWT at Carmeuse? Do you know what that stands for?
A. No.
Q. Does self-directed work team ring a bell?
A. Yes.
Q. Okay. Can you tell me what that is?
A. Self-directed work team?
Q. Right.
A. Is you, as a team, discuss what you're going to do and take it the safest and the most productive way of fixing the

     problem or going about something.

Q. Does it mean, also, that you're to -- to supervise yourselves and your teams?

A. Yes. I think to a certain degree.

Q. Okay. And when you say "a certain degree," can you explain what you mean by that?

A. I think unless you have a big problem -- any -- any type of problems to be discussed, if somebody has a problem with you or anything, to be discussed to you by your team member, and if it doesn't get resolved then, then you move higher to a manager.

Q. And when you say "team," are you referring to the shift or are you referring to all of the boat end members?

A. The boat end members, but mainly the shift that you work with.

Q. Okay. So did Carmeuse, then -- is it your understanding that basically they -- they had -- strike that.

Is this -- the self-directed work teams, does that apply to the boat end department as well as all other departments at Carmeuse?

A. Yes.

Q. Okay. Was this a similar type of work situation that you had at your prior employers as well, at the Port Inland plant, the self-directed work teams?

A. At the Port Inland plant only?

 Q. Right.
A. Yes.
Q. Okay. And is it your understanding that this was -- strike that.
What is your understanding as to why they had self-directed work teams at the Port Inland plant?
A. Why -- you mean why did they have self-directed work teams, is that what you're asking?
Q. Right. What was the purpose of it, if you know?
A. I'm really not sure.
Q. Okay. Was it -- is it -- is it your understanding that they did it because they trusted their employees?
A. Yeah.
Q. Okay. They entrusted them to work out their own work schedules?
A. Work schedules, work out their own everything, probably, yes. "Everything" meaning work.
Q. Are they allowed to discipline one another, your team? Is your team allowed to discipline each other?
A. As far as meaning discipline, like . . .
Q. For instance, someone does something wrong on your shift, they've done -- they've loaded the tunnel incorrectly, they cleaned the tunnel incorrectly, what is expected of -- in that situation, when you worked for Carmeuse, what was the expectation of you as an employee who saw that?

A. Yeah. You go to that employee and have a talk with them and tell them what -- wasn't -- if it's not acceptable or whatever, and if they -- if this keeps happening and then you move on to higher management.

Q. Okay. It sounds like the -- they had a lot of trust in their employees, then; "they" meaning Carmeuse and your prior employers?

A. Uh-huh. Yes.

Q. That would be an accurate statement?

A. Yeah.

Q. Okay. Are -- were the -- your team members, and you can just speak to boat end because I know you worked only in the boat end in 2008 at Carmeuse from your earlier testimony, were the boat end team members allowed under the self-directed work teams, are they allowed to hire or fire?

A. No.

Q. Okay. Have you spoken to anyone at Carmeuse since your termination?

A. Yes.

Q. Who have you spoken to?

A. I've spoken to Pat Beckman.

Q. Do you know how to spell Beckman?

A. Nope. Oh, yeah. B-E-C-K-M-A-N.

Q. And who is Pat Beckman?

A. Just a worker out there. He's a neighbor of mine that lives

A. Yes.
Q. Okay. And right underneath that, it says "Carmeuse Lime & Stone, Gulliver, Michigan"?
A. Yes.
Q. Okay. That would be inaccurate, is that correct, based upon your testimony today?
A. I'm not sure what your question is.
Q. Well, your testimony today throughout the day has been that you worked for Carmeuse Lime & Stone in 2008.
A. Yeah.
Q. But this document reflects that you worked for them in 2002 through 2008?
A. Right. Okay. Yes. There is a misstatement here.
Q. Okay. Do you recall filing a charge of discrimination with the EEOC before filing your lawsuit --
A. Yes.
Q. -- against Carmeuse? Okay. And did you interview with anyone at the EEOC? In other words, did they ask you any questions about your complaint?
A. They -- they did ask some questions, which I don't recall what they were.
Q. Do you recall telling them that -- that you felt that you were discharged because your daughter's health cost too much on the respondent's insurance?
A. Yes.

Q. Okay. Did you have any evidence for that statement?
A. No.
Q. Okay. You were just guessing that to be the case?
A. No, I wasn't guessing. I assumed that I made a mistake. And I --
Q. Mistake --
A. -- don't know how -- why else I would be fired.
Q. Okay.
A. Other than making a mistake on my time card, if that's possi -- if that's true.
Q. But no one's ever told you that it had anything to do with your daughter's insurance or health benefits or medical or anything of that sort?

MS. EARDLEY: I'm going to object, asked and answered earlier today. Go ahead and answer again.

BY MS. GRAMZOW:
Q. Go ahead.
A. Correct.

(Deposition Exhibit Number 11 was marked for identification at 1:21 p.m.)

BY MS. GRAMZOW:
Q. Mr. White, I'm going to show you what's being marked as Deposition Exhibit Number 11, and one for your attorney, as well. Can you take a look at that document and tell me what that is?

 A. Yeah.
Q. Okay. I just want to ask you a couple of questions about these employers --
A. Uh-huh.
Q. -- that are listed here. Starting at -- well, first, 5/94 to 11/95, it lists Specialty Minerals, Inc. Do you see that?
A. Uh-huh.
Q. Was that another past -- past operator or owner of Port Inland plant?
A. Correct.
Q. And you worked for Specialty Minerals in or between that time? Around that time --
A. Yes.
Q. Okay. Do you have any reason to believe that that's the wrong date or dates?
A. I have no reason, no.
Q. Okay. And then right above it, it shows that you had worked for Ken Thorell Masonry from June of '96 to January of '97. Do you see that?
A. Uh-huh.
MS. EARDLEY: That was a "yes"?
THE WITNESS: Yes.
BY MS. GRAMZOW:
Q. Is -- does that appear to be an accurate statement as to --



 A. I was a booker, a core saw operator, a dryer feeder.

Q. I was just going to ask what type of business was that so we understood what you meant.

A. Yeah. It's a veneer mill. Veneer mill.

Q. Which means?

A. You make -- you're making veneer, spinning logs down into veneer, paper thin wood.

Q. Okay. And how did your employment end with Timber Products?

A. It ended with a two weeks' notice to get hired on at the Inland.

Q. Okay. Mr. White, can you tell me, what was your -- we already went over your rate of pay when you worked -- last worked for Carmeuse. If I remember correctly, it was twenty-one oh two.

A. Yeah.

Q. Does that sound right?

A. Yeah. That sounds right.

Q. How many hours did you work per week on an average?

A. Average -- at the boat end, it always changed. Anywhere from 40 to I've had 70-something there.

MS. EARDLEY: Are you talking a two-week period or a one-week period?

THE WITNESS: Two-week. That's a two-week pay period.

BY MS. GRAMZOW:



result of your termination of employment from Carmeuse?

A. Tons.

Q. And how so? Could you explain that?

A. Yes. I didn't know of anybody else that got treated like that out there, never -- for a -- if I -- if I wasn't there and I made a mistake on my time card, I never, ever got a second chance; no one talked to me about it. I know people out there that's done worse, millions of dollars' worth of damage, and it's like they just could not wait to see me go, and that was very hurtful and embarrassing to live in a small community like this.

Q. Did you ever contact -- and you testified -- I don't want to do asked and answered. You said earlier you'd never contacted Carmeuse corporate, correct?

A. Correct.

Q. Okay. Is there any reason why you didn't contact them to find out information regarding your termination?

MS. EARDLEY: Hang on. Before or after?

MS. GRAMZOW: Well, about his termination, so it would have to be after.

MS. EARDLEY: Okay.

BY MS. GRAMZOW:

Q. Is there any reason why you didn't --

MS. EARDLEY: When you say "corporate," you mean like Pittsburgh as outside of the meetings and stuff?

Q. Is there any individual who marked down on their time card for a time when they weren't there?

A. I'm not sure.

Q. Do you have any -- can you think of anyone as you sit here today?

A. I'm not sure. No, I can't.

Q. You can't think of anyone?

A. Think of anybody.

Q. Okay.

A. But I know there's other people out there that have made mistakes.

Q. Other mistakes or the same mistake we're talking about today?

A. Similar mistakes.

Q. Okay. I just want to know, do you know of anyone who has written down on their time card one thing indica -- that they indicated that they worked when, in actuality, they did not; do you know of anyone who did that?

A. No.

Q. Outside of what you testified earlier?

A. No.

Q. Okay. In Paragraph 11 you state the "various employees/supervisors of Defendant O-N who were decision makers in Plaintiff Jason White's termination . . ." And then you list -- it goes on, but you list a number of

employer, as he was due to come in to work that night to advise he would need a few days off." Do you -- do you know what night you're referring to there?

A. I believe it would be the night that they -- or the evening that they were going to put Savannah in intensive care because of the port removal, they couldn't get all the pieces.

Q. Okay.

A. But it happened so many -- I don't . . .

Q. If you want to look at Deposition Exhibit 8, it may help you.

MS. EARDLEY: Is that the time card?

MS. GRAMZOW: Yeah.

MS. EARDLEY: Okay. The August 10th time card?

MS. GRAMZOW: Yeah. Exhibit 8, week ending 8/10/08.

BY MS. GRAMZOW:

Q. You stated earlier that this is an accurate reflection of your work hours that week; is that correct?

A. I believe so.

Q. Okay. And so in Paragraph 34 where you say you contacted your employer since you were due to come in to work that night, do you know which night you are referring to here as you look at Exhibit 8?

A. Paragraph 34.

Q. Thirty-five. Paragraph 35.
A. I don't remember.
Q. You have a few days off on Wednesday and Thursday that week. Do you see that?
A. Yes.
Q. Is it possible, then, that you called on Tuesday night?
A. It -- anything's possible.
Q. Okay.
A. I don't remember.
Q. Okay. And when you say "employer," who are you referring to that you -- that you contacted? Who did you speak with?
A. I don't remember.
Q. Okay. Was it -- do you know if it was Mr. Mickelson or did you call a team member?
A. I believe I called a team member.
Q. Okay. But you don't recall which one?
A. No.
Q. Do you recall what time of day you called?
A. No, I don't.
Q. In Paragraph 36, you state that you informed your supervisors of what had happened with your child, who was in intensive care at -- in Green Bay hospital. I'm paraphrasing. Do you see that?
A. Yes.
Q. Do you know the supervisor you're referring to, or are

that Plaintiff's dependent child was in need of ongoing health care treatment which would be covered by its health insurance plan, and intentionally interfered in access to the health care insurance provided by Defendant employer by terminating Plaintiff from his position."

Did anyone make that statement to you?

A. No.

Q. So that's based upon -- that Paragraph 50 -- 51 is based upon an assumption that you made?

A. I've heard that. No, it's not an assumption.

Q. You've heard -- you've heard --

A. I've heard it from other people, and I don't recall who.

Q. You've heard what from other people?

A. That Paragraph 51.

Q. What part of Paragraph 51 did you hear from someone else?

A. The ongoing health treatment, which would be covered by health insurance plan initially interfered in access to the health care insurance provided by Defendant employer by terminating Plaintiff from his position. I was reading something else, I'm sorry, at the same time.

Q. Okay.

A. My mistake. I was reading a totally different number.

Q. Okay. So 51, you don't -- you don't know if -- no one has ever said that to you --

A. I don't --

Q. -- whether from Carmeuse --
A. -- recall --
Q. -- or anyone else?
A. No.
Q. Okay. So that -- that statement there is based upon an assumption that you made?
MS. EARDLEY: Which one are we on now?
THE WITNESS: Fifty-one.
MS. GRAMZOW: We're still on 51.
MS. EARDLEY: I'm going to object as to asked and answered earlier. He already talked about that. But you can answer it again if you understand her question.
THE WITNESS: No, I don't understand her question.
BY MS. GRAMZOW:
Q. It states here that -- you're making the statement that Defendant employer intentionally interfered with your access to health insurance. And my question is, is how did -- how did that happen? Did you hear -- did someone make that statement to you, that they -- they -- that they were intentionally interfering with you? That they terminated you because they wanted to intentionally interfere with your health care?
A. In a roundabout way, yes.
Q. Someone at Carmeuse made that statement to you?
A. Several people have, but I'm not sure if they were from

Carmeuse or not at that time.

Q. You don't know who these people are?

A. No.

Q. Or when the statements were made?

A. No.

Q. Okay. You don't know if they were ever employed by Carmeuse?

A. No.

MS. GRAMZOW: Okay. That's all I have.

THE WITNESS: Pardon?

MS. GRAMZOW: That's all I have.

THE WITNESS: Oh, okay.

MS. EARDLEY: I have some follow-up questions.

CROSS-EXAMINATION

BY MS. EARDLEY:

Q. Jason, how many times has the ownership of the plant -- and we'll call it the plant with a small "P" -- changed since you started working there in '02?

A. Two or three.

Q. Okay. And from the time that you started in 2002 working at the plant up to the time you were terminated, who was your boss, the individual who was your supervisor?

A. Primarily David Mickelson (indicating).

Q. And was Mr. Himes employed all throughout that time as -- is it plant manager?

Q. Okay.
A. Oglebay Norton. Carmeuse.
Q. Okay.
A. I'm sure there's more. I don't have them offhand.
Q. As we sit here today in 2010, do you know how long the plant has been there?
A. A long time.
Q. Okay. And do people here locally call it all different kinds of different names, or what is it called usually?
A. Normally Port Inland.
Q. Just Port Inland?
A. Yeah.
Q. Okay. Did it continue to be called that by you and others even when it changed names?
A. Yes. For some reason, yes.
Q. Okay. You've got Exhibit 8 right out here, the one that Ms. Gramzow marked as 8.
A. Uh-huh.
Q. She talked to you about. Take your hand off your mouth so everybody can hear you. Do you know if you were at the plant on that Friday where the -- on this copy, there's like a -- it looks like a highlighter mark (indicating).
A. Uh-huh.
Q. Do you know if you were there that day or not?
A. I don't know. Honest to God, I don't know --

Q. Okay.
A. -- if I was there or not.

MS. GRAMZOW: You're referring to Friday?

MS. EARDLEY: Yeah. I'm sorry. I'm pointing -- it says Friday and it has a highlighter on it. I'm just pointing.

BY MS. EARDLEY:
Q. So you don't know for sure whether you were there or not?
A. Honest to God, no; I do not know.
Q. Okay. And where it says -- there's handwriting at the top of Exhibit 8, "Wasn't here," do you know who wrote that?
A. No, I don't.
Q. Was it you?
A. It was not me.

MS. EARDLEY: Okay. I don't have any further questions. She may.

REDIRECT EXAMINATION

BY MS. GRAMZOW:
Q. Mr. White?
A. Yes.
Q. Do you have any knowledge as to whether or not Carmeuse has any corporate affiliations with any of your prior employers, whether --
A. I don't.
Q. Okay. And just one other question. You testified just a

you want her to read it back. I apologize. I didn't mean to confuse the question.

THE WITNESS: I'm -- my statement is I'm not sure if I was there that day.

BY MS. GRAMZOW:

Q. Okay.

A. My final answer.

Q. You testified that Mr. Mickelson was your primary supervisor from 2002 to present at the Port Inland -- well, to August of 2008 at the Port Inland plant; is that correct?

A. Yes. All but one year.

Q. Okay. And did you have any problems working with Mr. Mickelson during that time period, with the exception of that one year?

A. No.

MS. GRAMZOW: Okay. That's all I have.

(The deposition concluded at 3:04 p.m.)

* * *

EXHIBIT "B"

ORIGINAL

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JASON S. WHITE and AMY WHITE,

Plaintiffs,

-vs-

Case No. 2:09-cv 265

Hon. R. Allan Edgar

O-N MINERALS (MICHIGAN) COMPANY
d/b/a CARMEUSE LIME & STONE,

Defendant.
_______________________________/.

DEPOSITION OF AMY LYNN WHITE

Taken by the Defendant on the 30th day of September, 2010, at the Comfort Inn, 617 East Lakeshore Drive, Manistique, Michigan, at 3:10 p.m.

HUDSON REPORTING & VIDEO 1-800-310-1769

A. J-E-N-E-R-O-U.
Q. Are you in any relation to the Jamie Jenerou or Butch Jenerou?
A. No. Actually Richard Jenerou is my stepdad. He is related to them. I think cousin, maybe.
Q. Cousin to Jamie Jenerou or --
A. Rick is.
Q. -- Butch Jenerou?
A. Yes.
Q. So cousin to Jamie or cousin to Butch Jenerou?
A. I think him and Butch would be cousins.
Q. Okay. Other than your parents, have you spoken to anyone today about your testimony?
A. No.
Q. Okay. Could you state your full name for the record?
A. Amy Lynn White.
Q. Amy, have you been known by any other names?
A. Amy Lynn Lakosky by previous marriage.
Q. Okay. Any other names?
A. My maiden name, Amy Lynn McBurney, M-C-B-U-R-N-E-Y.
Q. Okay. And when were you married to -- is it Mr. Dave Lakosky?
A. Uh-huh.
MS. EARDLEY: That was a "yes"?
THE WITNESS: Yes. When was I married?

BY MS. GRAMZOW:

Q. Yes.

A. In 1999 to 2002.

Q. Can you tell me what your -- what education you have?

A. High school and one year of college.

Q. And the high school you went to?

A. Manistique High School.

Q. And what college?

A. Northern Michigan University.

Q. Did you receive your high school degree?

A. Yes.

Q. And did you receive a -- you -- you have one year at Northern Michigan?

A. No, I didn't get a degree.

Q. Okay. Did you have a particular field of study at Northern --

A. I was going into general business and then decided not to continue and got a job in Manistique, so I didn't go back.

Q. What was the reason for discontinuing your education at Northern Michigan?

A. Just wasn't interested and I had a job opportunity in Manistique, so . . .

Q. Job opportunity. What job was that?

A. Manistique Medical Center.

Q. Are they in any way affiliated with Schoolcraft Medical

Center?
A. Schoolcraft Medical Care Facility?
Q. Medical Care Facility. Thank you.
A. No. They're connected, but -- you know, the building is connected.
Q. But they're two different companies --
A. Entities, yes.
Q. Thank you. Do you have any other education outside of the one year of college at Northern and the high school?
A. No.
Q. Any informal education, any type of training or certificates of any sort?
A. Billing certificates because I'm a billing clerk.
Q. Who did you receive those certificates from?
A. They're just in-service type. When we go to seminars, we just get certificates.
Q. Is that part of your current employer?
A. Yes.
Q. And your current employer is?
A. Schoolcraft Memorial Hospital.
Q. I understand you're married to Mr. Jason White, the other plaintiff?
A. Yes.
Q. And what is the date of your marriage?
A. March 13th, 2006.



Q. And do you have any children?
A. Yes.
Q. And who are your children? Could you give me their names and their birth dates, please?
A. Alexandra Lakosky from my previous marriage; date of birth, 4/7/01. Savannah White; date of birth, 8/12/04. And Jayda White; date of birth, 5/7/09.
Q. Did you keep any notes with regard to the allegations in your complaint?
A. No. Just my journals.
Q. Okay. Is that -- with those journals, do they -- are they -- do they contain notes regarding any of the allegations in your complaint?
A. No.
Q. Are they limited to a particular subject matter?
A. Savannah's illness.
Q. Okay. The treatment of that illness, is that what you mean?
A. Yes.
Q. Okay. And do you have any audiotapes made with respect to any of the allegations in your complaint?
A. Just the conversation that Jason recorded with Rhonda Schneider.
Q. Okay. And that --
A. Is the only tape I'm aware of.
Q. Okay. And that's the tape that's currently in the

Q. Not really. Well, it depends on how you define it. Is -- I should make it easier. Have you ever been involved in any type of a court proceeding?
A. Yes.
Q. Yes. And when was that?
A. I want to say 2002, 2003, my divorce was final.
Q. And what court was that pending in, do you recall?
A. Schoolcraft.
MS. EARDLEY: Schoolcraft County?
THE WITNESS: County.
MS. EARDLEY: Okay. Which is where we are right now, correct?
THE WITNESS: Yes.
BY MS. GRAMZOW:
Q. Have you been involved in any other type of court proceeding outside of your divorce proceeding?
A. I had to testify for the house when we went to court for Ken Schwabach.
Q. That was the -- the lawsuit that your husband was referring to --
A. The small claims.
Q. You have to wait until I finish the sentence.
A. I'm sorry.
Q. I have to talk slow so that she can get it, but then --
MS. EARDLEY: Take a deep breath. Wait.



A. Correct.
Q. Okay. Who lives at -- who lives at your home currently?
A. Jason and I and our three girls.
Q. Has anyone else lived in your home since the termination of your husband's employment in August of 2008?
A. No.
Q. Okay. Has it always been the five of you living in the home or has anyone left the home at any time?
A. It's always been us, the five of us.
Q. Okay.
A. Alex is also in cross-country, running, just so you have that.
Q. And when did she start cross-country?
A. About a month ago.
Q. Is this a new interest of hers?
A. Yes.
Q. Okay. Have you ever fought with your husband?
A. Of course.
Q. And how often currently do you fight with your husband, would you say, if you can categorize it? A daily basis? Weekly basis? Hourly basis? Monthly?
A. The last couple of weeks we haven't fought at all since we've started the counseling. Before that, we were to the point where we didn't even communicate for the last seven months. Communicated when we had to.

causes the arguing is the -- the health problems of your -- the former health problems, thankfully, of your daughter, Savannah White, correct?

A. Correct.

Q. Okay. So when was her diagnosis of the leukemia again?

A. January 11th, 2006.

Q. Would you say it was the -- more, less or the same, the amount of arguing that you had with your husband after the diagnosis of Savannah White's illness and after his termination of his employment? Does that make sense?

A. Well, Savannah's diagnosis brought us closer. His termination tore us apart.

Q. Did the stress from her -- the treatment and -- and difficulties you had from July -- January 11, 2006 until she went into remission, did that cause you to fight?

A. No. She actually went into remission within 45 days of her diagnosis. She just had to have treatment for two and a half years. She's been in remission since March 2006, but had to continue with chemo and radiation for two and a half years.

(Mr. Jason White exited the deposition room.)

Q. Okay. How often would you say you fought with your husband prior to his termination in August of 2008?

A. The occasional fight any marriage has. No marriage is perfect. Maybe once-a-month argument.

EXHIBIT "C"

Except for signature, spaces left blank must be completed by typewriter or printed legibly.

March 6, 2006
DATE OF APPLICATION

March 13, 2006
DATE CERTIFICATE FILED

# Marriage License

## State of Michigan

STATE FILE NO.

05-06
LOCAL FILE NO.

0864529

**To any person legally authorized to solemnize marriage in the State of Michigan,**

**Marriage must be solemnized *In the State of Michigan* on or before** April 7, 2006 DATE

**between**

JASON STEPHEN WHITE
FULL NAME OF MALE (FIRST, MIDDLE, LAST)

and

AMY LYNN LAKOSKY
FULL NAME OF FEMALE (FIRST, MIDDLE, LAST)

McBurney
LAST NAME BEFORE FIRST MARRIED, IF DIFFERENT

| Male | | Female | |
|---|---|---|---|
| 30 (PRESENT AGE) | October 6, 1975 (DATE OF BIRTH) | 34 (PRESENT AGE) | April 11, 1971 (DATE OF BIRTH) |
| 1656N Beckman Road (RESIDENCE NO. / STREET) | | 1656N Beckman Road (RESIDENCE NO. / STREET) | |
| Manistique, MI 49854 (CITY, STATE, AND ZIP CODE) | | Manistique, MI 49854 (CITY, STATE, AND ZIP CODE) | |
| Schoolcraft (RESIDENCE COUNTY) | None (NUMBER OF TIMES PREVIOUSLY MARRIED) | Schoolcraft (RESIDENCE COUNTY) | One (NUMBER OF TIMES PREVIOUSLY MARRIED) |
| Manistique, MI (BIRTHPLACE — CITY AND STATE) | | Manistique, MI (BIRTHPLACE — CITY AND STATE) | |
| Stephen Lee White (FATHER'S FULL NAME) | | Unknown (FATHER'S FULL NAME) | |
| Patti Joyce Swanson (MOTHER'S FULL NAME BEFORE FIRST MARRIED) | | Jeananne Marie McBurney (MOTHER'S FULL NAME BEFORE FIRST MARRIED) | |
| Michigan (FATHER'S BIRTHPLACE) | Michigan (MOTHER'S BIRTHPLACE) | Unknown (FATHER'S BIRTHPLACE) | Michigan (MOTHER'S BIRTHPLACE) |

[...]ity of MCL 333.2813

[SEAL]

[An af]fidavit has been filed in this office by which it appears that said statements are true. This marriage [license aut]horizes the marriage of the parties named above within the State of Michigan by any person [authorized to] perform a marriage ceremony under the laws of the State of Michigan.

[In witness] whereof, [I have sign]ed and sealed these presents, this 8th day of March 20 06;

Schoolcraft
COUNTY

COUNTY CLERK
Keith A. White
DEPUTY CLERK

# *Certificate of Marriage

Between Mr. JASON STEPHEN WHITE and M S. AMY LYNN LAKOSKY

**I hereby certify** that, in accordance with the above license, the persons herein mentioned were joined in marriage by me, in Manistique (CITY, VILLAGE, OR TOWNSHIP), county of Schoolcraft, MICHIGAN, on the 13th day of March 20 06, in the presence of

Sally Lauzon
SIGNATURE OF WITNESS

Keith White
SIGNATURE OF WITNESS

Sally Lauzon
NAME OF WITNESS (TYPE OR PRINT)

Keith White
NAME OF WITNESS (TYPE OR PRINT)

Belinda Cole
SIGNATURE OF MAGISTRATE OR CLERGY

Belinda Cole, Magistrate
NAME AND TITLE OF MAGISTRATE OR CLERGY (TYPE OR PRINT)

300 Walnut, Manistique, MI 49854
POST OFFICE ADDRESS OF MAGISTRATE OR CLERGY

This Space Reserved for Binding

THIS DUPLICATE must be delivered by the person solemnizing marriage to one of the parties joined in marriage.

DCH-0482 1998
(Formerly B138 (6/90))

CA00572

EXHIBIT "D"

STATE OF MICHIGAN

11TH CIRCUIT COURT/FAMILY DIVISION/SCHOOLCRAFT COUNTY

AMY LYNN LAKOSKY

Plaintiff,

-vs-

DAVID GEORGE LAKOSKY

Defendant.

Hon. William W. Carmody
Family Division Judge

Court File No. 03-3461-DM

TRUE COPY

James E. Soderberg (P37058)
Attorney for Plaintiff
504 Ludington Street
Escanaba, MI 49829
Phone: (906) 786-1403

Mary K. Vader (P48720)
Attorney for Defendant
109 South 6th Street
Escanaba, MI 49829
Phone: (906) 786-1223

# JUDGMENT OF DIVORCE

At a session of said Court held in the Schoolcraft County Courthouse, Escanaba, Michigan on the 25 day of May, 2004.

PRESENT: Hon William W. Carmody, Circuit Judge/Family Division

This case was brought on to be heard upon the Complaint filed by Plaintiff. Upon reading the Complaint and hearing the testimony taken in open Court, it satisfactorily appears to this Court that the allegations of the Complaint for Divorce are true and there has been a breakdown in the marriage relationship to the extent that the objects of matrimony have been destroyed and there remains no reasonable likelihood that the marriage can be preserved;

On motion of James E. Soderberg, attorney for Plaintiff:

## DISSOLUTION OF MARRIAGE

**MCL 552.12**

By virtue of the authority vested in this Court, and pursuant to statute, this Court orders that the marriage between the parties shall be dissolved, and a divorce from the bonds of matrimony between the parties is ORDERED.

EXHIBIT "E"

**AFFIDAVIT OF PAUL TUNNICLIFFE**

COMMONWEALTH OF PENNSYLVANIA )
) SS
COUNTY OF ALLEGHENY )

The Affiant, Paul Tunnicliffe, being first duly sworn, deposes and states as follows:

1. I am employed as the Vice President of Operations at Carmeuse Lime & Stone, Inc. ("CL&S, Inc.") at its headquarters located in Pittsburgh, Pennsylvania.

2. On or about February 13, 2008, CL&S, Inc. acquired Oglebay Norton Company and its subsidiaries, including O-N Minerals (Michigan) Company, which operates limestone and dolomite facilities located in Gulliver/Port Inland, Michigan ("Port Inland Plant").

3. Simultaneous with this acquisition, O-N Minerals (Michigan) Company began doing business as Carmeuse Lime and Stone ("Carmeuse").

4. In or around August 2008, Carmeuse's Site Operations Manager ("SOM"), Jeffrey Himes contacted me (via telephone) at CL&S, Inc.'s headquarters in Pittsburgh, Pennsylvania.

5. At that time, SOM Himes informed me that an employee at the Port Inland Plant (Jason White) had submitted a falsified time card for payment by Carmeuse indicating that he had worked a 12-hour shift on a particular day when, in fact, he had not worked on that date.

6. Upon inquiry as to how to proceed, I informed SOM Himes that Carmeuse considered this to be theft and directed that employee Jason White be terminated from his employment with Carmeuse.

7. During the term of Jason White's employment with Carmeuse, I had no knowledge regarding the costs to either Carmeuse (and/or the predecessor owner of the Port Inland Plant) associated with Mr. White's health care benefits (including those of his qualified dependents).

8. During the terms of Jason White's employment with Carmeuse, I had no knowledge as to what amount, if any, Carmeuse (and/or the predecessor owner of the Port Inland Plant) paid for qualified health care claims submitted by Carmeuse's employees (as well as their qualified dependents), including Jason White and/or his qualified dependants, if any.

9. During the term of Jason White's employment with Carmeuse, I did not have any access to and indeed did not review any "Stop Loss Report(s)" relative to the Port Inland Plant and/or any other Carmeuse facility/location.

10. If called upon as a witness, I could competently testify as to the truth and accuracy of the foregoing statements, basing my testimony upon actual knowledge, except as to those statements that are based upon information and belief, and, as to those statements, I have reason to believe that they are true.

Further deponent sayeth not.

PAUL TUNNICLIFFE

Subscribed and sworn to before me
this 7th day of December, 2010

Notary Public, Commonwealth of Pennsylvania, County of Allegheny
Acting in the County of Allegheny
My Commission Expires: 6/16/14

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Millicent A. Smith, Notary Public
City of Pittsburgh, Allegheny County
My Commission Expires June 16, 2014
Member, Pennsylvania Association of Notaries

**EXHIBIT "F"**

# Employee Transaction Authorization

- [X] Hire
- [ ] Employee Job/Type/Hours Change
- [ ] Compensation Change
- [ ] Transfer
- [ ] Retirement
- [ ] Termination
- [ ] Return from Initial Disability or LOA
- [ ] Estate/Survivor Payments

## Employee

| Name (Last, First, Initial) | Social Security Number | Effective Date (Month Day Year) |
|---|---|---|
| White, Jason S. | [redacted] | |

## Position Information

| | From | To |
|---|---|---|
| Position Number | | |
| Department | | 41411 |
| Unit | | |
| Company | | SMI Port Inland |
| Location/Territory | | Gulliver |
| Pay Class | | |
| Job Code | | |
| Job Title | | Summer Student |
| Employee Type | | |
| Work Time % / Work Week | | |
| Grade | | |

## Compensation

| | From | To |
|---|---|---|
| Base Salary/Wage | $ per | $ 8.00 per hour |
| Bonus | $ | $ |
| Total Compensation | $ per | $ 8.00 per hour |

## One-time Payments

| | |
|---|---|
| Prorated Bonus | $ |
| Severance | $ |
| Other (Specify) | $ |
| Unused Vacation (Days) | |
| Comments | |

## Approvals

| Signature | Date | Signature | Date |
|---|---|---|---|
| [signature] | 5/11/94 | | |
| [signature] | 5/11/94 | | |
| | | | |

# Employee Transaction Authorization

- [X] Hire
- [ ] Employee Job/Type/Hours Change
- [ ] Compensation Change
- [ ] Transfer
- [ ] Retirement
- [ ] Termination
- [ ] Return from Initial Disability or LOA
- [ ] Estate/Survivor Payments

**Employee**

| Name (Last, First, Initial) | Social Security Number | Effective Date Month | Day | Year |
|---|---|---|---|---|
| White, Jason | [redacted] | 05 | 11 | 95 |

**Position Information**

| | From | To |
|---|---|---|
| Position Number | | |
| Department | | 4I312 |
| Unit | | |
| Company | | |
| Location/Territory | | SMI Port Inland |
| Pay Class | | |
| Job Code | | |
| Job Title | | Summer Student |
| Employee Type | | |
| Work Time % / Work Week | | |
| Grade | | |

**Compensation**

| | From | To |
|---|---|---|
| Base Salary/Wage | $ per | $ 9.00 per hour |
| Bonus | $ | $ |
| Total Compensation | $ per | $ 9.00 per hour |

**One-time Payments**

| | |
|---|---|
| Prorated Bonus | $ |
| Severance | $ |
| Other (Specify) | $ |
| Unused Vacation (Days) | |
| Comments | |

**Approvals**

| Signature | Date | Signature | Date |
|---|---|---|---|
| [signature] | 5/9/95 | | |
| [signature] | 5/15/95 | | |
| | | | |

CA00138

# EXHIBIT "G"

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF MICHIGAN

NORTHERN DIVISION

JASON S. WHITE and AMY WHITE,

Plaintiffs,

Case No. 2:09-CV 265

-v-

Hon. R. Allan Edgar

O-N MINERALS (MICHIGAN) COMPANY
d/b/a CARMEUSE LIME & STONE

Defendant.

---

DEPOSITION OF JEFFERY HIMES

DATE: October 13, 2010 and October 14, 2010

TIME: 1:51 p.m. and 10:00 a.m. respectively

PLACE: 617 Lakeshore Drive, Manistique, Michigan

APPEARANCES:

On behalf of Plaintiff:

MS. EUGENIE EARDLEY (P48615)
EARDLEY LAW OFFICES
P.O. Box 830
Cannonsburg, Michigan 49317
(616) 874-2647

On behalf of Defendant:

MS. KIRSTEN E. GRAMZOW (P52134)
LIPSON, NEILSON, COLE, SELTZER & GARLIN
3910 Telegraph Road, Suite 200
Bloomfield Hills, Michigan
(248) 593-5000

Also Present: Jason White

Reported By: Teri L. Heacock, RPR/CRR/CSR-2309

e9c0bd04-2f17-41e8-ad5f-7e2af493c0c1

plant manager or general manager.

Q. Okay. All right. And so when did that change?

A. 1998.

Q. Okay. And is that when you became, what?

A. Oglebay-Norton bought Port Inland --

Q. Okay.

A. -- from Specialty Minerals, which was a division of Minerals Technologies.

Q. Okay. So did you go from general manager to plant manager?

A. No.

Q. Okay.

A. I went from production manager to general manager.

Q. Got it. Okay.

A. I didn't mean to confuse the situation, but a general manager is what many people refer to as a plant manager.

Q. Okay. And then when -- then you were sort of bringing me, I think, up to speed, then, when Carmeuse bought Oglebay-Norton?

A. Oglebay-Norton.

Q. Were you then promoted, or --

A. No, the name of the position changed.

Q. And give me that one more time. I'm sorry.

A. Site operations manager.

Q. What happened to Mr. Skinner? Where did he go?

A. Mike Skinner, in 1998, was promoted to vice president and

cylinders there, would that come through?

A. In this case it's my boss, Paul Tunnicliffe, who's a member of the management team and me, so that didn't come through a silo.

Q. That was a direct?

A. That came right from -- those conversations would be primarily within our team at the plant.

Q. Okay.

A. Stating what we think our plan should be, and that is presented to the executive management team, including my boss, Paul Tunnicliffe.

Q. Uh-huh.

A. And there's a negotiation that goes on as that -- as part of that process.

Q. So -- and I don't know if this is appropriate or not. You're the artist of your diagram. How can you depict that on there? Can you show, like, use the red pen or something, a dotted line between -- because a moment ago, as you're drawing a moment ago, you said there would be a direct line between Tunnicliffe and you to having those discussions about ton per hour, cost per hour, equipment, et cetera, ton?

MS. GRAMZOW: What does its say in the --

THE WITNESS: VP operations site operations manager. There's direct communication.

e9c0bd04-2f17-41e8-ad5f-7e2af493c0c1

have been Paul Tunnicliffe.

Q. And I know we talked about it before. I'll have to see if it's in my notes. Do you remember what month it was? I think you said about three months in that --

A. Which.

Q. -- that Miclette went to California?

MS. GRAMZOW: Objection; asked and answered. Go ahead.

THE WITNESS: I think it was about three months.

BY MS. EARDLEY:

Q. Okay. Three months after the buy, the purchase?

A. Sometime in that time frame.

Q. Okay. March, April, May, in that?

A. Somewhere in there.

Q. Okay.

A. Not March or April, May, June.

Q. I was counting. March -- using the ol' fingers here. May, June of '08. Okay.

A. It may have even been a little later.

Q. Okay. Now, is he still with Carmeuse out in California?

A. Yes, he is.

Q. So who reported to you among the production managers in 2008 at Port Inland? I know we talked in general about some of those individuals.

A. In 2008?

Q. Yes.
A. Dave Mickelson.
Q. Okay.
A. Jim Weber, John Abbott joined us in late February, early March. No. At the acquisition, Scott Whitman reported to me as a production manager.
Q. Okay. So despite the change in some -- I'm sorry.
A. And Rhonda Schneider. A complicating part of this whole thing is that Rhonda Schneider, who handled some HR functions, also handled quality and some other responsibilities. This is why it kind of got messy when Cliff Purington showed up and said, Rhonda, you now report to my group. Well, that's only a quarter of her job.
Q. Oh, I see.
A. So Rhonda was on the management team. Kevin reported to Lisa.
Q. Was Lisa one of the managers too?
A. Lisa's the controller. I'm walking through the offices, trying to keep --
Q. Visualize?
A. Yeah.

MS. GRAMZOW: Make sure you're just answering the question she asked.

THE WITNESS: Probably not.

BY MS. EARDLEY:

Q. All right. And then Mr. Tunnicliffe authorized the swiping time clock thing to come out?
A. Yes.
Q. All right. Was there any discussion about why?
A. Yes.
Q. What was the discussion?
A. The time clock fundamentally communicates to the employees that we don't trust them. Trust is an absolutely fundamental component of the how we manage Port Inland. Employees have to know that we trust them, and the employees have to behave in a trustworthy fashion, because there are no direct supervisors or anybody looking over their shoulder making sure they're doing what they're supposed to be doing.
Q. Okay.
A. Secondly, the time clock didn't provide this data.
Q. The data on Exhibit 2?
A. On any time -- all these cost accounts.
MS. GRAMZOW: And you're pointing --
THE WITNESS: Labor distribution.
MS. GRAMZOW: When you point to things, we have to tell the court reporter.
BY MS. EARDLEY:
Q. Exhibit 2?
A. Exhibit 2, yes. On Exhibit 2 we have all the accounts for

all the functions or all the tasks that all the employees perform over the course of the day that data could not be captured by a time clock.

Q. Okay.

A. And so the time clock didn't serve a function --

Q. Okay.

A. -- and it was caustic.

Q. "Caustic" in what way?

A. To our system of management, because it communicated to the hourly employees that we didn't trust them.

Q. Well, let me ask you this, 'cause I don't have it in front of me and I can't look at it. Did the time clock that we're talking about that came out that was removed --

A. Yes.

Q. -- after Carmeuse came in, was that something that the employees literally had some kind of a card and they swiped it to say I'm in or I'm out?

A. There was a method, and I can't remember if it was a method, and I can't remember if it was a card or bio-scan anymore.

Q. Okay.

A. But there was an in and out.

Q. Okay.

A. They swipe it, their time would start, they swipe it, their time would end.

Q. Okay. Right. When did you first learn that there was any issue with Jason White having a problem with a time card of any kind, either when you're general manager or the SOM?
A. The -- Dave Mickelson came to me the Monday after the incident.
Q. Monday after what incident?
A. The -- incident where -- what's the date? Where is that other time card?
MS. GRAMZOW: You don't have to -- if you don't know it, the date, that's okay.
THE WITNESS: I don't recall the date off the top of my head.
BY MS. EARDLEY:
Q. So tell me the incident you're referring to?
A. The incident I'm referring to where Jason put time on his time card that he had not worked.
Q. Okay. And how did you learn of that?
A. Dave came to me the Monday after that.
Q. Okay. And what did Dave say?
A. Dave told me that members of the boat-end team had told him that there's an issue with Jason's time card, that there's time on the card he didn't work.
Q. Okay. Did he tell you, he, Mr. Mickelson tell you who on the boat-end team had communicated this to him?
A. My recollection at that time was that he just indicated

that it was the boat-end team members.

Q. Okay. You don't remember a name?

A. I don't recall who it was specifically.

Q. Okay. And is that all Mickelson told you at that point?

A. No. He walked through the details of what had happened.

Q. Okay. Tell me what he told you.

A. And my recollection of that explanation was Dave had called the boat end and asked them to do a specific task, and they said they didn't have enough people to do that task, and he reassigned them or took whatever action was necessary at that point, and then it came to his attention that Jason was not on shift that day, and that's who Dave had been counting on to do whatever the task was, and then it came to his attention that Jason had put down time that he had been there that day --

Q. Okay.

A. -- and he did some background check on that and brought it to --

Q. Do you know who -- I'm sorry. When you say "background check," do you know what he did?

A. He was looking at the time cards.

Q. Go ahead. I'm sorry to interrupt.

A. He brought that to my attention on Monday, and Dave was made aware that there was more than one incident the boat end was concerned about, and Dave went back and looked at

time cards, and we -- he, as you looked at and then I looked at with him, we looked at security camera information.

Q. Was that the first time anybody communicated to you concerned that Mr. White had worked or written down time he had worked for but he hadn't worked?

A. That was the first time I had heard about it, yes.

Q. Okay. And so Mr. Mickelson had already done the background that you described, brought it to your attention, and then the two of you went and looked at the security cameras, you said?

A. David had looked at security camera information, and then I looked at it with him, also.

Q. What did you look at?

A. There were -- the information that Dave was researching indicated that there were two occasions, as I recall, where Jason had indicated that he had worked, and the team was indicating that he had not been there. We looked at the security camera information to see if there was anything on there that could confirm or oppose this information --

Q. Uh-huh.

A. -- supporting one position or the other.

Q. Uh-huh.

A. What we saw in looking at the security camera information is it didn't refute the information that the team had

 indicated. It was nothing that indicated that Jason was on the plant site on those occasions, and there was information that seemed to support that he had left. For instance, this photograph right here.

Q. And "photograph right here," you're referring to Exhibit -- well, it was Exhibit 6 in Jason's deposition, Exhibit 3 today, in Mr. White's. Is that the one you're referring to?

A. Yes.

Q. Can you tell me what about this one that seemed to support that he had left? For instance, okay, so what about that photo supported that he had left?

A. My recollection of this photo is this shows a vehicle leaving the plant at around midnight, and Jason's time card indicated that he stayed well beyond this, and we'd have to look at the time card to confirm what time that was. We saw nothing else on this tape, any other vehicles leaving around the time Jason said he was leaving, and this vehicle looks similar, the dark-colored SUV type vehicle, similar to the vehicle that Jason was driving.

Q. Okay.

A. But that's what we did, we looked at videos, we looked at time card, we looked at the information.

Q. Okay. And as far as this photograph we're talking about here, you're saying it looks similar to Jason's car, but I

mean, can you absolutely say that that looks like Jason's car?

A. No, I can't. In our analysis of the information, we had -- we had these pieces of information that we gathered in our look at it. What we -- what we did not see in the examination of the cameras was information that would say Jason was here. What we did see was information that seemed to indicate that he had not been here. It's not -- it's not solid information. In our analysis of the case, we came back to this one time card where he said he was on shift. Not only did he say he was on shift, he said these are the exact things that he did while he was on shift, and he was not here.

Q. Uh-huh.

A. And as a group, we said this is the cameras, the photos, things like that. Are -- there's nothing in there that helps his case, and it sure seemed to support what the boat end said, but we focused on that one day in our analysis.

Q. I'm going to ask you, when you say we looked at the cameras, nothing to indicate he was there, I have no idea how many cameras or what you're talking about. Were there cameras -- let me stop you before you answer. Were there cameras that focussed on the physical area where Jason would have worked so you could play it and go, and did someone look at that and say he was there or he wasn't?

A. One of the cameras was looking at the dock area.

Q. At the what? I'm sorry.

A. At the dock area.

Q. Okay.

A. Which is where the boat-end team typically parks, and it's where the lunchroom is, and where you would expect to see activity. On -- the time card indicated that Jason was there for several hours past the rest of the team. We looked at the video showing where the parking area and everything else. We saw cars leave when the rest of the team said that they left. We saw the lunchroom lights go out, and we saw no other activity for the rest of night.

Q. Okay.

A. Nobody else's car left, no lights came on the lunchroom. There was nothing that indicated somebody was there working for however many hours Jason indicated on his time card that he worked.

Q. Okay.

A. So that's what I mean, there was nothing in there that supported that Jason's time card was accurate. What we did seemed to support what the boat end was telling us.

Q. What boat ends?

A. The boat-end team, his team members.

Q. Oh, okay.

A. They told us.

A. We talked about the issue within the management team. We reviewed that possibility, and what really makes it difficult to accept that was there's a detailed description of work done. It wasn't the wrong day, it was no day. It wasn't like he worked Friday and put down Friday's time on Saturday.

Q. Uh-huh.

A. He had a whole made-up day. Here's -- I want pay for this day, and here's what I did on that day.

Q. But the -- what about the possibility that he did work a day and do those activities and he put it down on the wrong day?

A. He did not work that day. He did not work the number of days that he had on his time card.

Q. So you talked to Mr. Mickelson, you reviewed the video. How long a process was this to then come to the conclusion to terminate? A couple of days, or right away?

A. My recollection is that we looked at information for a good part of Monday. I can't tell you exactly if I recall we met and made the determination Monday or if we did that on Tuesday or the following day, but I believe it was on -- we met later than Monday with the management team. The management team reviewed the situation, looked at the data. It indicated that Jason had falsified a time card. We reviewed our employee expectations, which clearly say this

is a serious offense that could result in termination. We were dealing with this issue of corporate policies coming at us.

Q. From Carmeuse, you mean?

A. From Carmeuse, yes.

Q. Uh-huh.

A. And so as a management team, what we concluded was here's all the information, this is an offense that would fall into the category of offenses that could result in termination, but what is the Carmeuse policy? And as a team we decided I should call Paul Tunnicliffe and get clarification on this.

Q. When did you decide that termination was the appropriate thing to do, in your own mind?

A. What I determined, and my own thinking, and consistent with what the rest of the management team was expressing was falsifying a time card was an offense that fell into the category along with fighting drugs, not -- not -- I'm not talking about the drug policy, but selling drugs, things -- there's a list of things that are on the expectation list --

Q. Uh-huh.

A. -- that can result in termination, and we all came to the conclusion that this was one of those, one of those violations that could result in termination.

Q. So you checked with Mr. Tunnicliffe because he was the new the owner of the company and your -- or part of the new corporate owner?
A. Yeah. He was my boss. To clarify an answer to your question, specifically, I looked at that falsification of time card as theft. Theft is a violation that I would consider terminating somebody on, so I was at that point already, but --
Q. And management team was as well, sounds like. There was an agreement?
A. I can't speak for what the management team members were thinking at that point. What we came to as a consensus was we need to call Mr. Tunnicliffe and get clarification what the Carmeuse policy is before the conversation needs to go any further.
Q. So what did you tell Mr. Tunnicliffe?
A. I told Mr. Tunnicliffe we had an employee that falsified a time card and asked for clarification on what's Carmeuse policy. The Carmeuse policy, he said, is termination. Somebody lies on a time card, that's theft, the result is termination.
Q. So he agreed with your view?
A. He didn't ask for my view.
Q. Did you express your view?
A. I did not.

Q. You said he falsified a time card, I ask permission to fire him?

A. No. I said he falsified a time card. Mr. Tunnicliffe said falsifying a time card is a theft. The response for that is termination.

Q. Give me every other occasion you've ever called Mr. Tunnicliffe to ask him for his input on termination, either before Jason White or after.

A. I have never called Mr. Tunnicliffe asking for guidance on termination other than this case.

Q. Ever?

A. No.

Q. Why not?

A. I haven't had another instance where I thought termination was the correct response.

Q. Have you terminated anybody since August of 2008, as the SOM?

A. No.

Q. Has anybody been terminated from the Port Inland plant since August of 2008?

A. Terminated, no.

Q. Let go?

MS. GRAMZOW: Objection; asked and answered. Go ahead.

BY MS. EARDLEY:

by phone?

A. No. No, I don't recall any emails from Mr. Tunnicliffe regarding this.

Q. Okay.

A. At that -- at that time.

Q. Okay. So tell me about the meeting with Jason when he was brought in, your recollection.

A. We called Jason looking at notes here. It indicates it was August 25th. Called Jason to come in, and we explained to Jason what we had found, that there was a time card with a day on it indicated that he worked, and he had not worked. It was indicated in detail, and we considered that falsifying a time card and we considered that a theft.

Q. Uh-huh.

A. I believe we went -- we asked for explanation as -- what's going on, what's up with this, and most of the comments in here, most of the comments that I recall Jason making are covered in the summary. We explained that theft is a termination offense, and we really have no alternative but to terminate his employment based on this time card, that we regard it as theft.

Q. And other than not necessarily looking at the memo, but do you recall what Jason said?

A. Jason was shocked. He was stunned. He said he didn't mean to do -- can I take this call?

MS. EARDLEY: Sure, I understand.

(Interruption in the proceedings by phone ringing)

MS. EARDLEY: Back on?

THE WITNESS: Yes, back on.

(Off-the-record discussion)

THE WITNESS: Okay. Jason was stunned. He was devastated at that -- at what had happened here and what our decision was he didn't deny having filled the time card out, didn't deny that it was incorrect, and explained to him that this -- we really don't have another choice, this is theft, and it's a dismissal offense.

BY MS. EARDLEY:

Q. Did he say anything to you along the lines of it must have been a mistake, I didn't do it on purpose?

A. He did say -- a direct quote in here that I think is very accurate.

Q. Which is? Go ahead. I don't have it in front of me right now. What direct quote you say is very accurate are you referring to?

A. Jason said, I need this job. It was Monday.

MS. GRAMZOW: You can say it.

THE WITNESS: Expletive. Oh, shit. I've got to fill out time cards. I was off a couple of days. I guess I was off three of them. This is bad. This is stealing, but I never did it on purpose.

BY MS. EARDLEY:

Q. Okay. And did you take his statement that he didn't do it on purpose at face value, or did you believe at the time that he was not being honest?

A. I believe at the time he was not being honest, because the -- he filled in the level of detail on the day that he -- for a day that he did not work.

Q. Now, you heard the testimony from his father, Mr. White, Stephen White, earlier today?

A. Uh-huh.

Q. That it was not uncommon for the various employees to -- when it was time to turn in their time cards, kind of talk to each other and say what did we do on Wednesday, did we, I don't know --

A. So for --

Q. Let me finish.

A. I'm sorry.

Q. I was trying to pick something. Did we do quarry operations or were we cleaning out the tunnel or what was it? In other words, is that something that you observed in the past or something that the laborers do when they're filling out their time cards?

A. I'm not familiar with specific instances, but I am familiar with how the process works, and for two people that did work together, actually worked together, particularly

maintenance guys that may have worked on ten different jobs over the course of the day to corroborate on, okay, what did we do from here on to here, that would be perfectly reasonable.

Q. And something that the boat ends do, if that's the testimony of Mr. White, the boat ends would occasionally go what did we work on Tuesday or Wednesday, as they were filling out their cards?

A. If two guys had worked together, they would say what did they do from here to here. To collaborate might be an appropriate thing.

Q. So that wouldn't surprise you?

A. That wouldn't surprise me.

Q. So as far as you said that Jason was stunned and so forth, did, during this meeting, how long did it last? Let me ask you that.

A. Lasted more than ten minutes.

Q. Okay. Did he say anything about, gee, I think I've even got vacation and sick time coming to me, why don't you just take it out of there, or something along those lines?

A. Yes.

Q. Okay. And what did you say?

A. That's not an option.

Q. Okay.

A. This is falsification of time card, it's theft. It's a

termination offense.

Q. Did he ask if you would give him a second chance or talk to him about it, do anything different?

A. Yes.

Q. And what did you say?

A. Can't.

Q. And did you say why?

A. You falsified a time card, it's theft. It's a termination offense.

Q. Now, at the time of this event, so when he's called in and you talked to him, had you, yourself, personally talked to any of the boat-end employees on the team about what they saw or what happened with Jason on the day that he was not there, they're saying, but the time card was filled out?

A. I don't recall that I spoke with any boat-end employees directly.

Q. Okay. So the information you had was from Mr. Mickelson?

A. Yes.

Q. Conveying to you? Okay.

MS. GRAMZOW: Wait for the question.

THE WITNESS: Sorry.

MS. GRAMZOW: That's okay.

THE WITNESS: It's late.

MS. GRAMZOW: I know.

BY MS. EARDLEY:

A. Don't recall that.
Q. Okay. Do you recall him taking a family medical leave time off for any reason at any point?
A. The only thing that would bring that to mind was Steve's testimony.
Q. Okay.
A. I don't recall it.
Q. I mean, if you don't know, that's fine. I know you have a lot of employees and you're monitoring all of them.
A. Yeah. That's -- yeah.
Q. Now, let me ask you about -- there's been testimony in this case, and if you don't know anything about it, just tell me that, and you may or may not, that Savannah White traveled to Green Bay, Wisconsin, in the summer of '08 to have a catheter removed, you heard Mr. White talking about that, and there was a complication. Do you recall hearing about that incident at any point in time before Mr. White talked about it today?
A. What I recall hearing about was that there was a participation from Oglebay-Norton in helping to pay for the flight for that. That's about it. I don't recall.
Q. You mean back at the time?
A. Back at the time. I don't recall from back then, the specifics of it.
Q. When you say Oglebay-Norton paying for the flight, for

whom?

A. For Savannah.

Q. To go to?

A. Wherever she was treated.

Q. Okay. All right. Do you remember hearing about -- outside of this litigation, of course, but hearing about back at the time that for some reason she was back in the hospital in Wisconsin?

A. I don't recall specifically hearing that.

Q. Something about a flight to somewhere for treatment?

A. That's -- it's -- it's a long time ago.

Q. Okay. Do you recall Mr. -- any discussion between you and Mr. Mickelson at the time the time card issue was presented to you by Mr. Mickelson that that day that was noted on there was the same week of the event, meaning where she had to go back, Ms. White had to go back for treatment in Green Bay?

A. I don't recall that.

Q. Okay. Do you know, did Mr. Mickelson tell you whether or not Jason had taken time off that week because of his daughter's illness?

A. I don't recall that I heard that he took time off because of the illness.

Q. Okay. And what I'm talking about, the time frame, during the discussion like before the termination meeting or in

doing the investigation with Mr. Mickelson?
A. I just don't recall that.
Q. Okay. So Stephen White contacted you at some point and you talked to him a little bit, and that leads me up to when Mr. White was terminated. Did you contact Mr. White or did he, Stephen, or did he contact you?
A. I went to see Steve right after the meeting that we had with Jason.
Q. Why?
A. He's a friend of mine. He was, and I hope still is a friend of mine, and out of respect for him, I didn't want him to hear this through the grapevine.
Q. Why not?
A. I just didn't think that was the right thing to do.
Q. Was he still working at the plant, or --
A. He was working for Western Lime.
Q. Which is nearby?
MS. GRAMZOW: Make sure she finishes the question.
MS. EARDLEY: Okay. That's right. It's getting --
BY MS. EARDLEY:
Q. All right. So you just went to see him, just went over there and talked to him?
A. Yes.
Q. Okay. And what did you tell him?
A. I told him we had let Jason go for falsifying a time card.

around the lake in the car with him and talked about his son's termination?

A. Yes.

Q. Remember? Okay. During that conversation, did you say something to the effect of this was my decision, to Mr. Stephen White?

A. I would have said something along those lines. I am the manager of the facility.

Q. Uh-huh.

A. Therefore, I am the representative of the corporation at the facility.

Q. Uh-huh.

A. So actions taken in the facility are my responsibility.

Q. And in that conversation you heard Mr. White testify about a little bit, is he accurate in his recollection of the conversation from your perspective, Mr. White? In other words, he was recounting the discussion?

A. Yeah. Generally, that -- that's a fair representation of the conversation.

Q. Okay. All right. I want to get back to the issue of the actual termination of Mr. White after he was terminated. Did you instruct, I guess it would be Rhonda, was Rhonda Schneider the HR person at the Port Inland plant?

A. Yes.

Q. I know that she typed up a memo that we talked about

MS. GRAMZOW: Is it asked and answered, then?

MS. EARDLEY: It's continuing objection, 'cause I don't think you have the right to have your own witness change his testimony. It sounds like we're going over the same turf we went over yesterday.

MS. GRAMZOW: For the record, asked and answered, the objection, okay, that's fine. For the record, yesterday the document was shown to Mr. Himes, the conflict resolution policy, but the team member performance expectations, while he spoke of it, was not shown to him or discussed at any length. I want to make sure that he was speaking of this document yesterday, since it was not given to him.

BY MS. GRAMZOW:

Q. Go ahead.

A. These documents are related. The team member performance expectation is the basis for performance and discipline at Portland has been communicated to the team members from very early in the team management system. As I said this document existed before I came to Port Inland in 1995. The management team realized that the teams were having trouble resolving their conflicts either regarding issues in this performance expectation list or other conflicts. We put together the conflict resolution policy to give them a process to walk through either issues that were

e9c0bd04-2f17-41e8-ad5f-7e2af493c0c1

straightforward conflicts between team members or issues that could be related to discipline. But this is the list of expectations, the basis for our list of expectations. As I said, it's not inclusive, there are other things, but this gives a guideline on this is the kind of behavior we expect team members to have working for us accordingly.

Q. Are the Port Inland employees required to utilize the conflict resolution policy, Deposition Exhibit 1 from Steve White's dep?

A. There isn't an absolute requirement that they use this conflict resolution policy. If they have an issue that they don't feel comfortable in addressing within their team, they can certainly bring it to management. We would prefer they try to resolve things within the team, but they do have the option to bring issues to management directly.

Q. I'm not sure if this is today or yesterday, but you were testifying with respect to the termination meeting with Jason and I believe you told Jason, you said that you told him you said you can't give him a second chance. Do you recall that?

A. Yes.

Q. Why did you say that?

A. The decision was essentially made when I spoke with Paul Tunnicliffe. He said this is the falsification of time card is a termination offense. At that point our decision

making process was done.

Q. Are there any circumstances where you would not consider past performance as part of a mitigating factor for discipline?

A. Yes. For example, if we caught an employee selling illegal drugs on the property, that would be an immediate dismissal. I don't care how good of an employee they were.

Q. Any other circumstances?

A. Assault, sabotage, gross misconduct, gross violation of safety policies, there's a number of things that are on this list that one offense could be enough to result in termination, no matter what the past performance was.

Q. When you say this document, you're referring to?

A. The team member performance expectations, which is --

Q. Plaintiff's Exhibit 4, Bates stamped CA 001189?

A. And that's the purpose of the statement at the bottom. There are things that may result in immediate firing.

Q. Have you ever seen any documents related to employees -- strike that. Stick with Oglebay-Norton first, so it's not confusing. Have you ever seen any documents related to an employee's health care claims or expenses for Oglebay-Norton when you worked for them?

A. I don't recall seeing any documents that listed individual health care expenses for Oglebay-Norton.

Q. For an employee?

e9c0bd04-2f17-41e8-ad5f-7e2af493c0c1

A. For an employee.

Q. Same question with respect to Carmeuse. Have you ever seen any documents related to an employee's health care claims or expenses?

A. I've never seen any individual claims for employees for Carmeuse.

Q. Do you know where those type of documents would have existed for Oglebay-Norton when you worked for them?

A. No, not specifically.

Q. Do you know where they exist for Carmeuse, if at all?

A. No.

Q. Outside of the plaintiff, Jason, are you aware of any employee, either with Oglebay-Norton or Carmeuse, who have submitted a falsified time card requesting to be paid for time they did not work?

A. No.

MS. GRAMZOW: That's all I have.

RE-EXAMINATION

BY MS. EARDLEY:

Q. Have you an done exhaustive search in every employee file to determine whether or not a prior employee has been terminated for falsifying a time card that manner similar to what Mr. White did?

A. I have not done a search.

Q. Let me ask you about -- you talked just a little bit with