UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN – NORTHERN DIVISION

JASON S. WHITE and AMY WHITE,

        Plaintiffs,

                                 Case No. 2:09-cv 265

v.

                                 Hon. R. Allan Edgar

O-N MINERALS (MICHIGAN) COMPANY
d/b/a CARMEUSE LIME & STONE,          Mag. Timothy P. Greeley

        Defendant.

                                                                  /

| | |
|---|---|
| EARDLEY LAW OFFICES, P.C. | LIPSON, NEILSON, COLE, SELTZER & GARIN, P.C. |
| EUGENIE B. EARDLEY (P48615) | BY:   JOSEPH A. STARR  (P47253) |
| Attorneys for Plaintiffs |          KIRSTEN E. GRAMZOW (P52134) |
| P.O. Box 830 | Attorneys for Defendant |
| Cannonsburg, MI 49317 | 3910 Telegraph Road, Suite 200 |
| (616) 874-2647 | Bloomfield Hills, Michigan 48302 |
| | (248) 593-5000 |

                                                                                     /

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, PURSUANT TO FED. R. CIV. P. 56

## EXHIBITS H-X

# EXHIBIT "H"

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF MICHIGAN

NORTHERN DIVISION

JASON S. WHITE and AMY WHITE,

      Plaintiffs,          Case No. 2:09-CV 265

-v-                    Hon. R. Allan Edgar

O-N MINERALS (MICHIGAN) COMPANY
d/b/a CARMEUSE LIME & STONE

      Defendant.
_____

DEPOSITION OF DAVID MICKELSON

DATE:   October 14, 2010

TIME:   1:05 p.m.

PLACE:  617 Lakeshore Drive, Manistique, Michigan

APPEARANCES:

On behalf of Plaintiff:

     MS. EUGENIE EARDLEY  (P48615)
     EARDLEY LAW OFFICES
     P.O. Box 830
     Cannonsburg, Michigan  49317
     (616) 874-2647

On behalf of Defendant:

     MS. KIRSTEN E. GRAMZOW (P52134)
     LIPSON, NEILSON, COLE, SELTZER & GARLIN
     3910 Telegraph Road, Suite 200
     Bloomfield Hills, Michigan
     (248) 593-5000

Also Present:  Jason White, Jeff Himes

Reported By:  Teri L. Heacock, RPR/CRR/CSR-2309

Page 5

1    A.    Yes.

2    Q.    Fair?  Okay.  Have you ever had to testify in some kind of

3          a case in court or under oath for any reason that you can

4          recall?

5    A.    No.

6    Q.    All right.  What's your current position at the Port Inland

7          plant?

8    A.    Materials manager 3.

9    Q.    How long have you held that position?

10   A.    They changed my title this year.

11   Q.    Okay.  Approximately when?

12   A.    Earlier this summer.

13   Q.    Sometime in 2010?

14   A.    Yes.

15   Q.    Okay.  What was your title before that change?

16   A.    Production manager.

17   Q.    Production manager, you said?

18   A.    Production manager.

19   Q.    Okay.  How long was that your title?

20   A.    I think since '92.

21   Q.    Okay.

22   A.    '93.

23   Q.    Why the change in your job title, if you know?

24   A.    They hired a new person at Cedarville to manage their

25         shipping and logistics, and Carmeuse does not have -- that

281d46c8-d526-445a-a7cc-c6e2a3895a55

1      morning the -- after the Friday time card was turned in.

2      It would have been probably that Monday morning.

3  Q.  Okay.  And what did you hear, and from who?

4          MS. GRAMZOW:  Objection; compound question, but go

5      ahead.

6          THE WITNESS:  About the --

7  BY MS. EARDLEY:

8  Q.  About the time card issue.

9  A.  What did I hear about the time card issue?  I talked to the

10     crew at the boat end, and I believe it was a Monday, and

11     they said they thought that there was someone at the boat

12     end that was not being honest with his time card and

13     putting down time that they did not work.

14  Q.  Okay.  Who told you that?

15  A.  I'm trying to remember the people that were on that Monday.

16     I want to say that the crew was Burkholder, Turan.  I

17     believe Winsor was there, and I'm not sure who the -- I'm

18     not sure who the other person was, but there should have

19     been four in the lunchroom.

20  Q.  Okay.  Do you recall which one of those individuals raised

21     with you what you just said, that there's somebody who's

22     not being honest on their time card?

23  A.  All three made comments.

24  Q.  All three?  And you said Burkholder?

25  A.  Burkholder.

Page 57

1  Q.  What was that second one?

2  A.  Turan.

3  Q.  How do you spell Turan?

4  A.  T-u-r-a-n.

5  Q.  And what was the last one?

6  A.  Winsor.

7  Q.  W-i-n-d-s-o-r?

8  A.  No D.

9  Q.  Okay.  And were these members of the boat-end team who

10     worked the same shifts as Jason?

11 A.  I believe they were on his crew.

12 Q.  Did they say we think someone is doing this, or did they

13     say Jason White is doing this?

14 A.  They never said his name.

15 Q.  Did you ask the name?

16 A.  Uh-huh.

17 Q.  Yes?

18         MS. GRAMZOW:  You have to say out loud.

19         THE WITNESS:  Oh, yeah.  I'm sorry.  Yes.

20 BY MS. EARDLEY:

21 Q.  And what did you say?

22 A.  I said who is it.

23 Q.  And they said?

24 A.  The comment was you have everything that you need to find

25     out.

281d46c8-d526-445a-a7cc-c6e2a3895a55

Page 58

1    Q.   And who spoke those words?

2    A.   I think it was Loren Winsor.

3    Q.   Is Loren Winsor a male or female?

4    A.   Male.

5    Q.   So in this answer here, where it says Ms. Winsor, that

6         would be incorrect?  It's a mister?

7    A.   It's Mr. Loren Winsor.

8    Q.   Okay.  Just there's a witness list, and it says Ms., so

9         that's why I was confused.  Okay.  Then what happened?

10        What did you do with this information?

11   A.   Well, I tried to find out who they were talking about, and

12        I don't remember the exact word, but I said, okay, I'll go

13        back and look at the time cards and see if I can figure

14        this out, so I went back and looked at the time cards.

15   Q.   For what period of time?

16   A.   For the week before.

17   Q.   Okay.  And what did you see?

18   A.   The discrepancy was that Jason had put down that he had

19        worked that Friday, and that would have been incorrect,

20        because we only had three people out.

21   Q.   When you say "we only had three people out," what do you

22        mean?

23   A.   Loading the boat.  And I had called -- I had called to

24        change the load on that boat, and they told me there are --

25        we don't have enough people, and I said, well, who's not

Page 59

1          there? And I believe it was John Chandler that was in on

2          the phone in the loader, and he told me that Jason White

3          was not there.

4   Q.   And that was the prior Friday?

5   A.   That was -- that was the night that we were loading the

6          boat, yeah.

7   Q.   What boat was it?

8   A.   I don't know. I could look it up.

9   Q.   How would you look it up?

10   A.   We have records of the date that the boat left, so if we

11          loaded two boats that day, I couldn't tell you what boat.

12   Q.   Okay. But it would be one of the two?

13   A.   We can't load more than two in one day.

14   Q.   Okay. Do you remember what precisely was being loaded?

15   A.   We were -- can I tell you exactly?

16   Q.   Well, here's what I'm trying to do is you said you called

17          and talked to John Chandler?

18   A.   Yes.

19   Q.   Okay.

20   A.   And if I recall, I wanted to load the boat faster, and if

21          we added number four tunnel, and I don't remember if it

22          would have been north or south, that we could have gotten

23          that boat out of there quicker.

24   Q.   Okay.

25   A.   And it happened that -- this was after 7:00.

281d46c8-d526-445a-a7cc-c6e2a3895a55

1   Q.   In the evening?

2   A.   In the evening.

3   Q.   Okay.

4   A.   And so I called and said, you know, this is Dave, how's the

5        boat going.  I thought about it, and I think maybe we can

6        load it faster if we can grab another tunnel, and load from

7        another tunnel.  And there was hesitation at the other end,

8        and I thought from his voice that it was John Chandler, and

9        I didn't -- I didn't know yes hesitated, and I said, can

10       you or can't you, and he said, well, we don't have enough

11       people.

12  Q.   Okay.

13  A.   And I said, well, who's not there?  And he said, Jason

14       White, and I said, well, I guess we can't -- I guess we

15       can't change the load.

16  Q.   Now, at that time, how did people who worked as boat ends

17       get their schedules set?  For example, if Jason was

18       planning to come into work and he couldn't for some reason,

19       how was that communicated to you?

20  A.   It may not be.  He needed to clear that with his crew.

21  Q.   "Crew" meaning the co-workers?

22  A.   Yes.

23  Q.   Okay.  Tell me how that would work.  Give me an example.

24  A.   He would call in and say do I need to come out tonight, and

25       they would need to know what the boat schedule was in order

Page 61

1    to make that decision, but if they -- if they could load

2    the boat, they would -- it's not uncommon to accommodate a

3    boat-end team guy if he can't come out.

4    Q.  And that's kind of what I was trying to figure out.  If

5        Jason, hypothetically, had called in that week and said,

6        hey, my kid's sick and I can't come in, I've got to go to

7        the hospital or something, he could have communicated that

8        to one of the boat-end team members; is that correct?

9    A.  He should have.

10   Q.  Okay.  So he didn't have to call some other person in the

11       office or call you directly; is that correct?

12   A.  He did not.

13   Q.  Okay.  All right.  So you were just describing to me what

14       you remember about that Friday.  So that Friday, when you

15       called and talked to Mr. Chandler, you think it was

16       Chandler, at that point, if Jason wasn't there one way or

17       the other, it didn't make any difference to you at that

18       moment, back on Friday?

19   A.  Did it make a difference?

20   Q.  (Nods head)

21   A.  It was not something I could do anything about.

22   Q.  Well, let me ask it this way.  Were you upset, like, hey,

23       Jason's supposed to be working tonight, where is he, that

24       kind of reaction?  Do you think he was supposed to be

25       there?

281d46c8-d526-445a-a7cc-c6e2a3895a55

Case 2:09-cv-00265-RAED  Doc #47-1  Filed 12/08/10  Page 11 of 110  Page ID#480
White v. Carmeuse          10/14/2010          David Mickelson

Page 62

1    A.    No.

2    Q.    That's what I'm trying to figure out.  All right.  So that

3          Monday you mentioned these people, the boat-end people who

4          said that there's a problem, you said you looked at the

5          time cards, and so the time card you were looking at we

6          marked as Exhibit 8 in Jason's deposition.  Let's mark this

7          in his, too.  Call it Mickelson 1.

8              (Deposition Exhibit Number 1 marked)

9              MS. GRAMZOW:  Just recalling Plaintiff's Exhibit

10         Number 8 is Mickelson Number 1?

11             MS. EARDLEY:  Yeah.

12   BY MS. EARDLEY:

13   Q.    You're looking at that, Mr. Mickelson?

14   A.    Yes, I am.

15   Q.    This is the time card you said you looked at that Monday

16         after the boat-end team people talked to you, correct?

17   A.    Yes.

18   Q.    All right.  Did you also go through the time cards of the

19         other people who were working that prior week, or just

20         Jason's?

21   A.    I went through all of them.

22   Q.    So when you say you went through all of them, how many

23         employees would that have included?

24   A.    12.

25   Q.    Who have been on that list of employees?

Page 63

1   A.   The boat-end team.

2   Q.   Can you -- but can you give me the names of the

3        individuals?

4   A.   I can try.

5   Q.   Okay.  Do your best.

6   A.   Burkholder, Turan, Winsor, Faulkner, Kraatz.  Isn't that

7        something.

8   Q.   Do your best.

9   A.   I am.

10  Q.   Take your time.

11  A.   That too.  The guys change around so much that it's hard to

12       remember two years ago who was actually sitting on that

13       team.  Kenny, probably.  I don't even know if Kenny Rice

14       was there then.  Some of the guys there now I'm having

15       trouble remembering if they were on that team.  We have a

16       temporary there now.  I don't know if Bill Parrish was

17       there then.  I think he was a team member, but I'm not sure

18       that he was at the boat end.

19  Q.   How about Dave Tiglas?

20  A.   Oh, Dave Tiglas would have been there.

21  Q.   Anybody else you can think of at the moment?  Loren Winsor?

22  A.   I said Winsor.

23  Q.   Okay.  All right.  That's all you can remember right now?

24  A.   Yeah.

25  Q.   Okay.  So your testimony is you went through all of those

281d46c8-d526-445a-a7cc-c6e2a3895a55

Case 2:09-cv-00265-RAED Doc #47-1 Filed 12/08/10 Page 13 of 110 Page ID#482
White v. Carmeuse       10/14/2010      David Mickelson

Page 64

1    individuals' time cards?

2  A.  For the week.

3  Q.  For the week.  Okay.  Did you see any other problems or

4      discrepancies on any of those time cards other than the one

5      you're looking at, Exhibit 1 for Mickelson?

6  A.  Nothing that I recognized as a discrepancy.

7  Q.  What do you mean?

8  A.  Nothing that I recognized as a discrepancy.

9  Q.  So if we were to have all those time cards in front of us

10     right now, did some of them have mistakes in math or other

11     kinds of errors on them, as you recall it?

12 A.  I did not see that.

13 Q.  Okay.  And did you go through any other means of double

14     checking the other individuals' time cards, meaning not

15     Jason White, but other people's time cards?

16     MS. GRAMZOW:  Objection.  I think it's asked and

17     answered, but go ahead.

18     THE WITNESS:  How do you mean?

19 BY MS. EARDLEY:

20 Q.  You said that as to Jason White, you had a memory that you

21     had called and talked to, you think, John Chandler?

22 A.  Yes.

23 Q.  Who said there's only three people there, and Jason wasn't

24     there, right?

25 A.  Correct.

Page 69

1    A.    Correct.

2    Q.    So after you found that card, what was the next step that

3          you took?

4    A.    Somehow I confirmed with the crew, and I don't remember if

5          I called them or if I went back down there, or -- and if I

6          took the card down there, I don't remember exactly, but I

7          confirmed that you guys are talking about Jason White.

8    Q.    Okay.  And do you remember who you confirmed that with?

9    A.    It would have been those same people that I mentioned

10         earlier, Burkholder, Winsor, Turan, I think was in the

11         lunchroom, so -- somehow that -- somehow I confirmed that.

12         I don't remember how I did that.

13   Q.    All right.

14   A.    And --

15   Q.    Okay.  Then what did you do?

16   A.    And that's when I wrote "wasn't here" on there.

17   Q.    On Exhibit 1 for Mickelson?

18   A.    Those are my -- that's my writing.

19   Q.    On Exhibit 1 there, underneath your hand, right?

20         MS. GRAMZOW:  Exhibit 1 Mickelson, yes.

21   BY MS. EARDLEY:

22   Q.    All right.  All right.  So you wrote that, "wasn't there,"

23         on the time card, then what did you do?

24   A.    I brought the time card, and I don't know if this was

25         immediately, I brought the time card to the attention of

281d46c8-d526-445a-a7cc-c6e2a3895a55

1    Jeff Himes.

2   Q.   Why?

3   A.   Because I suspected that -- well, I felt I had evidence

4        that Jason had written down to be paid for time that he had

5        not worked.

6   Q.   Did you consider that he could have made a mistake and

7        written it down on the wrong day at that time?

8   A.   At that time I wanted to show this to Jeff, because I

9        didn't know what to do with it, exactly.

10  Q.   Let me ask it one more time.  Did you consider, and if the

11       answer is no, that's fine, did you consider at the time

12       that maybe Jason had made a mistake on the time card?

13  A.   I did not consider that.

14  Q.   Okay.  Did you consider that someone else might have

15       written the wrong day on his time card?

16  A.   No.

17  Q.   You have heard some testimony earlier in the case that the

18       time cards would be filled out and put in some kind of

19       boxes or slots in the lunchroom.  Is that something that

20       you're familiar with?

21  A.   Yes, it is.

22  Q.   Okay.  Did you consider whether or not one of these other

23       boat-team members who brought this to your attention had

24       some problem or dispute with Jason White that might lead

25       them to try to get him in trouble?

Page 73

1   A.   I did not.

2   Q.   And then my question would be, why did you not?

3   A.   I was dealing with this time card.

4   Q.   Did you then, at that point, go back and look at other time

5        cards for earlier time periods of Jason's?

6   A.   When I talked to Jeff Himes, I told him about this time

7        card.  I indicated that the boat end suggested that this

8        probably was not the only time that this had happened.

9   Q.   Uh-huh.

10  A.   But they would not give me any more information.  I

11       couldn't get them to say, tell me when, you know, tell me

12       when those times were.  They couldn't -- they couldn't --

13       they either couldn't or wouldn't tell me.  And so when Jeff

14       and I talked, he asked me to go back and look at the entire

15       year's time card to see if there were any discrepancies

16       that I could see that wouldn't be normal, any discrepancy

17       to anything that I could find.

18  Q.   As the supervisor -- or what was your title again?

19  A.   Production manager.

20  Q.   As production manager, did you have the authority to call

21       in the someone or the boat-end individuals and say, look,

22       tell me if you know of a date and time Jason White did not

23       work but said he did?  Did you have the authority to ask

24       them those questions?

25  A.   I could ask any question I wanted.

281d46c8-d526-445a-a7cc-c6e2a3895a55

Page 76

1   Q.   Let me see if I can clarify. Are you saying before the

2        incident with Jason White, you, yourself, had never been

3        involved in any kind of disciplinary process for an

4        employee of any kind?

5   A.   I would sit in on the management team, and certain things

6        would be -- anything that came up would be discussed there

7        to the level that the management team needed to know about

8        it, but I don't believe that I ever was involved with a

9        direct report that was disciplined.

10  Q.   Did you ever, in your time at Port Inland, up to this time,

11       so when you're looking at Jason White's time cards, had you

12       ever reprimanded an employee verbally for being late or

13       doing something wrong at work?

14  A.   Verbally?

15  Q.   Yes.

16  A.   No record?

17  Q.   Yeah, just verbally.

18  A.   I can't say that I didn't.

19  Q.   Okay. And then as far as having to write someone up for

20       some reason, either they broke something, they got in a

21       fight with another employee, did you ever have to write

22       something up regarding that type of event while you were at

23       Port Inland?

24  A.   I don't recall.

25  Q.   Okay. So you looked at the prior time cards, and what did

281d46c8-d526-445a-a7cc-c6e2a3895a55

Case 2:09-cv-00265-RAED Doc #47-1 Filed 12/08/10 Page 18 of 110 Page ID#487
White v. Carmeuse      10/14/2010      David Mickelson

Page 77

```
 1          you find for 2008 for Mr. White?
 2    A.    I believe I pulled out two that showed Jason had put a
 3          longer time on his card than his crew had worked.
 4    Q.    And how were you able to determine that it was a longer
 5          time on his card than his crew had worked?
 6    A.    I looked at all the weeks that he worked, and I looked at
 7          the days that he worked, and I think we have copies of
 8          them, but I think there were two where Jason had put hours
 9          longer than his crew, the other people had put down on
10          their card.
11    Q.    So I'm trying to find them here.  If I understand you
12          right, this investigation that you did on those, it
13          required you to compare the times Jason put down on his
14          card -- excuse me, with what other crew members put in on
15          their cards?
16    A.    Correct.
17    Q.    Okay.  Now, correct me if I'm wrong, but I've heard other
18          testimony from witnesses that it was not unusual for
19          individuals on the same boat-end team, for example, to come
20          in at different times on occasion.  Meaning like they might
21          -- John Doe might start at a different time than Jane Doe,
22          even if they're on the same crew; is that correct?
23    A.    They may start at different times.
24    Q.    Okay.  And I also heard testimony that sometimes a boat-end
25          team member might leave at a different time than another
```

Case 2:09-cv-00265-RAED Doc #47-1 Filed 12/08/10 Page 19 of 110 Page ID#488
White v. Carmeuse          10/14/2010          David Mickelson

Page 79

1      had left on those dates, meaning left their work stations?

2  A.  No.  No.

3  Q.  And you heard Mr. Himes testify -- I'm sorry, did I cut you

4      off?

5  A.  Excuse me, but I may have brought them up.  I may have

6      brought up those times later.

7  Q.  To whom?

8  A.  We had -- I don't remember.  I probably shouldn't have said

9      that, but it seems to me like -- oh, but it wouldn't have

10     been with the boat end.  It wouldn't have been with the

11     boat-end crew.

12 Q.  All right.  All right.  So the one photo that was marked as

13     Exhibit 3 on yesterday's deposition, Stephen White's

14     deposition, looks like this, 5/17/08.  Would that -- would

15     that have been one of the dates that you said you looked at

16     the time card and saw something questionable?

17 A.  Oh, yes.

18          (Deposition Exhibit Number 2 marked)

19 BY MS. EARDLEY:

20 Q.  If you're looking there at what we had marked as Mickelson

21     2, that is --

22          MS. GRAMZOW:  The document she was just -- he was

23     handed is the same.  These two have been marked, the exact

24     same thing.

25          THE WITNESS:  She handed that to me first.

White v. Carmeuse

1   A.   That would be correct.

2   Q.   And you said you think there was another one or another

3        time card that you observed where you thought it looked

4        like there was a discrepancy?

5   A.   Yes.

6   Q.   Do you remember what the date of that one was?

7   A.   No.

8   Q.   Okay.  And you said you checked the camera for the one you

9        were just looking at, the May 18th.  One, did you check the

10       camera for another time card date as well?

11            MS. GRAMZOW:  He didn't hear you.

12   BY MS. EARDLEY:

13   Q.   I'm sorry, did you check the camera?

14   A.   I did.  I did hear you.  I'm trying to remember.  Yes, I

15       did.

16   Q.   Okay.  And what cameras did you look at to try to see if

17       you could corroborate the times Mr. White was present or

18       not present?

19   A.   There's two cameras.  There's one that looks at the

20       boat-end lunchroom.  It's really designed to look at the

21       harbor, but it includes the boat-end lunchroom and where

22       they park.

23   Q.   Okay.  Okay.

24   A.   And I went back and looked at the pictures for that, too.

25   Q.   And what did you see on the pictures?

281d46c8-d526-445a-a7cc-c6e2a3895a55

Case 2:09-cv-00265-RAED Doc #47-1 Filed 12/08/10 Page 21 of 110  Page ID#490
White v. Carmeuse          10/14/2010          David Mickelson

Page 83

1             MS. GRAMZOW:   For which day?

2             MS. EARDLEY:   Either.

3             THE WITNESS:   It was a series of pictures, and the

4        pictures showed that there were two cars that left, and the

5        lights went out, and Jason's time card was a couple hours

6        beyond that.

7   BY MS. EARDLEY:

8   Q.   His time card indicated that he was still there?

9   A.   He was about two hours beyond when the cars left and when

10       the lights went out in the lunchroom.

11  Q.   Okay.   But we don't have copies of that footage; is that

12       correct?

13  A.   That would be correct.

14  Q.   So when you reviewed them, did you save them to disk or

15       anything?

16  A.   It was not that easy to print them out.   I had a lot of

17       trouble printing them out, and so I did not.

18  Q.   And at that time, the one -- when you looked at the footage

19       from the break room --

20  A.   Uh-huh.

21  Q.   -- that you just described, do you have any idea whether

22       Jason would have been working in some other area of the

23       plant for any reason?

24  A.   There would have been no reason to work in another area of

25       the plant.

Page 89

1     and Lecia then can -- and I don't remember having a lot of

2     issues with the boat-end time cards.

3  Q. Now, if Ms. Neadow testified this morning that it was not

4     uncommon for her to have some problem or issue on a time

5     card and then contact the employee to question them about

6     it, do you have any reason to dispute that?

7  A. No. Dana did a pretty good job of that.

8  Q. Okay. And you'd rely on whatever she testified to about

9     that?

10 A. I would, yes.

11 Q. Okay. All right. So you looked at the cameras, and then

12    you looked at the cards, and then what, who did you go to

13    next in your investigation of the allegation of problems

14    with Jason's time cards?

15 A. I discussed what I found with Jeff in the instance where

16    you have a picture, we had two cars leaving the boat end --

17 Q. Uh-huh.

18 A. -- and they both left about -- within about five minutes.

19 Q. Uh-huh.

20 A. And with the other one, we had two cars leave the boat-end

21    lunchroom area. The lights went out in the lunchroom and I

22    followed the camera 'til 7:00 the next morning, when the

23    day crew came in, and there were no vehicles there during

24    that time.

25 Q. So how long did you sit there and watch? I mean, did you

Page 90

1          watch the continuous tape feed?

2    A.    It's not a continuous tape feed.  It's a motion camera.

3    Q.    So if there's no activity, it's just still?  It just

4          doesn't run?

5    A.    That's my understanding of how it works.

6    Q.    How long did this all take you?  How much time did this all

7          take you?

8    A.    I don't remember.  Most of a day.

9    Q.    Eight hours?

10   A.    On and off, maybe.

11   Q.    So was just destroyed because there was some kind of

12         computer error or server crash?

13              MS. GRAMZOW:  If you know.

14   BY MS. EARDLEY:

15   Q.    Is that your understanding?

16   A.    I heard that here.

17   Q.    Okay.  You didn't know that before?

18   A.    No.

19   Q.    Okay.  Then you and Mr. Himes discussed what you had found.

20         What did you do next?

21   A.    I think Jeff talked to me and said we should -- I believe

22         we had a management team meeting, a staff meeting the next

23         day.

24   Q.    Who was in on that meeting?

25   A.    It would have been the -- it would have been the staff at

281d46c8-d526-445a-a7cc-c6e2a3895a55

Page 91

1    the time; Kevin, Rhonda, Jeff, me.  And if we have a staff

2    meeting, regardless of the people available, 'cause they're

3    so hard to keep -- get everybody together.

4  Q.  Okay.

5  A.  And we reviewed what I had found and what I had heard.

6  Q.  Okay.  And did you make a recommendation as to what you

7    thought should be done with the boat-end employee in

8    question?

9  A.  I did not.

10  Q.  Did you offer any thoughts at all?

11  A.  I wasn't sure what we were going to do about it.

12  Q.  And so my question is did you say, gee, I think this is

13    pretty serious, we should fire him, or this is upsetting,

14    or any comment at all?

15  A.  Well, as a group, I said this is what we have, this is what

16    we -- this is what we have to discuss, and there was

17    probably some discussion back and forth about what had

18    happened, because I'm -- they must have asked me when did

19    you find out.  We probably reviewed the whole thing at that

20    meeting, and I think at that meeting there was a question

21    what should we do.  Because like what do we do with

22    Carmeuse now, how do we bring -- what do we do now?  How

23    would Carmeuse handle this?  And Jeff -- it was -- and I

24    don't know if Jeff said I will do this, or we said, you

25    know, we should check with someone at corporate.  Jeff said

  
```
 1            he would talk to his boss, Paul Tunnicliffe, to see how
 2            they --
 3   Q.       Let me stop you one second.  What did you say in these
 4            discussions, if you can recall?
 5   A.       All I did was bring what information I had about the
 6            incident.
 7   Q.       Did you ever say something to the effect of I think this is
 8            pretty serious, we should consider termination, or anything
 9            to that effect?
10            MS. GRAMZOW:  Objection; asked and answered.  Go
11            ahead.
12   BY MS. EARDLEY:
13   Q.       You can go ahead and answer.  You still haven't answered
14            that question.  I mean, you've told me a lot of things, but
15            I want to know, did you ever express that in any form
16            during this meeting?
17   A.       No.
18   Q.       Okay.  Did anyone express their feelings on that during the
19            meeting, to the best of your memory?
20   A.       Not that I recall.
21   Q.       What did you think should happen, as you sat there, as
22            opposed to whether you said anything or not?
23   A.       Well, it was a staff meeting, and so I don't remember if we
24            -- I don't remember if this was the only issue we talked
25            about, and then Jeff went and called, or -- I don't
```

Case 2:09-cv-00265-RAED Doc #47-1 Filed 12/08/10 Page 26 of 110 Page ID#495
White v. Carmeuse          10/14/2010          David Mickelson

Page 93

1      remember, but the -- I didn't know where to go with it, and
2      as a staff, is this a -- I don't remember if we discussed
3      the employee expectations at that time, and determined that
4      it was an offense where you could be terminated.  I don't
5      remember if we did that or not.
6   Q.  Did you, in your own brain, think this is the kind of thing
7      someone should get fired for, just your own internal
8      thought process at the time?
9   A.  My own -- what I thought was I wonder how Carmeuse is going
10      to handle this information.
11  Q.  You didn't have any thought one way or the other about what
12      should be done?
13  A.  Not at that time.
14  Q.  Did you at any point in time express what you think should
15      be done about this offense?
16  A.  At the end, when Jeff came back and said Paul Tunnicliffe
17      told me that this is a very serious -- considered a very
18      serious offense with Carmeuse, and that this person should
19      be terminated, I really didn't think we had a -- I really
20      didn't think we had any recourse.  It's like I don't know
21      what we can -- there's -- I don't know that there's
22      anything else we can do.
23  Q.  Okay.  And I know Mr. Himes already testified about this
24      meeting.  During this meeting, your memory, did anybody
25      bring up the idea, well, let's bring in Jason White and

info@wmreporting.com WEST MICHIGAN REPORTING          616-361-1700
NCRA #8204
281d46c8-d526-445a-a7cc-c6e2a3895a55

Case 2:09-cv-00265-RAED Doc #47-1 Filed 12/08/10 Page 27 of 110 Page ID#496
White v. Carmeuse        10/14/2010           David Mickelson

Page 97

1        time off, he should talk to his team members.

2   A.   I did.

3   Q.   Okay.  So you're saying you don't know whether or not he

4        did take some time off in consultation with his team

5        members to attend to his daughter's medical treatment?

6   A.   No, I don't know what days he would have done that.

7   Q.   Okay.  So you don't know if he did it or not?  You just

8        told him to do it by working it out with his team members?

9   A.   I told him that if he needed time and he -- he could work

10       it out with his team.  If he ran into a situation where

11       they could not work it out, which means there would be

12       nobody to fill in, to let me know.

13  Q.   Okay.  So that prior week, the week where we've got this

14       time card issue for which he was terminated, were you aware

15       during that week that Jason was called to Green Bay related

16       to something for his daughter?

17  A.   No.

18  Q.   Okay.

19  A.   No.

20  Q.   All right.  Did you ever hear that at any point in time?

21  A.   About a specific incident?

22  Q.   Uh-huh.

23  A.   No.

24  Q.   Okay.  All right.  Let me take a break here.

25            (Pause in the proceedings from 3:30 p.m. until 3:46

Case 2:09-cv-00265-RAED Doc #47-1 Filed 12/08/10 Page 28 of 110 Page ID#497
White v. Carmeuse          10/14/2010          David Mickelson

Page 98

1       p.m.)

2    BY MS. EARDLEY:

3    Q.   Okay.  I want to ask you about Mr. --

4    BY MS. EARDLEY:

5    Q.   Are you ready?

6    A.   Yeah.  I just wanted to -- in one of questions --

7    Q.   Okay.

8    A.   -- what did you tell them, what did you tell the management

9         group.

10   Q.   Team?

11   A.   Team.

12   Q.   Okay.  Did you have something you wanted to add?

13   A.   Well, the specifics were that the team had called me in,

14        and essentially I had gone down there, they had told me

15        they felt like someone had taken advantage of the time card

16        situation.  So I told them that what had happened that

17        Friday night, and I told them that Jason was the one not

18        there.  Jason had put time on his time card.  One of the

19        reasons we were -- one of the reasons that we were looking

20        at this time card in particular was he put down exactly

21        what he did by hour, which we knew couldn't be right.  Then

22        we talked about the lack of pictures showing him at the

23        plant.

24   Q.   Can I just stop you one second?  Is this when you're

25        talking in the management team meeting?

Page 99

1   A.   Yes.  Those are some of the -- those are the details I went

2        over.

3   Q.   That, what you told the group about?

4   A.   Right.  Right.

5   Q.   Okay.

6   A.   We talked about the -- we did talk about the other

7        discrepancies, and I had no reason -- and I had no reason

8        to believe that what was on this time card was correct, and

9        that the boat end was reluctant to come out and say it was

10       actually Jason.  But when I went back, they said, yeah,

11       that was it.  There was one other thing that was said.

12  Q.   At this same meeting?

13  A.   There was one other thing that was said that I believe I

14       brought up at the management meeting, was that Jason's card

15       was not with the other time cards when they turned them in.

16       He had turned it in himself, but I -- that was -- that

17       really didn't -- I didn't know what to make of that.

18  Q.   I don't understand what you just said.  What do you mean,

19       Jason's card was not with the other cards?

20  A.   Well, you talked about the slots.

21  Q.   Right.

22  A.   And one of the things I heard was that Jason had turned

23       that card in himself.

24  Q.   Who did you hear that from?

25  A.   It was one of -- part of the conversation.

281d46c8-d526-445a-a7cc-c6e2a3895a55

Page 101

1    Q.    But is there a specific reason for it, just convenience?

2    A.    Must be convenience.  It's a neat way to keep track of your

3          card, because you have a slot with a name on it.

4    Q.    Right.  Now, let me stop you for one second.  The slots,

5          'cause I haven't been there to see it, haven't seen a

6          picture or anything, are they set up in such a way that a

7          person could put the time card in and walk away, and then

8          if someone else is walking through, they could pull it out

9          and look at it?

10   A.    Yes.

11   Q.    Okay.  I'm sorry, I didn't mean to interrupt you.  Was

12         there something else you wanted to add about your

13         discussion?

14         MS. GRAMZOW:  Do you want her to read back where you

15         were?

16   BY MS. EARDLEY:

17   Q.    About your conversation to the management team, 'cause I

18         didn't ask you a question.  You just said I wanted to add

19         something.

20   A.    Yeah, I just wanted to go over the information that I

21         presented to the management team.

22   Q.    Okay.  All right.  So you presented to the management team,

23         and then after that happened, were you present when Jason

24         was terminated?

25   A.    Yes.

Page 102

1   Q.   All right.  And tell me what happened in that meeting,

2        based on your memory.

3   A.   At that -- Jeff, on that day, Jeff said call Jason in.  I

4        said when do you want him.  He said please bring him in at

5        1:00.

6   Q.   Okay.

7   A.   So I think I called down to the boat end, and I asked

8        Jason, will you have Jason come to the office at 1:00.

9   Q.   Okay.

10  A.   And he actually came in early, and I was at -- I was on the

11       phone, and I said, Jason, I really -- I really asked you to

12       come at 1:00, and you need to be here at 1:00.

13  Q.   So he came up early, and then you told him to go back out,

14       and came back later?

15  A.   Yeah.  I said -- I can't remember my exact words, but I

16       said we need to talk to you at 1:00.

17  Q.   Okay.

18  A.   I don't remember if that's the words I said, but he came

19       early, and, actually, I was still on the phone doing boats

20       and trying to do my schedule.

21  Q.   Okay.

22  A.   And so then he came in at 1:00 and I asked him to come into

23       Jeff's office, Rhonda came in.  Jeff explained to Jason

24       that as the plant manager, it was his responsibility to

25       notify him that he was being terminated for falsifying his

281d46c8-d526-445a-a7cc-c6e2a3895a55

Page 124

1  Q.  Okay.  Was it -- do you know how long Oglebay-Norton kept

2      its record for boats that came into port, Oglebay-Norton?

3  A.  Any record?

4  Q.  Record of boats that come into port.  Do you know how long

5      Oglebay-Norton kept that record?

6  A.  While under Oglebay-Norton?

7  Q.  Right.

8  A.  We tried to pretty much keep everything, and then there --

9      it would be purged once in a while when we ran out of the

10     room of the hard copy information.

11 Q.  Maybe I should ask who was in charge of keeping those

12     records at Oglebay-Norton, 'cause I don't --

13 A.  Me.

14 Q.  You were, okay.  And do you know if Oglebay-Norton had a

15     rule about keeping those records about boats coming into

16     port?

17 A.  No.

18 Q.  Okay.  You stated earlier, when Ms. Eardley asked you a

19     question, that you did not consider it a mistake with

20     respect to Mr. White's falsification of his time card.  Do

21     you remember that?

22 A.  Yes.

23 Q.  Okay.  Why?  Or why not, I guess.  You said you did not

24     consider it a mistake.  Why not?

25 A.  The detail that he put on it, and he said that he was there

Case 2:09-cv-00265-RAED Doc #47-1 Filed 12/08/10 Page 33 of 110 Page ID#502
White v. Carmeuse          10/14/2010          David Mickelson

Page 125

1       that day.  I know he wasn't there that day, but how he

2       could remember what he did, if he wasn't there, we didn't

3       -- if he would have just -- I mean, there was -- there was

4       explicit this is what I did for X amount of hours on a day

5       that he wasn't there.

6   Q.   Are you referring to Plaintiff's Deposition Exhibit 8, the

7       time card for 8/10/08?

8   A.   Correct.

9   Q.   Okay.  Why did it matter to you that the lunchroom light

10      was out in the footage that you referenced earlier?  What

11      does it mean?

12  A.   I assume when you leave, you turn out the lights.  I don't

13      know -- I don't know what he could have done without those

14      lights on for the time that he was there, and when the

15      lights went out, we had no more pictures of any movement at

16      all at the dock, and on his time card, he showed that he

17      did things at the boat end, and he couldn't have gotten

18      into his car without that camera taking a picture.

19  Q.   You stated that you initial the time cards at the beginning

20      of the week once they're received from administration.  Do

21      you recall that testimony?

22  A.   Once the payroll's completed, the time cards are put on my

23      desk, and I go -- I sign the time -- I would sign them

24      individually.

25  Q.   Okay.  My question is what is the purpose of initialling

Case 2:09-cv-00265-RAED  Doc #47-1 Filed 12/08/10  Page 34 of 110  Page ID#503
White v. Carmeuse        10/14/2010        David Mickelson

Page 128

1       what were you thinking during the termination meeting, and

2       you had said that you wonder how Carmeuse will handle it.

3       Do you remember saying that?

4   A.  I said that during management meeting.  I didn't --

5   Q.  Oh, management meeting, yeah.

6   A.  She asked me what I was thinking then.

7           MS. EARDLEY:  That's what I recall.

8   BY MS. GRAMZOW:

9   Q.  Yes, I said termination meeting.  I meant management

10      meeting.  Thank you for correcting me.  You recall saying

11      that?

12  A.  I don't know that I said it -- oh, I said it to her.

13  Q.  You said it to Ms. Eardley?

14          MS. EARDLEY:  It's all in here, whatever you said.

15  BY MS. GRAMZOW:

16  Q.  Yes.  Okay.

17  A.  Yeah, that's fine.

18  Q.  Why did you focus on Carmeuse's position?

19  A.  Well, in our list of expectations, this -- this could

20      result in termination, but --

21  Q.  "This" meaning?

22  A.  This incident that Jason did.  At the meeting, this could

23      result in termination, but we had very little experience

24      with Carmeuse, on how they handled things, and they had a

25      very hands-on -- we'll help you with almost any decision

Case 2:09-cv-00265-RAED Doc #47-1 Filed 12/08/10 Page 35 of 110 Page ID#504
White v. Carmeuse        10/14/2010        David Mickelson

Page 129

1      that you need to make.  So quite frankly, I was at a loss

2      where we were going with this once I told everybody that we

3      had, for all the details that I went through and explained

4      before.

5  Q.  Okay.  Just a few moments ago, before Ms. Eardley concluded

6      the -- your -- her questions to you, we were talking about

7      Dave Lakosky.

8  A.  Yeah.

9  Q.  Okay.  Do you recall at what point in time someone from the

10     boat-end team told you about this rumor?

11 A.  Actually, what I said was they asked me about it, and, no,

12     when they asked me about it, I don't remember.

13 Q.  What do you mean, they asked you about it?  Like --

14 A.  It would be a situation where what did you hear about

15     Lakosky?  What are you referring to?  And there would have

16     been some discussion, and it seems to me like at some point

17     I said I don't know.  This is what I heard, but he's not my

18     employee, doesn't work for me.  I have no reason to believe

19     any of it's true, so I just told him what I had heard.  I

20     don't know where he worked.  I don't know if he worked at

21     the quarry or if he worked at the garage.  I don't know

22     where he was working.

23 Q.  And with respect to the Jamie and Bush --

24 A.  Butch.

25 Q.  Jamie and Butch Jenerou situation that Ms. Eardley

Page 130

1    questioned you about a few moments ago -- ·

2  A.  Yeah.  She asked me about that.  That was a situation that

3      I believe he worked for Jeff at the time, and I think

4      that's what Jeff said today.

5  Q.  Do you remember -- what do you recall from that incident?

6      Do you remember when it occurred?

7  A.  I don't remember anything about the incident.  I just -- in

8      particular.

9  Q.  Okay.

10  A.  That was, again, he worked for a different production

11      manager.  It would be up to him to carry that forward.

12  Q.  Mr. Mickelson, have you ever seen any documents related to

13      an employee's health care claims or expenses, either when

14      you worked for Oglebay-Norton or Carmeuse?

15  A.  No.  No.

16  Q.  Have you ever participated in any health insurance

17      committee, like Mr. Himes testified to earlier?

18  A.  No.

19  Q.  If you recall that testimony, do you recall what I'm

20      referring to?

21  A.  Yeah.

22  Q.  Okay.  And the answer is still no?

23  A.  And the answer is still no.

24          MS. GRAMZOW:  That's all I have.

25          MS. EARDLEY:  What are we up to?

# EXHIBIT "I"

# NEW HIREE INFORMATION

Congratulations!!! You have been chosen to fill one of our Operations Associate openings.

We would like you to begin on July 1, 2002 , ( 2 weeks after successful completion or drug screening).

Employment is dependent upon a favorable drug screening which we would like to schedule immediately at with Compliance Management Systems in Munising. Their number is (906)387-2252 please schedule with Diana Barney as soon as possible. You will also need a physical (hearing and pulmonary). We (Pat) can schedule the physicals at Manistique Medical Center.

Your starting training wage will be $14.65 per hour. You will be at that rate for 90 days. After the training period the hourly rate will increase to $17.65. You will be evaluated at 60 and 90 days.

Benefits will begin the 1st of July (if starting in June or first of month following date of hire). *or 1st of Aug? ask Pat*

You will be required to wear steel toed shoes. The company currently reimburses up to $180.00 per year to each employee. Nelson shoes in town will charge your boots up to $180.00. You can also have Port Inland's Purchasing Associate order you a pair of boots. If you purchase your boots elsewhere on your own, bring in a receipt for reimbursement.

If you wear prescription glasses, you will need to get prescription safety glasses which we reimburse up to $100.00 for bi-focals. We are currently setting up accounts with Dr. Wilson, in Manistique and Shopko in Escanaba. You will need to get a slip from here before you can get our discount. You can go elsewhere if you would like. Bring in a receipt and we will reimburse our allowance.

Regular Safety glasses and hard hats will be supplied on your first day. Other attire you can find out about once you begin.

You will need MSHA training. Have you had training in the past and when? *will need*

Answer other questions as asked.

On your first day we will cover policies, programs and complete necessary paperwork for your employement here.

**EXHIBIT "J"**

# Employee Transaction Authorization

- ☐ Hire
- ☐ Employee Job/Type/Hours Change
- ■ Compensation Change
- ☐ Transfer
- ☐ Retirement
- ☐ Termination
- ☐ Return from Disability or LOA
- ☐ Estate/Survivor Payments

| Name (Last, First, Initial) | Social Security Number | Effective Date |
|---|---|---|
| WHITE, JASON S. | ▓▓▓▓▓▓ | October 1, 2002 |

| | From | To |
|---|---|---|
| Position Number | | |
| Department | | |
| Unit | | |
| Company | | |
| Location/Territory | | |
| Pay Class | | |
| Job Code | | |
| Job Title | | |
| Employee Type | | |
| Work Time % Work Week | | |
| Grade | | |

## Compensation

| | From | | | To | |
|---|---|---|---|---|---|
| Base Salary/Wage | .$14.65 | Per | Hr | $17.65 Per | Hr. |
| Bonus | $ | | | $ | |
| Total Compensation | $14.65 | Per | Hr. | $17.65 Per | Hr. |

## One Time Payments

| | |
|---|---|
| Prorated Bonus | $ |
| Severance | $ |
| Other (Specify) | $ |
| Unused Vacation Days | |
| Comments | |

## Approvals

| Signature | Date 9/09/2002 | Signature | Date |
|---|---|---|---|
| | | | |

CA00013

**EXHIBIT "K"**

**O-N MINERALS**
PORT INLAND OPERATION
199 COUNTY ROAD 432
GULLIVER, MI 49840

TEL 906-283-3456
FAX 906-283-3164

www.oglebaynorton.com

February 14, 2006

Northwoods Airlifeline
P.O. Box 2973
Kingsford, MI 49802

Greetings,

Recently, Savannah White of Manistique, Michigan was flown from Milwaukee's Children's Hospital, to Schoolcraft County Airport to aboard one of your aircraft. Savannah had been recently diagnosed with leukemia and was returning home from her initial treatment.  Savannah is the daughter of one of our employees at Port Inland, Jason White.  Savannah is currently receiving treatment at St. Vincent's Hospital in Green Bay, Wisconsin.  We are praying for her full and speedy recovery.

Shortly after the flight, we were contacted by Kathy Brown, an elementary school teacher in Manistique, who was conducting a fund raiser with her third grade class at Lincoln School in Manistique.  She wanted to know if O-N Minerals, Port Inland Operation was interested in donating to her project, or making a contribution directly to your group.

I am happy to enclose a check in the amount of $500 to your very worthwhile organization.  We would like to make this donation on behalf of Savannah White.

Thank you for your contribution to families in their time of need.

Sincerely,
Rhonda L. Schneider

*Rhonda L. Schneider*

TQM Manager
O-N Minerals
Port Inland Operation

CA00814

**EXHIBIT "L"**

CHATHAM AREA PORT INLAND OPERATION
DONATIONS/CONTRIBUTIONS - 2006

| DATE | RECIPIENT | AMOUNT | COST CENTER | EXPLANATION / DESCRIPTION | ACCOUNT BALANCE |
|---|---|---|---|---|---|
| 1/30/2006 | | $300 | | | $ 6,000.00 |
| 1/31/2006 | | $200 | | | $ 5,800.00 |
| 2/14/2006 | NORTHWOODS FAIR [BLANK] | $500 | | | $ 5,300.00 |
| 2/28/2006 | | $400 | | | $ 4,900.00 |
| 2/28/2006 | | $800 | | DONATION/INKIND/RC | $ 4,400.00 |
| 3/24/2006 | | $800 | | SAVANNAH WHITE--AIR SERVICE PROVIDER | $ 4,330.92 |
| 3/28/2006 | SAVANNAH WHITE BENEFIT | $50 | | | $ 3,830.92 |
| 4/18/2006 | | $200 | | | $ 3,780.92 |
| 4/18/2006 | | $50 | | | $ 3,580.92 |
| 4/18/2006 | | $1,000 | | BENEFIT FOR SAVANNAH WHITE/JASON'S DAUGHTER LEUKEMIA | $ 3,530.92 |
| 4/18/2006 | | $120 | | | $ 2,530.92 |
| 4/19/2006 | | $400 | | | $ 2,410.92 |
| 5/25/2006 | | $70 | | | $ 2,010.92 |
| 8/0/2006 | | $120 | | | $ 1,940.92 |
| 8/8/2006 | | $70 | | | $ 1,848.92 |
| 6/22/2006 | | $76 | | | $ 1,772.42 |
| 6/22/2006 | | $200 | | | $ 1,572.42 |
| 6/29/2006 | | $150 | | | $ 1,422.42 |
| 7/5/2006 | | $120 | | | $ 1,302.42 |
| 7/5/2006 | | $100 | | | $ 1,202.42 |
| 7/17/2006 | | $120 | | | $ 1,082.42 |
| 7/17/2006 | | $500 | | | $ 482.42 |
| 8/14/2006 | | $0 | | | $ 482.42 |
| 8/16/2006 | | $200 | | | $ 282.42 |
| 9/8/2006 | | $200 | | | $ 82.42 |
| 9/28/2006 | | $60 | | | $ 22.42 |
| 10/12/2006 | | $150 | | | $ (127.58) |
| 11/2006 | | $100 | | | $ (227.58) |
| 11/2006 | | $50 | | | $ (277.58) |
| 12/26/2006 | | $120 | | | $ (397.58) |

$6,398   $6,398

**EXHIBIT "M"**



**Carmeuse North America**

February 13, 2008

Dear Fellow Employee,

I want to take this opportunity to welcome you to Carmeuse Lime and Stone ("Carmeuse"), the largest subsidiary of our parent company, Carmeuse Group, located in Louvain-la-Neuve, Belgium.

Carmeuse is part of the worldwide Carmeuse Group that consists of over 100 production and distribution facilities throughout 22 countries. We currently manufacture a wide range of lime and limestone products and annually produce in excess of 28 million tons. Our operations span Belgium, France, Eastern Europe, Italy, Turkey, North Africa, and of course, North America. In the U.S and Canada we operate a network of manufacturing facilities and utilize a system of distribution outlets east of the Mississippi River and along the Great Lakes to supply and serve the Eastern States, Ontario, and Quebec.

Carmeuse has grown its business through carefully chosen strategic acquisitions. Success has been achieved when we have met three key criteria in working with: companies that provide a strong presence in an area that will expand our marketplace; companies that add products that serve our customers more effectively; companies that have core skills and expertise that fits well with Carmeuse's overall business strategy. Oglebay Norton fits this formula perfectly.

Carmeuse has also built its business with good people who work hard and are completely committed to our company and our customers. In some respects, this is an exciting time! However, I recognize that for many of you, it is a time filled with much anxiety and consternation. Many of you are concerned about what lies ahead, and to be honest, we don't yet have all the answers. Although a complex process, our goal is to make this transition as speedy and as straightforward as possible. The assimilation of two companies is never easy but we will do our best to do it right, and to be fair in our approach. Personally, I ask all of you to stay focused on the business at hand today and to perform your duties to the best of your ability, since this will enable us to work through the integration process most effectively.

Members of our leadership team and I will be making scheduled trips to all newly acquired Oglebay sites in the near future. A team of CNA representatives will follow to conduct "Meet and Greet" sessions with you. Our first visit will be to Cleveland. The CNA team that is following my visit is tentatively scheduled to visit the Cleveland corporate facility on February 26th and 27th. The whole schedule is not yet established, but be assured we will make each site visit as soon as we can, and will communicate the timing of each site visit as far ahead as possible.

We look forward to working with you as we integrate these two great companies.

Sincerely,

Tom Buck
Chief Executive Officer
Carmeuse Lime and Stone

EXHIBIT
J. White #2
9-30-2010 KG

CA01178

**EXHIBIT "N"**

# STATUS CHANGE FORM

| | | | | |
|---|---|---|---|---|
| **Employee Name:** | White Jason | | **Effective Date:** | 3/3/2008 |
| **Division Name:** | Great Lakes | **Location Name:** | Port Inland Operation | |
| **Division#** 320 | **Dept. #** 81 | **Major#** 582 | **Plant #** 15 | |

## CHANGE IN STATUS
(place an "x" in the box if applicable or fill in appropriate information where asked)

| | | | | | |
|---|---|---|---|---|---|
| Full-Time | ☐ | Demotion | ☐ | Equity or Market Adj. | ☐ |
| Part-Time | ☐ | Promotion | ☐ | Off Cycle Merit | ☐ |
| Temporary | ☐ | Promotion w/in Job | ☐ | Annual Merit | ☒ |
| Hourly to Salary | ☐ | Salary to Hourly | ☐ | Transfer | ☐ |
| Supervisor | ☐ | Bonus | ☐ | Other | ☐ |

| | Current Information | | Proposed Information | | |
|---|---|---|---|---|---|
| Salary | $20.40 | | $21.02 | | |
| Salary Grade and AIP% | | | | | |
| Salary Grade Range | Min Mid Max | | Min Mid Max | | |
| Job Title | Operations Associate | | Operations Associate | | |
| Department | Boat End | | Boat End | | |
| G/L Account Numbers | 320-15-81-582 | | 320-15-81-582 | | |
| Supervisor Name | Dave Mickelson | | Dave Mickelson | | |

## ADDRESS CHANGE/NAME CHANGE
(fill in appropriate information)

| | | | |
|---|---|---|---|
| New Address | same | | |
| New Phone Number | | Alternate Phone Number | |
| Name Change (Prev.) | | Name Change (Current) | |
| Employee Signature: | | | |

### COMMENTS

## TERMINATION PROCESSING
("x" = yes, N/A = not applicable)

| | | | | |
|---|---|---|---|---|
| Voluntary | ☐ | Involuntary | Reason: | |
| Last day worked: | | Eligible for rehire?: | | |
| Number of Vacation days unused: | | | | |
| Health Insurance | 401 (k) | Severance Package: | | |
| FSA Dependent | FSA Medical | Severance Begin date: | | |
| Supplemental Life- AD&D: | | Severance End date: | | |
| | | Date Agreement Signed: | | |

| | | | |
|---|---|---|---|
| Originating Manager | Jeffery Himes | Date | 3/3/2008 |
| Next Level Management | | Date | |
| Divisional HR Manager | | Date | |
| VP, Human Resources | | Date | |
| CEO or Sr. VP, Operations | | Date | |

**EXHIBIT**
J. White #3
9-30-2010 KG

CA00007

**EXHIBIT "O"**

EXHIBIT
J. White #8
9-30-2010 KG

# CARMEUSE LIME & STONE

**BOAT END TIMECARD**

NAME: _Jason White_

WEEK END: **8-10-08**

| EQUIP | PLANT/DEPT | JOB, EQUIPMENT, OR DESCRIPTION | START TIME >>>> | END TIME <<<<< | MON | TUE | WED | THU | FRI | SAT | SUN | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 7A 7A | 7P 7P | | | | | 7P 7P 7P | | | |
| | | | | | | | | | 7A 7A 7A | | | |
| | 14-41 | HICAL PROD HAUL (SHUTTLE) | | | | | | | | | | |
| | 15-81 | LOAD OUT | | | | | | | | | | |
| | | + boat loading equipment mtc (02) | | | | | | | | | | |
| | 50 | + shuttle | | | | | | | | 2 | | 2 |
| | 51 | + tunnels | | | | 11 | | | | | | 11 |
| | 53 | + housekeeping/drag | | | | | | | 4 | | 9 | 13 |
| | | + SP08-001 cedarville sand (shuttle) | | | | | | | 6 | | 3 | 9 |
| | 15-81 | SP08-006 SHUTTLE & DOCK REPAIR | | | | | | | | | | |
| | 15-82 | WESTERN | | | | | | | | | | |
| | 15-94 | SELF DIRECTION | | | | 1 | | | 2 | | | 3 |
| | | **DOLOMITE** | | | | | | | | | | |
| | 12-36 | DOLO PRIMARY OPERATIONS | | | | | | | | | | |
| | 12-38 | DOLO SEC OPERATIONS | | | | | | | | 10 | | 10 |
| | | **LOADER** | | | | | | | | | | |
| 54 | 12-21 | DOLO QUARRY OPERATIONS | | | | | | | | | | |
| 54 | 12-41 | DOLO PRODUCT HAUL | | | | | | | | | | |
| 54 | 14-41 | HICAL PRODUCT HAUL | | | | | | | | | | |
| 54 | 15-81 | HOUSEKEEPING/BOAT LOAD WASTE 53 | | | | | | | | | | |
| 54 | 15-81 | SP08-001 CEDARVILLE SAND | | | | | | | | | | |
| | | **HAUL TRUCK** | | | | | | | | | | |
| 55 | 12-21 | DOLO QUARRY OPERATIONS | | | | | | | | | | |
| 55 | 12-41 | DOLO PRODUCT HAUL | | | | | | | | | | |
| 55 | 14-41 | HICAL PRODUCT HAUL | | | | | | | | | | |
| 55 | 15-81 | HOUSEKEEPING/BOAT LOAD WASTE 53 | | | | | | | | | | |
| 55 | 15-81 | SP08-001 CEDARVILLE SAND | | | | | | | | | | |
| 55 | 15-81 | SP08-006B BE CLEAN UP (DOCK FACE) | | | | | | | | | | |
| | | **DOZER** | | | | | | | | | | |
| 56 | 12-21 | DOLO QUARRY OPERATIONS | | | | | | | | | | |
| 56 | 12-41 | DOLO PRODUCT HAUL | | | | | | | | | | |
| 56 | 14-41 | HICAL PRODUCT HAUL | | | | | | | | | | |
| 56 | 15-81 | SP08-001 CEDARVILLE SAND | | | | | | | | | | |
| 56 | 15-81 | PUSH PILES | | | | | | | | | | |
| 56 | 15-82 | WESTERN STONE | | | 12 | | | | | | | 12 |
| | | **LABOR TOTAL** | | | 12 | 12 | | 12 | 12 | 12 | | 60 |

HOLIDAY WORKED + REGULAR HOURS WORKED + O.T. BENEFITS = 40 HOURS

|  | 1ST SHIFT | | 2ND SHIFT | | HOLIDAY WORKED | O.T. BENEFITS | | | NON O.T. BENEFITS | | HOLIDAY UN WORKED |
|---|---|---|---|---|---|---|---|---|---|---|---|
|  | REG | OT | REG | OT | | VAC | FUNERAL | JURY | PERS | SICK | |
| MON | 12 | | | | | | | | | | |
| TUE | 12 | | | | | | | | | | |
| WED | | | | | | | | | | | |
| THR | | | | | | | | | | | |
| FRI | | | | | | | | | | | |
| SAT | | | 12 | | | | | | | | |
| SUN | | | 4 | 8 | | | | | | | |
| | | | 12 | | | | | | | | |
| TOTAL | 24 | | 16 | 20 | | | | | | | |

TOTAL HOURS WORKED [60]

TOTAL WEEKLY HOURS [60]

TOTAL BENEFIT HOURS [ ]

NOTE: 1st Shift: 7AM to 7PM    2nd Shift: 7PM to 7AM

Signature: _Jason White_

I certify that the information on this timecard is honest and correct

I:/admin/timecards with new account numbers

Revised 4/7/2008

CA00004

EXHIBIT "P"

Page 1

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF MICHIGAN

NORTHERN DIVISION

JASON S. WHITE and AMY WHITE,

        Plaintiffs,              Case No. 2:09-CV 265

                                Hon. R. Allan Edgar

-v-

O-N MINERALS (MICHIGAN) COMPANY
d/b/a CARMEUSE LIME & STONE,

        Defendant.

_____

DEPOSITION OF MIKE BURKHOLDER

      DATE:   October 14, 2010

      TIME:   5:02 p.m.

      PLACE:  617 Lakeshore Drive, Manistique, Michigan

  APPEARANCES:

      On behalf of Plaintiff:

          MS. EUGENIE EARDLEY  (P48615)
          EARDLEY LAW OFFICES
          P.O. Box 830
          Cannonsburg, Michigan  49317
          (616) 874-2647

      On behalf of Defendant:

          MS. KIRSTEN E. GRAMZOW (P52134)
          LIPSON, NEILSON, COLE, SELTZER & GARLIN
          3910 Telegraph Road, Suite 200
          Bloomfield Hills, Michigan
          (248) 593-5000

      Also Present:  Jason White, Jeff Himes

      Reported By:  Teri L. Heacock, RPR/CRR/CSR-2309

f4aebbda-a46a-4dd8-a527-8cc8f59d9d95

Page 7

1   A.   You work on different shifts.  There's a four-man crew, and

2        you get a partner, so you work with the same guy every day

3        or night, and then it rotates.  They -- how can I put it

4        in, we work with four other guys, two at one time, and then

5        after so many days and two with another, and then go back

6        with the other, so you rotate between -- six of us rotate

7        around.

8   Q.   Okay.  And I've heard these star team members and cost team

9        members.  Did you have a particular role on a team?

10  A.   Everybody does.

11  Q.   Okay.  And what was yours in 2008, if you know?

12  A.   I don't remember.

13  Q.   Okay.  And when you worked with Jason, did you also work

14       with him, at some point, at the dolomite plant, where the

15       two of you were both working in that area?

16  A.   Yes.

17  Q.   Okay.  And when you both worked at the dolomite plant, do

18       you remember who your boss was?

19  A.   Not really.

20  Q.   Okay.  Did you ever know anything about Jason White putting

21       time down on a time card when he hadn't actually worked the

22       time?

23  A.   Yes.

24  Q.   What do you know about that?

25  A.   He would leave at times and not put down the correct times.

f4aebbda-a46a-4dd8-a527-8cc8f59d9d95

Page 8

1  Q.  How do you know?

2  A.  'Cause I would look.

3  Q.  In other words, you'd be working with him?

4  A.  Yes.

5  Q.  And he would leave earlier than what he put on his time
6      card?

7  A.  Yes.

8  Q.  And how did you know, other than you said you saw him
9      leave?

10  A.  He's not there.

11  Q.  Okay.  And then did you look at his time card?

12  A.  Yes.

13  Q.  Where would you see his time card?

14  A.  In his pigeonhole or slot, whatever you want to call it.

15  Q.  Why would you look at his time card and take it out?

16  A.  'Cause it's not fair for us to work when he's not there.

17  Q.  When can you first recall ever seeing that?

18  A.  I don't remember.

19  Q.  Can you tell me if it was in 2008, the year he got
20      terminated, or would it have been sooner than that?

21  A.  Some sooner, and that year, too.

22  Q.  "Some sooner" meaning 2007?

23  A.  I don't remember.  We didn't write it down.  Nobody
24      documented it.

25  Q.  Why not?

**EXHIBIT "Q"**

**EXHIBIT**

J. White #5
9-30-2010 KG

CARMEUSE LIME & STONE

BOAT END
TIMECARD

NAME: Jason White

WEEK END: 5-18-08

| EQUIP | PLANT/ DEPT | JOB, EQUIPMENT, OR DESCRIPTION | MON | TUE | WED | THU | FRI | SAT | SUN | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| | | START TIME > > > > | 7P | 7P | | | 7P | 7P | | |
| | | END TIME < < < < < | 7A | 7A | | | 7A | 3A | | |
| | 14-41 | HICAL PROD HAUL (SHUTTLE) | | | | | | | | |
| | 15-81 | LOAD OUT | | | | | | | | |
| | | * boat loading equipment mtc (02) | | 3 | | | | | | |
| | 50 | * shuttle | | | | | | | 3 | 3 |
| | 51 | * tunnels | | | | | 6 | | | 6 |
| | 53 | * housekeeping/drag | | | | | | | | |
| | | * SP08-001 cedarville sand (shuttle) | | | | | 2 | | | 2 |
| | 15-81 | SP08-006 SHUTTLE & DOCK REPAIR | | | | | | | | |
| | 15-82 | WESTERN | | | | | | | | |
| | 15-94 | SELF DIRECTION | 11 | | | | | | | 11 |
| | | **DOLOMITE** | | | | | | | | |
| | 12-36 | DOLO PRIMARY OPERATIONS | | | | | | | | |
| | 12-38 | DOLO SEC OPERATIONS | | | | | | | | |
| | | **LOADER** | | | | Photos show time | | | | |
| 54 | 12-21 | DOLO QUARRY OPERATIONS | | | | loading @ Midnight | | | | |
| 54 | 12-41 | DOLO PRODUCT HAUL | | | | | | | | |
| 54 | 14-41 | HICAL PRODUCT HAUL | | | | | | | | |
| 54 | 15-81 | HOUSEKEEPING/BOAT LOAD WASTE 53 | | | | | | | | |
| 54 | 15-81 | SP08-001 CEDARVILLE SAND | | | | | | | | |
| | | **HAUL TRUCK** | | | | | | | | |
| 55 | 12-21 | DOLO QUARRY OPERATIONS | | | | | | | | |
| 55 | 12-41 | DOLO PRODUCT HAUL | | | | | | | | |
| 55 | 14-41 | HICAL PRODUCT HAUL | | | | | | | | |
| 55 | 15-81 | HOUSEKEEPING/BOAT LOAD WASTE 53 | | | | | | | | |
| 55 | 15-81 | SP08-001 CEDARVILLE SAND | | | | | | | | |
| 55 | 15-81 | SP08-006B BE CLEAN UP (DOCK FACE) | | | | | | | | |
| | | **DOZER** | | | | | | | | |
| 56 | 12-21 | DOLO QUARRY OPERATIONS | | | | | | | | |
| 56 | 12-41 | DOLO PRODUCT HAUL | | | | | | | | |
| 56 | 14-41 | HICAL PRODUCT HAUL | | | | | | | | |
| 56 | 15-81 | SP08-001 CEDARVILLE SAND | | | | | | | | |
| 56 | 15-81 | PUSH PILES | | 9 | | | 12 | | | 21 |
| 56 | 15-82 | WESTERN STONE | | | | | | | | |
| | | **LABOR TOTAL** | 12 | 12 | | | 12 | 8 | | 44 |

HOLIDAY WORKED + REGULAR HOURS WORKED + O.T. BENEFITS = 40 HOURS.

| | HOURS WORKED | | | | | O.T. BENEFITS | | | NON O.T. BENEFITS | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1ST SHIFT | | 2ND SHIFT | | HOLIDAY WORKED | VAC | FUNERAL | JURY | PERS | SICK | HOLIDAY UN WORKED |
| | REG | OT | REG | OT | | | | | | | |
| MON | | | 12 | | | | | | | | |
| TUE | | | | | | | | | | | |
| WED | | | | | | | | | | | |
| THR | | | | | | | | | | | |
| FRI | | | 12 | | | | | | | | |
| SAT | | | 4 | 4 | | | | | | | |
| SUN | | | | | | | | | | | |
| **TOTAL** | | | 40 | 4 | | | | | | | |

TOTAL HOURS WORKED 44

TOTAL WEEKLY HOURS 44

TOTAL BENEFIT HOURS

NOTE: 1st Shift : 7AM to 7PM    2nd Shift : 7PM to 7AM

Signature: Jason White

I certify that the information on this timecard is honest and correct

Timecards with new account numbers    Revised 4/1/2008

CA00612

**EXHIBIT "R"**

# RMS Remote Search



Site Name : : Office

Date : : 05-17-2008

Time : : 23:53:06



EXHIBIT
T. White #6
9-30-2010 KG

**EXHIBIT "S"**

**CARMEUSE LIME & STONE**

**EXHIBIT**
J. White #7
9-30 2010 KG

**BOAT END TIMECARD**

NAME: Jason White

WEEK END: 7-13-08

| EQUIP | PLANT/ DEPT | JOB, EQUIPMENT, OR DESCRIPTION | MON | TUE | WED | THU | FRI | SAT | SUN | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| | | START TIME > > > > | | | 7 P | 7 P | 7 P | 3 P | | |
| | | END TIME < < < < < | | | 5 A | 7 A | 4 A | 10 P | | |
| | 14-41 | HICAL PROD HAUL (SHUTTLE) | | | | | | | | |
| | 15-81 | LOAD OUT | | | | | | | | |
| | | * boat loading equipment mtc (02) | | | | | | | | |
| | 50 | * shuttle | | | 10 | | | | | 10 |
| | 51 | * tunnels | | | | | | | 4 | 4 |
| | 53 | * housekeeping/drag | | | | | 2 | | | 2 |
| | | * SP08-001 cedarville sand (shuttle) | | | | | | | | |
| | 15-81 | SP08-006 SHUTTLE & DOCK REPAIR | | | | | | | | |
| | 15-82 | WESTERN | | | | | | | | |
| | 15-94 | SELF DIRECTION | | | | | 1 | | | 1 |
| | | **DOLOMITE** | | | | | | | | |
| | 12-36 | DOLO PRIMARY OPERATIONS | | | | | | | | |
| | 12-38 | DOLO SEC OPERATIONS | | | | | | | | |
| | | **LOADER** | | | | | | | | |
| 54 | 12-21 | DOLO QUARRY OPERATIONS | | | | | | | | |
| 54 | 12-41 | DOLO PRODUCT HAUL | | | | | | | | |
| 54 | 14-41 | HICAL PRODUCT HAUL | | | | | | | | |
| 54 | 15-81 | HOUSEKEEPING/BOAT LOAD WASTE 53 | | | | | | | | |
| 54 | 15-81 | SP08-001 CEDARVILLE SAND | | | | | | | | |
| | | **HAUL TRUCK** | | | | | | | | |
| 55 | 12-21 | DOLO QUARRY OPERATIONS | | | | | | | | |
| 55 | 12-41 | DOLO PRODUCT HAUL | | | | | | | | |
| 55 | 14-41 | HICAL PRODUCT HAUL | | | | | | | | |
| 55 | 15-81 | HOUSEKEEPING/BOAT LOAD WASTE 53 | | | | | | | | |
| 55 | 15-81 | SP08-001 CEDARVILLE SAND | | | | | | | | |
| 55 | 15-81 | SP08-006B BE CLEAN UP (DOCK FACE) | | | | | | | | |
| | | **DOZER** | | | | | | | | |
| 56 | 12-21 | DOLO QUARRY OPERATIONS | | | | | | | | |
| 56 | 12-41 | DOLO PRODUCT HAUL | | | | | | | | |
| 56 | 14-41 | HICAL PRODUCT HAUL | | | | | | | | |
| 56 | 15-81 | SP08-001 CEDARVILLE SAND | | | | | | | | |
| 56 | 15-81 | PUSH PILES | | | | 12 | | 6 | 3 | 21 |
| 56 | 15-82 | WESTERN STONE | | | | | | | | |
| | | **LABOR TOTAL** | | | 10 | 12 | 9 | 7 | 38 | |

**HOLIDAY WORKED + REGULAR HOURS WORKED + O.T. BENEFITS = 40 HOURS**

| | HOURS WORKED | | | | | O.T. BENEFITS | | | NON O.T. BENEFITS | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1ST SHIFT | | 2ND SHIFT | | HOLIDAY WORKED | VAC | FUNERAL | JURY | PERS | SICK | HOLIDAY UN WORKED |
| | REG | OT | REG | OT | | | | | | | |
| MON | | | | | | | | | | | |
| TUE | | | | | | | | | | | |
| WED | | | 10 | | | | | | | | |
| THR | | | 12 | | | | | | | | |
| FRI | | | | | | | | | | | |
| SAT | | | 9 | | | | | | | | |
| SUN | 4 | | 3 | | | | | | | | |
| TOTAL | 4 | | 34 | | | | | | | | |

TOTAL HOURS WORKED 38       TOTAL BENEFIT HOURS [ ]

TOTAL WEEKLY HOURS 38

NOTE:   1st Shift : 7AM to 7PM     2nd Shift : 7PM to 7AM

Signature: Jason White

I certify that the information on this timecard is honest and correct

I:/admin/timecards with new account numbers          Revised 4/7/2008

CA00755

**EXHIBIT "T"**

# TEAM MEMBER PERFORMANCE EXPECTATIONS

A.    Come to work every scheduled workday and overtime period at the expected/agreed upon starting time.

    1.    Be on the job for all scheduled work time; avoid leaving the work site without expressed approval from team members.

B.    Perform all duties expected of empowered/cross trained team members.

C.    Notify team members directly and as soon as possible if time off is needed.

    1.    Provide adequate lead time on preceding shift for team members to fill your vacancy.

    2.    Call team members directly (avoid voice mail and call-ins by family members when reporting absence).

**NOTE: Failure to adequately notify team members for an unscheduled absence could result in loss of pay.**

D.    Follow established vacation policy; provide adequate notification to team members prior to taking a vacation day.

    1.    Do not record unexcused absences as vacation days.

E.    Complete company records accurately and honestly (including time cards).

F.    Report to work sober, free of the influence of intoxicants or illegal drugs; keep intoxicants and illegal drugs away from the workplace.

G.    Stay awake on the job during work hours.

H.    Do not participate in or tolerate disruptive behavior, e.g., fighting, horseplay, abusive language, hazing or harassing other team members.

I.    Do not participate on or tolerate any offensive behavior or actions that could be construed as sexual harassment, i.e., improper language, innuendo, posting offensive material (photographs/calendars, literature, etc.).

J.    Do not remove company property from the plant without permission.

K.    Follow company policy on personal and employee owned tools.

    1.    Notify team members before borrowing company tools for personal use.
    2.    Request permission to borrow personal/employee owned tools for company or personal use.
    3.    Return all borrowed tools.

L.    Maintain the proper level of workmanship and or work standards in keeping with TQM facility.

M.    Follow established safety and health rules; exercise caution and care when performing your duties to avoid personal injury and property damage. Provide clarification and enforcement of safety rules.

N.    Smoking is prohibited in all company buildings and mobile equipment cabs.

**This list is not all inclusive, but serves to highlight minimum performance expectations required to protect the interest of individuals, teams and our business. Each employee infraction will be evaluated according to degree of severity; certain offenses (theft, assault, sale and dispensing of illegal drugs, sabotage, gross misconduct, etc.) could result in immediate dismissal.**

CA01189

**EXHIBIT "U"**

August 25, 2008

Notes for File

Jeff Himes, Rhonda Schneider and Dave Mickelson met today with Jason White on August 25, 2008 at 1:20 PM

Jeff indicated that there was reason to believe that Jason falsified his timecard, citing an incident in the past week, where Dave called out on a Friday (August 8, 2008) night to alter the work load of the Boat End Team. The team indicated they could not accomplish the task because they were short handed. When Dave reviewed the timecards, he noted that Jason not only had entered 12 hours to be paid for that Friday night, but entered detail on how he spent that shift.

Jason said that 'swear to God, he is not a cheat, and that he was very sorry for the discrepancy, but he has a lot going on with his daughter.'

Jeff informed Jason that he has received information from the other members of the Boat End Team that this is not an isolated case.

Jason looked at the timecard in question and said that ' even without the 12 hours pay on Friday, he would still have 48 hours for that week and that we could take that back. We could take his whole paycheck back: I'll do whatever I can do. I never minded the time-clocks. This was not purposely done.'

I didn't remember for sure what I did. I guessed and I looked at John's card cause we do the same thing.

Jeff re-iterated that this was a falsification of the time cared

Jason said 'I need my job. It was Monday and Oh-shit, you gotta fill out the timecards and I was off a couple of days, well I guess I was off three of them. This is bad—this is stealing but I never did it on purpose'.

Jeff told Jason that we had no alternative, faced with the facts, than to terminate his employment.

Jason responded that this will 'ruin my life if I lost my job, I just built a new house and it will probably be a divorce'. Jason also said that 'people who have put sick on their timecard have gotten in trouble but they got a second chance'.

Jeff reiterated that we had no alternative in this case. He explained to Jason that Dave would accompany him to clean out his locker and he would be contacted by corporate about his COBRA benefits. Jeff said we would pay out his vacation time. Rhonda asked Jason if he had a gate key and  he said he would give it to Dave. Jason went to the boat end with Dave and gave Dave his gate key and left the property.

EXHIBIT "V"

# ADMINISTRATIVE SERVICES AGREEMENT

This Administrative Services Agreement (hereinafter "Agreement") is entered into by and between Oglebay Norton Company (hereinafter "Employer") and Community Insurance Company d.b.a. Anthem Blue Cross and Blue Shield (hereinafter referred to as "Anthem") upon the following terms and conditions:

1. Employer is the sponsor of a self-insured Group Health Plan (as herein defined) providing, among other things, health care benefits to certain eligible employees and their qualified dependents.

2. Employer desires to retain Anthem as an independent contractor to administer certain elements of the health care benefits of Members (as defined herein) pursuant to Employer's Group Health Plan.

3. Anthem desires to administer certain elements of the health care benefits of the Employer's Group Health Plan pursuant to the terms of this Agreement.

In consideration of the promises and the mutual covenants contained in this Agreement, Anthem and Employer (hereinafter referred to as the "Parties") agree as follows:

## ARTICLE 1 – DEFINITIONS

For purposes of this Agreement and any addenda, attachments or schedules to this Agreement, the following words and terms have the following meanings unless the context or use clearly indicates another meaning or intent.

a. ADMINISTRATIVE SERVICES FEE. The amount payable to Anthem in consideration of its administrative services and operating expenses as specified in the attachments to this Agreement, excluding any cost for stop-loss insurance coverage or any other policy of insurance, if applicable. Administrative Services Fee does not include any expenses associated with subrogation or any other recovery activities by Anthem referred to under this Agreement. Administrative Services Fee may include network access charges, if applicable.

b. AGREEMENT PERIOD. The period of time indicated in Section 1 of Schedule A.

c. BENEFIT BOOKLET. A description of the portion of the health care benefits provided under the Plan that is administered by Anthem.

d. BILLED CHARGES. The amount which appears on a Member's Claim form (or other written notification acceptable to Anthem that Covered Services have been provided) as the Provider's charge for the services rendered to a Member, without any adjustment or reduction and irrespective of any separate reimbursement contract between the Provider and Anthem.

e. BLUECARD PROGRAM. A Blue Cross and Blue Shield Association program whereby Anthem can process Claims for Covered Services received by Members outside of Anthem's service area while accessing the reimbursement arrangement between a Provider and another Blue Cross and/or Blue Shield Plan. However, some Blue Cross and/or Blue Shield Plans may not participate in this program and, in that event, Anthem will not access that Blue Cross and/or Blue Shield Plan's reimbursement arrangement.

f. CLAIM. Written or electronic notice of a request for reimbursement of any hospital, medical, pharmacy or health care service in a format acceptable to Anthem.

g. CLAIM INCURRED DATE. The date of hospital admission if the claim is for in-patient hospital services or the date that the service is provided to a Member if the Claim is for any other services.

h. CLAIMS RUNOUT. Claims which are incurred but unreported and/or unpaid as of the effective date of termination of the Agreement.

i. COVERED SERVICE. Any hospital, medical, pharmacy or other health care service rendered to Members for which benefits are eligible for reimbursement pursuant to the terms of the Benefit Booklet.

j. EFFECTIVE DATE. This Agreement shall be effective at 12:01 a.m. on the date indicated in Section 1 of Schedule A.

k.  EMPLOYER AFFILIATES. Companies affiliated with the Employer and are also sponsors of the Plan and are identified in Schedule A.

l.  ERISA. The Employee Retirement Income Security Act of 1974, as amended.

m.  GATEKEEPER FEES. Amounts paid by Anthem to some Participating Providers for coordinating, arranging and managing health care services and supplies. Such amounts are in addition to the Participating Providers' standard reimbursement for Covered Services.

n.  GROUP HEALTH PLAN. See Plan.

o.  GROUP IDENTIFICATION NUMBER (GID). The identifying number assigned to Employer or subgroups of Employer.

p.  HOSPITAL. A facility which provides medical or surgical care to patients for a continuous period longer than twenty-four (24) hours and which is not primarily providing psychiatric, rehabilitative, drug or alcoholism treatment.

q.  HOST BLUE. A Blue Cross and/or Blue Shield Plan participating in the BlueCard Program whose contracting Providers render care to Members.

r.  LINES OF COVERAGE. The benefit plans, such as HMO, POS, or PPO, available to Members under this Agreement, as determined by the Benefits Booklet.

s.  MEMBER and PLAN MEMBER. The Individuals, including the Subscriber and his/her dependents, as defined in the Benefit Booklet, who have satisfied the Plan eligibility requirements of the Employer, applied for coverage, and been enrolled for Plan benefits.

t.  PAID CLAIM. The amount charged to the Employer for Covered Services or services provided during the term of this Agreement. Paid Claims shall also include any applicable interest, Claim surcharges or other surcharges assessed by a state or government agency and any Claims paid pursuant to pilot or test programs as described more fully in Article 2(g). Paid Claims shall be determined as follows:

    1.  Hospital, Provider and Vendor Claims. Except as otherwise provided in this Agreement, Paid Claims shall mean the amount Anthem actually pays the Hospital, Provider or Vendor (whether Anthem reimburses a Hospital on a percentage of charges basis, a fixed payment basis, or a global fee basis, etc.) or whether such amount is more or less than the Hospital's, Provider's or Vendor's actual Billed Charges for a particular service or supply. In the event that the Hospital, Provider, or Vendor participates in any Anthem program where performance incentives or bonuses are paid (the "Performance Payments"), Paid Claims shall also mean an amount Anthem adds to the Hospital, Provider, or Vendor payment for services or supplies under the terms of that program designed to reward for effectively managing the care of Members. Such Performance Payments may be added on a per claim basis or on a pro-rata apportionment. Paid Claims may also include a portion of Anthem's negotiated discounts with Hospitals, Providers, or Vendors as agreed to by the Employer in Section 2 of Schedule A.

    2.  Providers or Vendors Reimbursed on a Capitated Basis. Paid Claims shall mean the amount per Member per month which Anthem actually pays the Provider or Vendor, irrespective of whether services are actually rendered to Members, plus any portion of the capitation or percent of premium equivalent that is retained by Anthem to fund Performance Payments designed to support effective quality and utilization or reward Providers or Vendors for effective management under the terms of the contracts with such Providers and Vendors. Paid Claims shall also include any sums paid to a Provider as Gatekeeper Fees or administrative fees charged by and retained by Anthem to manage the Providers or Vendors. Employer acknowledges and agrees that a portion of the amounts discussed in this paragraph may be retained or withheld by Anthem and that, as a result, the capitation fee or percent of the premium equivalent charged to Employer may be greater than the fees actually paid to the Providers or Vendors pursuant to the terms of the contracts with such Providers and Vendors.

    3.  Claims Payment Pursuant to any Judgment, Settlement, Legal or Administrative Proceeding. Paid Claims shall include any amount paid as the result of a settlement, judgment, or legal, regulatory or

CA01197

administrative proceeding brought against the Plan and/or Anthem with respect to the decisions made by Anthem regarding the coverage of services under the terms of the Plan, as well as any legal fees and costs awarded to any adverse party or incurred by Anthem in such litigation, regulatory or administrative proceeding.

4.   Claims Payment Pursuant to the BlueCard Program.   The calculation of a Member's liability on Claims for Covered Services incurred outside the geographic area that Anthem serves and processed pursuant to the BlueCard Program will be based on the lower of the Provider's billed charges or the negotiated rate Anthem pays the Host Blue. The calculation of the Employer liability on Claims for Covered Services incurred outside the geographic area Anthem serves and processed through the BlueCard Program will be based on the negotiated rate Anthem pays the Host Blue. The methods employed by a Host Blue to determine a negotiated rate will vary among Host Blues based on the terms of each Host Blue's provider contracts. More information about the BlueCard Program is found in Article 12 of this Agreement.

u.   PARTICIPATING PLAN.   A Blue Cross and/or Blue Shield Licensee other than Anthem that has agreed, either by written document or oral agreement to provide services in connection with the administration of the Plan. To the extent the Parties have agreed that a Participating Plan shall provide services in connection with this Agreement, the Participating Plan's role is described in Article 29 of this Agreement.

v.   PARTICIPATING PROVIDER.   A physician, health professional, hospital, pharmacy, or other individual, organization and/or facility that has entered into a contract, either directly or indirectly, with Anthem to provide Covered Services to Members at negotiated fees.

w.   PLAN and GROUP HEALTH PLAN.   An employee welfare benefit plan (as defined in section 3(1) of ERISA) established by the Employer, in effect as of the Effective Date, as described in the Plan Documents, as they may be amended from time to time.

x.   PLAN ADMINISTRATOR.   The Plan Administrator is the Employer.

y.   PLAN DOCUMENTS.   The documents that set forth the terms of the Plan, and which include the Summary Plan Description and the Benefit Booklet, if the Benefit Booklet is not incorporated in the Summary Plan Description.

z.   PROVIDER.   A duly licensed person, organization or facility that provides health services or supplies within the scope of an applicable license and meets any other requirements set forth in the Benefit Booklet.

aa.  SUBSCRIBER or PLAN SUBSCRIBER.   An employee or retiree of Employer or other eligible person (other than a dependent) who is enrolled in the Plan. The Benefit Booklet, Summary Plan Description, and all communications regarding the Plan will be issued by the Employer to the Plan Subscriber and shall serve as a communication to the Subscriber and his or her dependents.

bb.  SUMMARY PLAN DESCRIPTION.   A document provided to Subscribers by the Employer or its designee that describes the benefits available to Members, their rights under the Plan and obligations of the Plan. This document may incorporate the Benefit Booklet. In the event of any conflict or inconsistency between the Summary Plan Description and the Benefit Booklet, the terms of the Benefit Booklet shall control.

cc.  VENDOR.   A person or entity other than a Provider that provides services pursuant to a contract with Anthem.

## ARTICLE 2 – ADMINISTRATIVE SERVICES PROVIDED BY ANTHEM

a.   Anthem shall administer the enrollment of eligible persons and termination of Members as directed by the Employer, subject to the provisions of this Agreement. Anthem shall, with the assistance of Employer, respond to all direct routine inquiries made to it by employees and other persons concerning eligibility in the Plan. Unless otherwise specifically provided in the Benefit Booklet, Anthem shall apply its standard administrative practices and procedures and enrollment policies, which may be revised or modified from time to time, in connection with the performance of its responsibilities hereunder.

b.   Anthem shall perform the following Claims administration services:

CA01198

1. Process Claims with a Claim Incurred Date indicated in Section 1 of Schedule A, including investigating and reviewing such Claims to determine what amount, if any, is due and payable with respect thereto in accordance with the terms and conditions of the Benefit Booklet, and this Agreement. In processing Claims, Anthem shall perform coordination of benefits ("COB") services, and Employer hereby authorizes Anthem to perform such services in accordance with Anthem's standard policies, procedures and practices which may be revised or modified from time to time, unless alternative provisions for COB are indicated in the Benefit Booklet.

2. In connection with its Claims processing function, disburse to the person or entities entitled thereto (including any Provider and Vendor entitled to payment under an appropriate contract with Anthem or otherwise under the terms of the Benefit Booklet) payments that it determines to be due in accordance with the provisions of the Benefit Booklet. If applicable to the Plan benefits as indicated in Schedule B to this Agreement, Anthem may utilize its standard medical policy, utilization management and quality improvement policies, case management and administrative practices and procedures (including any Claims bundling procedures) which may be revised or modified from time to time to determine benefit payments.

c. Pursuant to Section 405(c)(1) of ERISA, Employer designates Anthem to serve as a fiduciary solely to perform the processing of Claims appeals. Anthem shall have all the powers necessary and appropriate to enable it to carry out its Claims appeal processing duties. This includes, without limitation, the right and discretion to interpret and construe the terms and conditions of the Plan benefits described in the Benefit Booklet, subject to the Claims review provisions as described in this Agreement. Anthem's interpretation and construction of this Agreement and Benefit Booklet in the course of its processing of any appeal of a Claim shall be binding upon the Plan, Employer, and Members. Employer designates Anthem to undertake fiduciary responsibilities exclusively in connection with the processing of appeals of Claims. Anthem and Employer agree that Anthem shall have no fiduciary responsibility in connection with any other element of the administration of the Plan.

d. Anthem shall administer complaints and appeals according to Anthem's complaint and appeals policy, unless as otherwise provided in the Benefit Booklet. Despite this authority, Anthem may process and pay non-covered Claims if directed in writing by Employer to do so. In such cases, such Claims payment shall not count toward any stop-loss attachment points under a stop loss agreement with Anthem or be reimbursed under any Anthem stop loss agreement. In addition, in connection with payment of these Claims, Employer will pay Anthem a processing fee as set forth in Section 6 of Schedule A.

e. Anthem shall have the authority to build and maintain its Provider network. If applicable to the Plan benefits as indicated in Schedule B of this Agreement, Anthem shall administer referral, authorization or certification requirements. Anthem shall also have the authority to waive any such referral, authorization or certification requirement if, in the discretion of Anthem, such waiver will not adversely impact the effective and efficient Claims administration. In addition, Anthem shall have the authority to change its administrative practices and procedures which it deems are necessary or appropriate for the effective utilization and administration of Covered Services, including but not limited to, changes to the Benefit Booklet in accordance with Article 10.

f. If applicable to the Plan benefits and as indicated in Schedule B of this Agreement, Anthem shall have the authority to perform case management on an individual basis. Case management is a feature that allows, but does not require, Anthem to customize benefits by approving, if authorized by Employer and provided in the Benefit Booklet, otherwise non-Covered Services for the purpose of assuring care is provided in an appropriate and cost effective setting.

g. If applicable to the Plan benefits and as indicated in Schedule B of this Agreement, Anthem shall have the authority, in its discretion, to institute from time to time, pilot or test programs regarding case management, disease management or wellness initiatives which may result in the payment of benefits not otherwise specified in the Benefit Booklet. Anthem reserves the right to discontinue a pilot or test program at any time with advance notice.

h. In the event that Anthem determines that it has paid a Claim in an amount less than the amount due under the Benefit Booklet, Anthem will promptly adjust the underpayment. If it is determined by Anthem or the Employer that any benefit payment has been made for an ineligible person, that an overpayment has been made, or that a sum is due to the Employer under the coordination of benefits or subrogation provisions, Anthem will make reasonable efforts to collect such amounts but shall not be required to initiate or maintain any judicial proceeding to make the recovery as described in Article 25 of this Agreement. Anthem shall,

CA01199

during the term of this Agreement, refund to the Employer any overpaid amounts only if Anthem successfully recovers such amounts. Employer agrees to apply to the benefit of Plan Subscribers that portion of such refund as maybe required by the applicable rules of ERISA.

i.    Anthem shall respond to inquiries by Members regarding Claims for benefits under the Plan.

j.    In processing Claims in accordance with the Benefit Booklet, Anthem shall provide notice in writing when a Claim for benefits has been denied, setting forth the reasons for the denial, the right to a full and fair review of the denial under the terms of the Plan and ERISA, and otherwise satisfying applicable regulatory requirements governing notice of a denied Claim.

k.    Anthem shall not be responsible for any act or omission undertaken at the direction of, or in accordance with, instructions received from the Employer..

l.    Anthem shall issue identification cards to each Subscriber who enrolls in the Plan, unless otherwise agreed upon by Anthem and Employer. Such identification cards shall be for the administration of Members' health care benefits under the Plan only and shall state that Anthem assumes no financial risk with respect to Claims.

m.    Anthem shall provide certificates of creditable coverage as required by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") with respect to Members' participation in the Plan for which Anthem provides services, unless otherwise instructed by the Employer.

n.    If applicable to the Plan benefits as indicated in Schedule B of this Agreement, Anthem shall provide the Employer for its subsequent distribution to Subscribers and potential Subscribers a directory of Providers (the "Provider Directories"), which shall be updated from time to time. The Provider Directories shall contain information such as medical specialty, office addresses and telephone number(s). Employer shall make copies of Provider Directories available to Subscribers. If the Employer wishes to receive Directories more often than once per Agreement Period, Anthem may charge a reasonable fee to it for such Directories. The Employer agrees that it will not charge Members for providing copies of Provider Directories.

o.    Anthem shall provide the Employer with information necessary to enable Members to effectively access Plan benefits described in the Benefit Booklet, including, but not limited to, Claim forms and Claim filing instructions, and shall periodically update Employer on changes which may affect the Plan.

p.    Anthem reserves the right to make benefit payments to either Providers or Subscribers. Employer represents and warrants that during the Agreement Period, the terms of the Plan will provide for such discretion in determining the direction of payment (including but not limited to the inclusion of a provision in the Plan that a Subscriber may not assign rights to receive payment under the Plan).

q.    Anthem shall not be required to provide information to Employer or Members pursuant to this Agreement which is Provider-specific or which discloses or leads to the disclosure of the specific amount of a negotiated fee with any Provider.

r.    Anthem makes no representation or warranty regarding the value or amount of the benefits which may accrue to the Employer, the Members, the Plan, or any other person or entity, as a result of utilization of Covered Services. Nothing in this Agreement shall be interpreted to require Anthem to maintain negotiated fees or reimbursement arrangements or other relationships with certain Hospitals, Providers or Vendors.

s.    If applicable to the Plan benefits and as indicated in Schedule B of this Agreement, Anthem will provide or arrange for the following managed care services. Anthem may subcontract any and all of such managed care services to another entity without the prior approval of Employer. Anthem managed care services may include:

    1.    Conduct utilization review. Such review may include preadmission review to evaluate and certify the medical necessity of an admission or procedure and appropriate level of care, and to authorize an initial length of stay, for inpatient admissions, with concurrent review throughout the admission for certification of additional days of care as warranted by the patient's medical condition.

    2.    Provide access to a specialty network of Providers if the Plan includes a specialty network. Anthem reserves the right to establish specialty networks for certain specialty or referral care.

CA01200

      3.    Provide any other managed care services incidental or necessary to perform the services set forth in Article 2 or other managed care services including the right to make benefit exceptions from time to time, on a case by case basis.

t.    Anthem, through its Vendor affiliate Anthem Prescription Management, Inc. ("APM") shall provide the following prescription drug management services:

      1.    Anthem shall offer the Employer a network of pharmacies that have entered into or are governed by contractual arrangements with APM under which such pharmacies agree to provide pharmacy services to Members and accept negotiated fees for such services (the "Network Pharmacies"). APM shall determine which pharmacies shall be Network Pharmacies, and the composition of Network Pharmacies may change at any time. If applicable to the Plan benefits and as described in Schedule B of this Agreement, APM will furnish a drug formulary for use with the Plan. The Employer hereby adopts such formulary as part of the design of the Plan. Unless the Parties agree otherwise, on termination of the Agreement the Employer shall cease adoption and use of the drug formulary as part of the Plan.

      2.    APM shall arrange for the processing of pharmaceutical drug Claims in accordance with the Benefit Booklet.

      3.    Anthem shall offer the Employer and Plan, through APM, a mail order pharmacy program, through which Members may receive mail order prescription services. Anthem shall also provide all necessary forms and procedural information to Members to obtain such services.

      4.    APM has negotiated rebate programs with pharmaceutical manufacturers on certain prescription drug products dispensed to members, and has arranged for payments of such rebates to be made directly to APM. The formula to determine rebate amounts varies depending upon the pharmaceutical manufacturer. In many cases, the rebate payments for certain prescription drugs are conditioned on APM including such prescription drugs on the formulary that Anthem furnishes to client groups to adopt as part of the design of the Plan. Under its agreement with Anthem, APM shall retain 20% of the rebates it receives from pharmaceutical manufacturers, and it passes the remaining rebates received to Anthem. Anthem shall grant Employer a credit to its Administrative Services Fee rate provided in Section 4 of Schedule A, based on Per Subscriber per Month credit rate depending on the benefit design of the Plan. Such per Subscriber per Month credit shall be provided in Section 4 of Schedule A.

          The per Subscriber credit shall be re-calculated at least once within a 24 month period. The Employer hereby agrees to accept this credit in lieu of receipt of or claim to amounts attributable to rebates receivable by APM, or Anthem, and the Employer agrees that neither itself, the Group Health Plan, nor any Members shall have any legal or beneficial interest in any rebates or amounts attributable to rebates. Employer also agrees that during the term of this Agreement, neither it nor the Group Health Plan will negotiate or arrange or contract in any way for rebates on the purchase of prescription drugs from any manufacturer.

u.    On behalf of Employer, Anthem shall produce and maintain a master copy of the Benefit Booklet and make changes and amendments to the master copy of the Benefit Booklet and incorporate the approved changes or amendments pursuant to Article 10 of this Agreement. Employer shall determine, in its sole discretion, whether Anthem has accurately produced the Benefit Booklet and has fully implemented the approved changes or amendments. Anthem may charge a fee to provide this service, which fee shall be set forth in Section 6 of Schedule A to this Agreement.

v.    Upon written request, Anthem will provide the Employer with Plan data and assistance necessary for preparation of the Plan's information returns and forms required by ERISA or other federal or state laws. Anthem shall prepare and mail all IRS Form 1099's and any other similar form that is given to Providers or brokers. Form 5500's shall be prepared by and are the sole responsibility of the Employer, with the timely assistance and cooperation of Anthem, if requested. Summary annual reports shall be prepared and mailed by, and are the sole responsibility of the Employer.

w.    Anthem has oversight responsibility for compliance with Provider and Vendor contracts, including discount and multi-year compliance audits. Anthem shall have authority to enter into a settlement or compromise regarding enforcement of these contracts. Employer acknowledges and agrees that Anthem shall retain any

CA01201

recoveries made from a Provider or Vendor resulting from these audits if the total recovery from one Provider or Vendor with respect to all of Anthem's group-sponsored health benefit plans is $1,000 or less.

x. If Anthem retains outside Vendors, auditors, or counsel to conduct audits or reviews of or to enforce Provider or Vendor contracts or activities, and recoveries or cost avoidance is a result of such audits, reviews or enforcement activities, then Anthem shall provide Employer a credit, after a reduction in such recovery or cost avoidance amount of its expenses and a five percent (5%) fee. Anthem shall credit Employer a proportionate share of the net recovery equal to the ratio of (1) Members' Paid Claims to such Provider or Vendor for the audit/review period, to (2) all Paid Claims to such Provider or Vendor for the audit/review period. The Employer acknowledges and agrees to Anthem's retention of such 5% fee, and agrees that the fee will be charged on all recoveries or cost avoidance resulting from such audits, reviews or enforcement activities, including audits or reviews of Claims incurred prior to the Agreement Period.

y. If set forth in Section 6 of Schedule A, Anthem shall provide conversion rights to Subscribers following termination of the Agreement.

## ARTICLE 3 – OBLIGATIONS OF EMPLOYER

a. The Employer shall furnish to Anthem initial information regarding Members. Employer is responsible for determining eligibility of persons and advising Anthem in a timely manner, through a method agreed upon by Anthem, including eligibility reports, electronic transmissions and individual applications, as to which employees, dependents, and other persons are to be enrolled Members. The Employer shall keep such records and furnish to Anthem such notification and other information as may be required by Anthem for the purpose of enrolling Members, processing terminations, effecting COBRA coverage elections, effecting changes in single or family contract status, effecting changes due to a Member becoming eligible for Medicare, effecting changes due to a Member becoming disabled or being eligible for short-term or long-term disability, determining the amount payable under this Agreement, or for any other purpose reasonably related to the administration of this Agreement.

Subscribers, dependents, or other persons who are determined to be ineligible for benefits under the Plan shall be reported on a monthly listing as a deletion from the Plan. Upon the Employer's direction to Anthem, the benefits of such Subscriber, and his or her dependents, shall terminate at the end of the period for which fees were paid. The Employer shall give Anthem at least five (5) working days advance notice of any Member's termination to enable Anthem to remove the Member from Anthem's list of Members. Anthem will have no obligation to pay Claims for persons no longer eligible for coverage. Further, if Anthem has paid Claims for persons no longer eligible because Anthem was provided inaccurate eligibility information, Anthem did not receive timely notification of termination, or Anthem received notice of a retroactive change to enrollment, then Employer shall reimburse Anthem for all unrecovered amounts it has paid on Claims. In the event that Employer has already reimbursed Anthem for such unrecovered amounts paid on Claims, no further sums are owed under this Article 3(a). In addition, Anthem may also charge Employer twenty percent (20%) of all amounts paid on Claims for persons no longer eligible to receive benefits to cover the cost of recovery (the "Retroactive Change Fee").

Anthem reserves the right, in its sole discretion, to limit retroactive changes to enrollment to a maximum of sixty (60) days from the date notice is received and collect the Retroactive Change Fee. Acceptance of payment of fees from the Employer or the payment of benefits to persons no longer eligible will not obligate Anthem to continue to administer benefits.

b. In determining any individual's right to benefits under the Benefit Booklet, and in performing its other obligations as set forth in Article 2, Anthem shall rely on eligibility information furnished by the Employer. It is mutually understood that the effective performance of this Agreement by Anthem will require that it be advised on a timely basis by the Employer during the term of this Agreement of the identity of all employees, dependents, and other persons eligible for benefits under the Plan. Such information shall identify the effective date of eligibility and the termination date of eligibility and shall be provided in accordance with the terms of this Agreement with such other information as may reasonably be required by Anthem for the proper administration of Plan benefits described in the Benefit Booklet. The Employer acknowledges that prompt and complete furnishing of the required eligibility information is essential to the timely and efficient administration by Anthem of Claims.

c. Employer acknowledges that it serves as Plan Administrator and Named Fiduciary (as those terms are defined in ERISA), and shall have discretionary authority and control over the management of the Plan, and

CA01202

      all discretionary authority and responsibility for the administration of the Plan except as provided in Article 2 (c) of this Agreement. Anthem does not serve either as Plan Administrator or as a Named Fiduciary of the Plan other than as a fiduciary for processing appeals of Claims. All functions, duties and responsibilities of Anthem are governed exclusively by this Agreement and the Benefit Booklet.

d.      It is understood and agreed that any notice, election form, collection of fees, or communication regarding Title X of the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"), or any other applicable law governing continuation of health care coverage, shall be the sole responsibility of Employer and not Anthem, except as otherwise agreed to in a separate agreement between the Parties.

e.      Employer acknowledges that it is the Employer's sole responsibility, and not Anthem's, to comply with the Family and Medical Leave Act ("FMLA") in connection with certain Subscribers on leave. The Employer authorizes Anthem to request evidence satisfactory to Anthem of the applicability of the FMLA to an Employer's employee.

f.      Employer agrees to and shall notify Subscribers of their right to apply for health benefits and make available to them Claim forms and Claim filing instructions. Claim forms and Claim filing instructions shall also be supplied to the Members by Anthem upon request.

g.      Employer agrees to and shall notify all Subscribers in the event of termination of this Agreement.

h.      Employer agrees to and shall collect those contributions from Subscribers that are required by Employer for participation in the Plan. Employer shall abide by Anthem's participation and contribution guidelines.

i.      Employer shall review and adopt the Benefit Booklet provided by Anthem. Unless otherwise agreed by the Parties, the Employer shall prepare and distribute Summary Plan Descriptions, summary annual reports, and all notices or summaries of changes or material modifications in the Benefit Booklet. Employer shall ensure that when it or its designee prepares the Summary Plan Description, the Summary Plan Description will accurately reflect the terms and coverages of the Benefit Booklet. Anthem shall provide the Benefit Booklet to the Employer, and the Employer shall be responsible for ensuring that the Benefit Booklet is distributed to Subscribers.

j.      Employer shall prepare and is responsible to make all governmental filings, including but not limited to, the Form 5500, associated with the Plan.

k.      The Employer shall reimburse Anthem for all payments made on behalf of the Employer pursuant to demand letters forwarded by the Centers for Medicare and Medicaid Services (CMS) or other government agency to recover a refund when Medicare has erroneously paid as the primary coverage.

l.      The Employer represents that it and its Employer Affiliates comprise a single "control group" as that term is used in section 3(40) of ERISA.

m.      Employer shall give notice to Anthem of the expected occurrence of any of the following events (including a description of the event), with such notice to be given at least thirty (30) days prior to the effective date of the event:

    1.      Change of Employer's name;

    2.      Any merger between, or consolidation with another entity, where Employer is not the surviving entity or where the owners of Employer do not continue to own at least twenty-five percent (25%) or more of the equity of the surviving entity;

    3.      The sale or other transfer of all or substantially all of the assets of either the Employer or any of the Employer Affiliates listed on the Attachment hereto, or the sale or other transfer of twenty-five percent (25%) or more of the equity of Employer or any of the Employer Affiliates listed on Attachment A hereto; or

    4.      Any bankruptcy, receivership, insolvency or inability of Employer to pay its debts as they become due.

ASO Agreement Midwest-Nov. 2002        8

If the Employer fails to timely notify Anthem of a change in the Employer's name or a change or modification of the Employer's organization as provided in this Article 3(m), Anthem reserves the right to assess against Employer a fee, in its sole discretion, for the costs incurred by Anthem as a consequence of the change.

n. The Employer shall have the sole responsibility to develop procedures and determine if a medical child support order is a "qualified" medical child support order as provided for in ERISA, and shall perform all administration relating to such determinations, including providing all appropriate notification to Anthem.

o. The Employer is solely responsible for complying with all unclaimed property or escheat laws, and for making any required payment or filing any required reports under such laws.

p. Employer shall provide or designate others to provide all other services required to operate and administer the Plan that are not expressly the responsibility of Anthem under this Agreement.

### ARTICLE 4 – CLAIMS PAYMENT METHOD

a. Employer shall pay Anthem for Paid Claims according to the Claims Payment Method described in Section 3 of Schedule A. In addition, from time to time, the Parties acknowledge that the appropriateness of a Claim payment may be reviewed. During the course of the period of time for review, Anthem shall not hold the Claim payment and Employer shall reimburse Anthem for such Claim payment.

b. The Parties acknowledge that, from time to time, a Claims adjustment is necessary as a result of coordination of benefits, subrogation, workers' compensation, payment errors and the like, and that the adjustment takes the form of a debit (for an additional amount paid by Anthem) or a credit (for an amount refunded to Anthem). The Parties agree that such Claims adjustment shall be treated as an adjustment to the Claims payment made in the billing period in which the adjustment occurs, rather than as a retroactive adjustment to the Claim as initially paid. Any Claims credit shall be reduced by Anthem's fee or a fee charged by Anthem's contractors, if any, related to the adjustment. No Claims adjustment shall be made beyond the Claims Runout period following termination of this Agreement. In addition, a credit shall not be applied if the adjustment is related to a Claim that was covered under Anthem stop-loss coverage.

### ARTICLE 5 – ADMINISTRATIVE SERVICES FEE

Employer shall pay Anthem the Administrative Services Fee, described in Section 4 of Schedule A, during the term of this Agreement. Employer shall pay such amounts by the invoice due date. If Employer self-bills the Administrative Services Fee, Employer shall pay such amount by the first day of each month.

### ARTICLE 6 – CLAIMS RUNOUT

a. Anthem shall pay the Claims Runout for the period of time described in Section 5 of Schedule A. Following termination of this Agreement, the terms of this Agreement shall continue to apply with respect to the processing of such Claims Runout and Administrative Services Fee. Employer acknowledges and agrees that Anthem shall have no obligation to process or pay any Claims Runout or return Claims filed with Anthem to Employer beyond the Claims Runout period designated in Section 5 of Schedule A, including any Claims incurred by a Member under a continuation of coverage provision of the Benefit Booklet, and Employer acknowledges and agrees that any amounts recovered beyond the Claims Runout period shall be retained by Anthem as reasonable fee for Claims Runout services.

b. Upon termination, the Administrative Services Fee applicable to the Claims Runout shall be a percentage of the Paid Claims during the Runout period. Such Administrative Services Fee shall be based on the percentage of Paid Claims described in Section 5 of Schedule A and shall be invoiced and paid in the same manner as the Claims Runout.

c. Employer shall pay Anthem the amounts due under this Article by the invoice due date.

CA01204

## ARTICLE 7 – INTEREST CHARGES

If Employer fails to timely pay any amount due to Anthem under this Agreement, Employer agrees to pay a late payment charge for each day the payment is late. The late payment charge shall be at the rate of eighteen per cent (18%) simple interest per annum (365 days), and shall be payable by the invoice due date. Any acceptance by Anthem of late payments shall not be deemed a waiver of its rights to terminate the Agreement for any future failure of Employer to make timely payments.

## ARTICLE 8 – RENEWAL SCHEDULES

If Anthem offers to renew this Agreement at the end of an Agreement Period, then Anthem shall provide Employer with such terms and conditions of the proposed renewal within the time period provided in Section 1 of Schedule A. The Employer shall indicate to Anthem in writing its acceptance of the renewal of its selections from among the renewal option(s) provided by Anthem at least thirty (30) days in advance of the renewal date, and Anthem shall confirm such selections by issuing a new Schedule for such Agreement Period. Schedule selections made by Employer for any Agreement Period may not be changed without the prior written approval of Anthem's underwriting area. The Employer's payment of the amounts set forth in the new Schedule shall constitute Employer's acceptance of the revisions and the new Schedule without the necessity of securing the Employer's signature on the Schedule. Such Schedule shall then become a part of this Agreement.

## ARTICLE 9 – NOTICES

a.    Any notice or demand under this Agreement shall be deemed sufficient when made in writing as follows: to Employer, by first class mail, personal delivery, or electronic mail or overnight delivery with confirmation capability, to its principal office shown upon the records of Anthem; to Anthem, by first class mail, personal delivery, or overnight delivery with confirmation capability, to the Chief Underwriter.

b.    A notice or demand shall be deemed to have been given as of the date of mailing or, in the case of personal delivery, as of the date it is placed into the hands of any agent, officer, or employee of the person or party to whom such notice or demand is directed. For purposes of this paragraph, Anthem shall not be deemed to be an agent of the Employer nor shall the Employer be deemed an agent of Anthem.

c.    Employer will timely distribute to Subscribers any notices or other information relating to this Agreement that may be addressed or directed to the Members enrolled under the Plan.

d.    Employer shall be obligated to provide all notices to Members as necessary to effectuate any change in or termination of the Agreement.

## ARTICLE 10 – CHANGES IN BENEFIT BOOKLET AND AGREEMENT

a.    Anthem reserves the right to propose changes to the provisions described in the Benefit Booklet by giving written notice to Employer not less than thirty (30) days prior to the effective date of such change, unless otherwise permitted under this Agreement. If such change is unacceptable to Employer, Employer shall have the right to terminate this Agreement by giving written notice of termination to Anthem before the effective date of change. If Anthem does not receive written notice from Employer prior to the effective date of a change that such change is unacceptable, the change shall be deemed acceptable by Employer. In the event changes to the provisions of the Benefit Booklet are mandated as a result of a change to any state and/or federal law, Anthem shall have the right to make such changes to the Benefit Booklet to comply with the law without thirty (30) days notice. In either case, Employer will fully and accurately incorporate any effective changes into the appropriate Plan Document and Summary Plan Description as necessary, and timely provide any notice or summary of material modification to Members.

b.    Anthem also reserves the right to change the Administrative Services Fee by providing a revised Schedule A to Employer not less than thirty (30) days prior to the effective date of such change. If such change is unacceptable to Employer, Employer shall have the right to terminate this Agreement by giving written notice of termination to Anthem before the effective date of the change. If Anthem does not receive written notice from Employer prior to the effective date of a change, the revised Schedule A shall then become part of this Agreement without the necessity of securing Employer's signature on the Schedule and/or addenda.

CA01205

c.  In the event Employer seeks to change the provisions of the Benefit Booklet, the request must be made in writing to Anthem not less than ninety (90) days prior to the requested effective date of such change. If Anthem does not agree to administer Plan benefits consistent with such change, Anthem shall have the right to terminate this Agreement by giving thirty (30) days written notice, unless Employer withdraws such request. Anthem's incorporation of the changes into the Benefit Booklet shall constitute acceptance of the change by Anthem.

d.  No waiver, modification or change in any provision of this Agreement, including but not limited to changes at renewal, shall be effective unless and until approved in writing by an officer of Anthem and evidenced by an amendment or new Schedule attached to this Agreement.

## ARTICLE 11 – TERMINATION AND/OR SUSPENSION OF PERFORMANCE

a.  This Agreement automatically terminates, without any notice to the other party or action required by any party, at the end of each Agreement Period unless Anthem offers to renew this Agreement and Employer accepts such offer of renewal pursuant to Article 8 of this Agreement. Upon termination of this Agreement, Employer shall remain liable for all payments due to Anthem.

b.  Notwithstanding any other provision of this Article, if Employer fails to make any payment due under this Agreement or pays only a portion of the payment due under this Agreement, Anthem shall have the right to (1) terminate this Agreement, effective at the end of the last period for which full payment was made, or (2) suspend performance of its obligations under this Agreement, and Employer acknowledges and agrees that in such event Anthem shall have no liability to any Member.  Notwithstanding such termination or suspension of Claims payment under this Agreement, Anthem may, in its sole discretion, accept late payment of delinquent amounts and, upon acceptance, this Agreement may be reinstated.  Any such acceptance of a delinquent payment by Anthem shall not be deemed a waiver of the provisions of this Article 11(b) in the event of any future failure of the Employer to make timely payment of the amounts due under this Agreement.  In no event shall Anthem have any obligation to pay any Claims under the Agreement unless and until all required payments have been and are paid in full when due.

c.  Notwithstanding any other provisions of this Agreement, if Employer fails to comply with its duties and obligations under this Agreement, Anthem shall have the right (1) to terminate this Agreement by giving Employer at least thirty (30) days prior written notice of termination, or (2) upon written notice to Employer suspend performance of its obligations under this Agreement, and the Employer acknowledges and agrees that in such event Anthem shall have no liability to any Member.  Anthem, at its option and in its sole discretion, may allow the Employer to cure a breach of this Agreement and, upon acceptance in writing by Anthem that a breach is cured, this Agreement may be reinstated retroactive to the date of the breach or suspension of performance.

d.  Notwithstanding any other provision of this Agreement, if, in Anthem's opinion, Employer engages in fraudulent conduct or misrepresentation, Anthem shall have the right to rescind, cancel, or terminate this Agreement.  In the event Anthem terminates the Agreement, the effective date of termination may be retroactive to the date of the fraudulent conduct or other date as determined by Anthem. The Employer shall be liable to Anthem for any and all payments made and any losses, costs or damages sustained by Anthem as a result of such conduct by Employer.

e.  If there shall occur any change in the condition (financial or otherwise) of Employer or an Employer Affiliate that, in the reasonable opinion of Anthem, has a material adverse effect upon the validity, performance, or enforceability of this Agreement, on the financial condition or business operation of Employer (or Employer Affiliate), or on the ability of Employer to fulfill its obligations under this Agreement, then Anthem shall have the right to require Employer to provide adequate assurance of future performance. Employer hereby acknowledges and agrees that such assurance may include its payment of a deposit. Examples of such a change could include, but would not be limited to: voluntary or involuntary insolvency proceedings under Title 11 of the United States Code, the sale of all or substantially all of Employer's assets or a key Employer Affiliate's assets, or a change in control of Employer's management or operations.  The Employer acknowledges and agrees that the deposit amount paid pursuant to this section shall be paid out of the Employer's general account assets, shall not be funded in any part by Subscriber contributions and shall be the property of Anthem and held in its general account. At the termination of this Agreement and designated Claims Runout period, the deposit amount, net of any outstanding fees or Claims payable to Anthem, shall be returned to the Employer. Any deposit amount returned to Employer under this Article 11(e) shall not include interest.  Employer acknowledges and agrees that any interest on a deposit amount is the property

of Anthem and that neither it, nor the Plan, nor any participant in the Plan shall have any beneficial or legal ownership interest in such deposit.

In the event such further assurance is required by Anthem as provided herein, Employer acknowledges and agrees that Anthem may, at any time after the date of notice to Employer of such requirement, suspend its performance of its obligations under this Agreement until the date of receipt by Anthem of such adequate assurance without being liable to the Employer, the Plan or any Member for such suspension. In the event such adequate assurance is not received within a reasonable period of time as determined by Anthem, Anthem may terminate this Agreement.

f.    In the event that Employer terminates this Agreement without giving appropriate notice to Anthem as provided herein, this Agreement is terminated pursuant to the provisions of this Article, or a Member is no longer eligible for coverage and has been terminated from coverage and, after the effective date of termination, Anthem makes payment of any Claims which would otherwise have been payable under the terms of this Agreement but for the fact that the Claims were incurred after the effective date of termination, Employer shall be liable to reimburse Anthem for such Claims. Employer also agrees to cooperate fully with Anthem in the coordination of pharmacy Claims with any successor pharmacy Claims with any successor pharmacy benefits manager.

g.    If a voluntary or involuntary insolvency or bankruptcy petition under Title 11 of the United States Code is filed by or against the Employer, then within ten (10) days of the petition date, Employer shall file in the bankruptcy court a motion for authority to assume or reject this Agreement effective in either case as of the date the motion is filed. If Employer fails to do so, then Anthem may file in the bankruptcy court a motion requiring Employer to assume or reject this Agreement effective in either case as of the date the motion is filed and Employer shall not oppose such motion. In any and all events, Anthem shall have no obligation to pay any claims under this Agreement unless and until all pre-petition and post-petition amounts owing hereunder have been and are paid in full when due.

## ARTICLE 12 – BLUECARD PROGRAM

a.    Whenever Members access health care services outside the geographic area Anthem serves, the Claim for those services may be processed through BlueCard and presented to Anthem for payment in conformity with network access rules of the BlueCard Policies then in effect ("Policies"). Under BlueCard, when Members receive covered health care services within the geographic area serviced by an on-site Blue Cross and/or Blue Shield Licensee ("Host Blue"), Anthem will remain responsible under this Agreement, however, the Host Plan will be responsible in accordance with applicable BlueCard Policies, if any, for contracting with its Participating Providers and handling all interaction with its Participating Providers, and, if applicable, providing some managed care services.

b.    BlueCard Liability Calculation Method Per Claim. The calculation of Member liability on claims for covered health care services incurred outside the geographic area Anthem serves and processed through BlueCard will be based on the lower of the Provider's billed charges or the negotiated price Anthem pays the Host Blue. The calculation of Employer liability on Claims for covered health care services incurred outside the geographic area Anthem serves and processed through BlueCard will be based on the negotiated price Anthem pays the Host Blue. The methods employed by a Host Blue to determine a negotiated price will vary among Host Blues based on the terms of each Host Blue's Provider contracts. Other than access fees and other compensation noted in Article 12(e) below, the negotiated price paid to a Host Blue by Anthem on a Claim for health care services processed through BlueCard may represent

1.    the actual price paid on the Claim by the Host Blue to the Provider ("Actual Price"), or

2.    an estimated price, determined by the Host Blue in accordance with BlueCard policies and based on the Actual Price, increased or reduced to reflect aggregate payments expected to result from settlements, withholds, any other contingent payment arrangements and non-claims transactions with all of the Host Blue's Providers or one or more particular Providers ("Estimated Price"), or

3.    an average price, determined by the Host Blue in accordance with BlueCard policies, based on a billed charges discount representing the Host Blue's average savings expected after settlements, withholds, any other contingent payment arrangements and non-Claims transactions for all of its Providers or for a specified group of Providers ("Average Price"). An Average Price may result in greater variation to the Member and Employer from the Actual Price than would an Estimated Price.

CA01207

Host Blues using either the Estimated Price or Average Price will, in accordance with BlueCard policies, prospectively increase or reduce the Estimated Price or Average Price to correct for over- or underestimation of past prices. However, the amount paid by the Member and Employer is a final price and will not be affected by such prospective adjustment. In addition, a liability calculation method of Estimated Price or Average Price may result in some portion of the amount paid by Employer being held in a variance account by the Host Blue, pending settlement with its Participating Providers. Because all amounts paid are final, the funds held in a variance account, if any, do not belong to Employer and are eventually exhausted by provider settlements and through prospective adjustments to the negotiated prices.

Statutes in a small number of states may require a Host Blue either (1) to use a basis for calculating Subscriber liability for covered health care services that does not reflect the entire savings realized, or expected to be realized, on a particular Claim or (2) to add a surcharge. Should any state statutes mandate liability calculation methods that differ from the negotiated price methodology or require a surcharge, the Host Blue would then calculate Member liability and Employer liability for any covered health care services consistent with the applicable state statute in effect at the time the Subscriber received those services.

c.   Negotiated Price Per Member Per Month (Applicable to Point of Service Coverage Only). For some Host Blues, Employer may have liability on a per Member/employee/Subscriber per month basis for Provider health care services performed outside of the geographic area Anthem services, such as for capitated service fees, performance incentive fees, adjustments to the Actual Price determined by the Host Blue instead of developing an Estimated Price or Average Price per claim, or other provider fees charged on this basis. The methods employed by a Host Blue to determine a negotiated price will vary among Host Blues based on the terms of each Host Blue's Provider contracts.

Employer's liability for capitated provider services will be at the negotiated price Anthem pays to the Host Blue. Other than access fees and other compensation noted in Article 12(f) below, the negotiated price paid by Anthem for per member per month capitated services provided through BlueCard represents:

1.   the Provider's actual per member per month price paid by the Host Blue to the Provider ("Actual PMPM Price")
     or

2.   an estimated per member per month price, determined by the Host Blue in accordance with BlueCard Policies, based on the Actual PMPM Price increased or reduced to reflect aggregate payments expected to result from settlements, withholds, any other contingent payment arrangements and non-claims transactions with all of the Host Blue's Providers or one or more particular Providers ("Estimated PMPM Price"), or

3.   an average per member per month price, determined by the Host Blue in accordance with BlueCard Policies, based on (A) the sum of the Actual PMPM Price of each Member of the account, adjusted for expected settlements, withholds, any other contingent payment arrangements and non-claims transactions, divided by (B) the total number of Members of the account ("Average PMPM Price").

Negotiated prices, other than for capitated services, for provider fees paid per Member per month (other than for capitated services), such as a performance incentive fee, are based on an estimate of the annualized total of that fee, determined by the Host Blue, in accordance with BlueCard Policies, for all of its Providers or for a specified group of Providers.

Host Blues using either the Estimated PMPM Price or Average PMPM Price method will, in accordance with BlueCard Policies, prospectively increase or reduce the Estimated PMPM Price or Average PMPM Price to correct for over – or underestimation of past prices. However, the amount paid by the Member and Employer is a final price and will not be affected by such adjustment. In addition, a liability calculation method of Estimated PMPM Price or Average PMPM Price will result in some portion of the amount paid by Employer being held in a variance account by the Host Blue, pending settlement with its Providers. Because all amounts paid are final, the funds held in a variance account do not belong to Employer and are eventually exhausted by provider settlements and through prospective adjustments to the negotiated prices.

d.   Return of Overpayments. Under BlueCard, recoveries from a Host Blue or from Participating Providers of a Host Blue can arise in several ways, including, but not limited to, anti-fraud and abuse audits, Provider/Hospital audits, credit balance audits, utilization review refunds, and unsolicited refunds. In some

CA01208

cases, the Host Blue will engage third parties to assist in discovery or collection of recovery amounts. The fees of such a third party are netted against the recovery. Recovery amounts, net of fees, if any, will be applied in accordance with applicable BlueCard Policies, which generally require correction on a claim-by-claim or prospective basis.

e.    BlueCard Fees and Compensation. Employer understands and agrees (1) to pay certain fees and compensation to Anthem which Anthem is obligated under BlueCard to pay to the Host Blue, to the Blue Cross and Blue Shield Association, or to the BlueCard vendors, unless Anthem's contract obligations to Employer requires those fees and compensation to be paid only by Anthem and (2) that fees and compensation under BlueCard may be revised from time to time without Employer's prior approval in accordance with the standard procedures for revising fees and compensation under BlueCard. Some of these fees and compensation are charged each time a Claim is processed through BlueCard and include, but are not limited to, access fees, administrative expense allowance fees, Central Financial Agency Fees, and ITS Transaction Fees. Also, some of these claim-based fees, such as the access fee and the administrative expense allowance fee, may be passed on to Employer as an additional claim liability. Other fees include, but are not limited to, an 800 number fee and a fee for providing appropriate Provider Directories.

f.    Determinations of Covered Services (Applicable to Point of Service Coverage Only). If Anthem, or if the Employer, determines that a Claim is a covered service, coverage shall not be denied based on the Host Blue's network protocols, if any. Under BlueCard, a Member shall not be denied coverage of health care services received outside of the geographic area Anthem serves if the health care services (1) are covered by the network protocols, if any, of the Host Blue; and (2) are not specifically limited or excluded by Employer's Plan Document. In such a case, the Employer agrees to pay for such covered services pursuant to the provisions of this Article 12.

## ARTICLE 13 – LIABILITY AND INDEMNITY

a.    It is understood that Employer retains all final authority and responsibility for the Plan and its operation and that Anthem is empowered to act on behalf of Employer in connection with the Plan only as expressly stated in this Agreement or as mutually agreed to in writing by Anthem and Employer.

b.    In performing its obligations under this Agreement, Anthem neither insures nor underwrites any liability of Employer under the Plan, or any liability of the Plan itself, and Anthem is not the provider of benefits or medical services under the Plan and does not assume any liability therefore. It is expressly understood and agreed by Employer that in performing its obligations under this Agreement, Anthem is not engaged in the practice of medicine, and that no Hospital or Provider acts as agent for or on behalf of Anthem. Anthem shall be responsible only for performing the administrative services described in this Agreement. Employer, acknowledges and agrees that nothing contained in this Agreement shall confer upon Employer, the Plan, or Members any right or cause of action, either at law or in equity, against Anthem for acts or omissions of any Hospital or other Providers or Vendors from which any Members receive services. Anthem makes no representations or warranties, express or implied, concerning whether Employer's Plan, as administered by Anthem, complies with state and federal laws regulating employee benefit plans.

c.    Anthem shall defend against any legal action or proceeding brought against Anthem to recover a claim for benefits under the Plan Documents as administered by Anthem. If a demand is asserted, or litigation, investigation, or other proceedings commenced against Anthem by a Member, or by any other party on behalf of a Member, in connection with the Plan, Anthem shall provide written notice to the Employer as soon as practicable. Anthem will select and retain counsel, and Employer will assume liability of payment of legal fees in connection with the litigation, proceeding, or investigation. If the Employer or Plan is also named, the Employer reserves the right to retain separate counsel for itself, in its sole discretion and at its own expense, and separate counsel for the Plan. If during such litigation, investigation or proceedings Employer and Anthem are both represented by the same counsel selected by Anthem and a conflict of interest arises, the selected counsel shall continue to represent Anthem's interests only, at Anthem's expense. The Employer shall waive any conflict for such representation and retain its own counsel, or separate counsel for the Plan, at its own expense. Employer will provide Anthem with reasonable cooperation in the defense of any such matter.

Anthem is authorized to settle or compromise any claim to recover Plan benefits under the Plan Documents arising out of a course of legal action or in anticipation of litigation with the approval of Employer, which

CA01209

approval shall not be unreasonably withheld. Employer shall be liable for the full amount of and shall indemnify Indemnitees (as defined below) for any amounts paid by Anthem pursuant to this Article 13 (c).

In the event of any legal action or proceeding against the Employer or Plan respecting benefits described in the Benefit Booklet, Anthem shall make available to Employer, the Plan, and its counsel, such evidence that is not privileged and is relevant to such action or proceeding as Anthem may have as a result of its administration of the contested benefit determination.

d.     Employer shall defend, indemnify, and hold harmless Anthem, its affiliates and subcontractors and their respective directors, officers, employees, agents and assigns (past or present) (the "Indemnities") from and against any and all claims, demands, losses, liabilities, fines, penalties, excise, premium or other taxes, expenses and damages (including reasonable attorneys' fees and court costs) which the Indemnities may suffer or incur as a result of any breach of fiduciary responsibility by Employer, Employer's or the Plan's failure to comply with local, state or federal law, Employer's breach of confidentiality or right of privacy of any Member, Employer's failure to fulfill its obligations under this Agreement, or otherwise as a result of Anthem's prudent performance of its duties and obligations under this Agreement. This indemnity shall survive termination of this Agreement.

e.     Anthem shall defend, indemnify and hold harmless Employer and its respective directors, officers and employees from and against any and all claims, demands, losses, liabilities, fines, penalties, expenses and damages (including reasonable attorneys' fees and court costs) which Employer may suffer or incur as a result of any gross negligence, willful and wanton, fraudulent, or criminal act or omission of Anthem in the performance of its duties and obligations under this Agreement or by Anthem's breach of confidentiality or right of privacy of any Member. This indemnity does not extend to any acts or omissions other than those enumerated in this paragraph. This indemnity shall survive termination of this Agreement.

## ARTICLE 14 – DATA REPORTS

Upon Employer's request and only as permitted by the Business Associate Agreement entered into between the parties, Anthem will provide data reports pursuant to Anthem's standard reporting package, as described in Schedule B. In the event Employer shall request from Anthem information that is not a part of Anthem's standard package, Anthem shall be entitled to establish a reasonable charge for provision of such reports and such charge shall be payable prior to receipt of the reports.

## ARTICLE 15 – CLAIMS AUDIT

a.     At Employer's expense, Employer shall have the right to audit any Claims paid by Anthem on behalf of Employer on Anthem's premises, during regular business hours and in accordance with Anthem's External Account Audit Policy, as the policy may be revised from time to time. A copy of said External Account Audit Policy shall be made available upon reasonable advance request. In the event that Employer elects to utilize a third-party auditor to conduct an audit pursuant to this Article and Anthem's External Account Audit Policy, said auditor must be mutually acceptable to Employer and Anthem. Anthem reserves the right to charge a fee to Employer for expenditure of time by Anthem's employees in completing any audit in accordance with Anthem's External Account Audit Policy.

b.     Claims included in the Employer audit must have been incurred during the current or immediately preceding Agreement Period as described in Anthem's External Account Audit Policy. Neither Employer, nor anyone acting on Employer's or the Plan's behalf, shall have a right to audit Claims incurred prior to such time. Any errors identified and/or amounts identified as owed to Employer as the result of the audit shall be subject to Anthem's review and approval prior to any reimbursements to Employer. Overpayments shall be credited pursuant to Article 2(h.) of this Agreement.

c.     Any and all Claims records or other information reviewed by Employer or any third party auditor shall be treated as confidential and shall be used strictly within the parameters of the audit. Employer and any third party auditor shall agree to jointly and severally indemnify and hold Anthem harmless from any action, cost, expense or liability, including reasonable attorneys' fees, which may arise out of the disclosure of any confidential information obtained through such audit and shall execute an agreement to this effect prior to conducting such audit. This indemnity shall survive termination of this Agreement.

Formatted: Font: Not Bold

Formatted: Font: Not Bold

CA01210

## ARTICLE 16 – PROPRIETARY INFORMATION

a.     Anthem agrees to treat all proprietary information concerning Employer's operations and the Plan in a confidential manner.

b.     Anthem owns and shall own all rights, title and interest in and to the systems, procedures, methodologies and practices used by it in connection with the Claims processing, Claims payment and utilization monitoring functions of the Plan, together with the Participating Provider network, the negotiated fees, terms and discounts with Providers, Claims processing, Claims history and utilization data and information (collectively, the "Anthem Proprietary Information"), all of which is proprietary, confidential and a trade secret of Anthem. Employer shall have no right, title or interest in or to Anthem Proprietary Information. Employer agrees to treat all Anthem Proprietary Information in a confidential manner.

c.     Neither party shall disclose proprietary information (whether that of the Employer or Anthem Proprietary Information) to any other person without the prior written consent of the party that holds the right, title and interest in the information. Nothing in this Article 16 shall prohibit the disclosure of any information required by law, but in the event of any such disclosure, the disclosing party shall immediately notify the other party in writing, describing the circumstances of and extent of the disclosure. This provision shall survive termination of this Agreement.

## ARTICLE 17 – LIMITATION ON ACTIONS

No lawsuit may be filed on a Claim made in connection with this Agreement after the expiration of three (3) years from the date on which the Claim arose. Any disputes between the Parties in connection with this Agreement shall be resolved pursuant to Article 27.

## ARTICLE 18 – NO WAIVER

a.     The failure of either party to enforce or insist upon compliance with any provision of this Agreement, in any instance, shall not be construed as or constitute a waiver of the right to enforce or insist upon compliance with such provision in the future.

b.     No failure or delay by Anthem to exercise any right or to enforce any obligation herein, and no course of dealing between Employer and Anthem, shall operate as a waiver thereof. No single or partial exercise of any right or failure to enforce any obligation hereunder shall preclude any other or further exercise thereof or the right to exercise any other right or enforce any other obligation. No notice to or demand on Employer will entitle it to any other or further notice or demand in other circumstances, or constitute a waiver of Anthem's right to any other or further action in any circumstance without notice or demand.

## ARTICLE 19 - SEVERABILITY

In the event that any provision of this Agreement or the applicability thereof to any person or circumstance is held invalid by competent judiciary or regulatory authority, it shall not affect the validity or enforceability of any other provision of this Agreement.

## ARTICLE 20 – ASSIGNMENT

Unless it has first obtained the written consent of an officer of the other party, neither party may assign this Agreement to any other person. Anthem may, however, without the consent of or notice to Employer, assign or otherwise transfer its rights and obligations hereunder, in whole or in part, to: (i) any affiliate of Anthem; or (ii) any entity surviving a transaction involving the merger, acquisition, consolidation, or reorganization of Anthem, or in which all or substantially all of Anthem's assets are sold. Any assignee of rights or benefits under this Agreement shall be subject to all of the terms and provisions of this Agreement. Anthem may subcontract any of its duties under this Agreement without the prior written consent of Employer.

CA01211

## ARTICLE 21 – GOVERNING LAW

Except to the extent preempted by ERISA and any other applicable provisions of federal law, this Agreement shall be governed by, and shall be construed in accordance with, the laws of the State of Ohio but without giving effect to its rules governing conflict of laws.

## ARTICLE 22 – SERVICE MARKS

Employer, on behalf of itself and its Members acknowledges its understanding that, this Agreement constitutes a contract solely between Employer and Anthem, that Anthem is an independent corporation operating under a license with the Blue Cross and Blue Shield Association, an association of independent Blue Cross and Blue Shield Plans, permitting Anthem to use the Blue Cross and Blue Shield Service Marks in the State of Ohio, and that Employer further acknowledges and agrees that it has not entered into this Agreement based upon representations by any person other than Anthem and that no person, entity or organization other than Anthem shall be held accountable or liable to it for any of Anthem's obligations to Employer created under this Agreement. This paragraph shall not create any additional obligations whatsoever on the part of Anthem other than those obligations created under other provisions of this Agreement.

## ARTICLE 23 – CONTRACT ADMINISTRATION

a.    Employer shall be solely and directly liable for the payment of any and all benefits due and payable under the Plan. Employer, on behalf of itself and its Members acknowledges its understanding that this Agreement constitutes a contract solely between Employer and Anthem, that Anthem is an independent corporation operating under a license with the Blue Cross and Blue Shield Association, an association of independent Blue Cross and Blue Shield Plans, permitting Anthem to use the Blue Cross and Blue Shield Service Marks in the State of Ohio, and that Employer further acknowledges and agrees that it has not entered into this Agreement based upon representations by any person other than Anthem and that no person, entity or organization other than Anthem shall be held accountable or liable to it for any of Anthem's obligations to Employer created under this Agreement. This paragraph shall not create any additional obligations whatsoever on the part of Anthem other than those obligations created under other provisions of this Agreement.

b.    Anthem is providing administrative services only with respect to the portion of the Plan described in the Benefit Booklet. Anthem only has the authority granted it pursuant to this Agreement. Anthem is not the insurer or underwriter of any portion of the Plan, notwithstanding any monetary advances that might be made by Anthem.

c.    Anthem does not insure or underwrite the liability of Employer under this Agreement. Anthem is strictly an independent contractor. Anthem has no responsibility or liability for funding benefits provided by the Plan, notwithstanding any advances that might be made by Anthem. Employer retains the ultimate responsibility and liability for all benefits and expenses incident to the Plan, including but not limited to, any state or local taxes that might be imposed relating to the Plan.

d.    The Parties acknowledge that the portion of the Plan described in the Benefit Booklet is a self-insured plan and as such is not subject to state insurance laws or regulations.

e.    Employer shall ensure that sufficient amounts are available to cover Claims payments, the monthly Administrative Services Fee, and other fees or charges.

f.    Employer shall reimburse Anthem for the actual costs charged Anthem by any external medical reviewer.

## ARTICLE 24 – RELATIONSHIP OF THE PARTIES

a.    Employer and Anthem are separate legal entities. Nothing contained in this Agreement shall be deemed to constitute them as partners, members, agents or representatives of the other, nor shall either party have the expressed or implied right or authority to assume or create any obligation on behalf of or in the name of the other party through its actions, omissions or representations.

ASO Agreement Midwest-Nov. 2002          17

b.  Employer is not responsible for the services and benefits of Anthem, but is simply agreeing that its eligible employees, dependents and other eligible persons have the option of enrolling in the portion of the Plan administered by Anthem. In holding itself out to administer the services specified under this Agreement, Anthem does not act for the benefit of Employer.

c.  Employer acknowledges and agrees that Anthem is obligated to administer Claims for a Member only so long as it receives from Employer the appropriate payments described in this Agreement and so long as the Employer is in full compliance with the terms, conditions, covenants and obligations found in this Agreement.

## ARTICLE 25 – ANTHEM AS RECOVERY AGENT

a.  Employer grants to Anthem the right but not the obligation to pursue recovery of Paid Claims administered on behalf of Members under this Agreement. Anthem shall establish recovery policies, determine which recoveries are to be pursued, incur costs and expenses and settle or compromise recovery amounts. Anthem will not pursue recoveries for overpayments if the cost of collection exceeds the overpayment amount. If Anthem would recover the overpayment amount through an automatic recoupment mechanism, Anthem will not pursue such recovery if the overpayment was in the amount of twenty-five dollars ($25.00) or less. If Anthem would recover the overpayment amount through manual recovery, Anthem will not pursue such recovery if the overpayment was in the amount of seventy-five dollars ($75.00) or less.

b.  Anthem shall charge a fixed percentage fee 25% (twenty-five percent) of gross subrogation recovery, or, if outside counsel is retained, 15% (fifteen percent) of net recovery after a deduction for outside counsel fees for subrogation-related services. For these purposes, "subrogation-related services" are services in which Anthem pursues recoveries to Members by any other person, insurance company or other entity on account of any action, claim, request, demand, settlement, judgment, liability or expense that is related to a Claim for Covered Services. These fixed subrogation fees will be charged on all subrogation matters, including any that may have Claims incurred and paid in any prior Agreement Period. The Administrative Services Fee does not include any expenses associated with subrogation. Such subrogation expenses shall reduce amounts recovered for purposes of any adjustments applied toward Employer's Claims as described in Article 4 of this Agreement.

c.  Generally, net recovery amounts after payment of fees as provided in this Article 25 shall be paid to Employer as soon as practicable, without interest. In no event, however, will Anthem be liable to credit Employer for any recovery after the termination date of this Agreement, including any Claims Runout period, and the Employer acknowledges and agrees that such sums shall be retained by Anthem as reasonable compensation for recovery services provided during the Agreement Period. In addition, if Anthem has successfully made a recovery, but the Paid Claim or a portion of the Paid Claim to which the recovery relates was covered under a stop-loss coverage policy issued by Anthem, that portion of the recovery representing the portion of the Paid Claim covered under Anthem's stop-loss coverage will not be refunded to Employer. Employer acknowledges and agrees that neither it, nor the Plan, nor any Member shall have any legal or beneficial right to such retained amounts, and such retained amounts constitute reasonable compensation for services provided during the Agreement Period.

d.  In the event that litigation appears to be necessary and appropriate for recoveries contemplated by this Article 25, Anthem shall notify Employer and obtain its consent to such litigation and choice of counsel, which such consent shall not be unreasonably withheld. In the alternative, Anthem may assign to Employer claims for recoveries.

## ARTICLE 26 – ENTIRE AGREEMENT

a.  The following documents will constitute the entire Agreement between the Parties: this Agreement, Schedules and any amendments thereto: the Benefit Booklet and any amendments thereto: Anthem's Employer application: the individual applications and any coverage election forms submitted by employees of Employer, Anthem medical policy, applicable Blue Card Policies, Business Associate Agreement, Anthem External Account Audit Policy, Anthem policies regarding utilization management and quality improvement, the APM formulary, any other documents or policies referenced in this Agreement, and administrative practices and procedures of Anthem as may be revised or modified from time to time.

b.  This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

CA01213

c.  This Agreement supersedes any and all agreements regarding this subject matter, including any and all amendments thereto, whether written or oral, previously entered into between Anthem and Employer.

## ARTICLE 27 – ARBITRATION

a.  In the event that any dispute, claim, or controversy relating to this Agreement arises between the Parties, the Parties agree to meet in person and make a good faith effort to resolve the dispute.  Except for disputes deemed exclusively by Anthem to be related to termination of the Agreement without cause, if the dispute is not resolved following such meeting, and either party wishes to pursue the dispute further, that party shall commence arbitration by filing an arbitration demand with the American Arbitration Association ("AAA") within twenty (20) days of the meeting.  The dispute shall be resolved through arbitration to be heard in Cincinnati, Ohio unless the parties agree otherwise.

b.  Any dispute subject to arbitration under this Article 27 shall be settled by binding arbitration, except to the extent that the dispute is required by law to be resolved by a state or federal regulatory authority.  The Employer shall not have the right to participate as a member of any class of claimants pertaining to any dispute subject to arbitration hereunder, nor shall there be any authority for disputes arising under this Agreement to be arbitrated on a class action basis.  Arbitration shall be limited to disputes between the Parties and cannot be consolidated or joined with claims of other persons who may have similar claims.

c.  The Commercial Arbitration Rules of the AAA shall apply, using a three (3) member panel of arbitrators.  The arbitration panel shall consist of one arbitrator selected by the party demanding arbitration, one arbitrator selected by the other party, and the third independent arbitrator shall be selected and agreed upon by the first two arbitrators.  The parties may also use a single arbitrator provided they mutually agree to do so and mutually agree on the choice of the arbitrator.  The decision of the arbitrator, if a single arbitrator is used, or the decision of the arbitrators, if a panel is used, shall be binding.  Each party shall bear its own costs (including attorneys fees) during the proceedings, and all other costs of the arbitration proceeding shall be shared equally by the parties, except as may be awarded in the discretion of the arbitrator(s) (including an award of attorneys' fees) in accordance with the arbitration decision.  Judgment upon the award rendered by the arbitrator(s) may be entered and enforced in any court of competent jurisdiction.  In the event a dispute arising under this Agreement is required by law to be resolved by a state or federal regulatory authority, the Parties agree to be bound by the findings of such state or federal regulatory authority.

d.  This Article 27 shall survive the termination of this Agreement.

## ARTICLE 28 – HIPAA

a.  The Employer agrees that on or after April 14, 2003, the Plan will be in compliance with all requirements involving the use or disclosure of protected health information as provided for in 45 C.F.R. Part 164.  Anthem's duties and responsibilities in connection with the requirements imposed by HIPAA and regulations promulgated thereunder will be set forth in a separate agreement between the Parties.

b.  In the event Group Health Plan submits claims or eligibility inquiries or any other HIPAA Covered Transaction as defined in 45 CFR Part 160 and 162 to Anthem on or after October 16, 2003 through electronic means, Group Health Plan and Anthem shall comply with all applicable requirements of HIPAA and Group Health Plan and Anthem shall require any of their respective agents or subcontractors to comply with all applicable requirements of HIPAA.

## ARTICLE 29 – PARTICIPATING PLAN SERVICES

If the Parties have agreed that a Participating Plan shall provide services in connection with this Agreement, the following shall apply:

a.  Anthem shall enter into an agreement with each of the Participating Plans that sets forth the responsibilities of such Participating Plan (hereinafter "Participating Plan Agreements").  In negotiating such Participating Plan Agreement, Anthem is not acting on behalf of or as agent for the Employer, Plan or Member.  Anthem shall provide to Employer a copy of its standard form Participating Plan Agreement, and to the extent that

CA01214

Anthem shall enter into a Participating Plan Agreement that is materially distinct from such standard form agreement it will notify Employer.

b.     Employer agrees that Anthem shall not have any responsibility in connection with the processing and payment of claims for benefits performed by Providers in the Participating Plan's Provider Network except as may be set forth in a Participating Plan Agreement. The Participating Plan Agreement may provide for an administrative or network access fee to be paid to the Participating Plan by Anthem, and the Employer further agrees to reimburse Anthem for the administrative or access fee set forth in any Participating Plan agreement. The Participating Plan Agreement shall set forth the provider discount and other Provider payment methodologies that the Participating Plan will employ to bill Anthem for covered services provided by Providers in the Participating Plan's network. The Employer agrees that it shall pay the amounts billed to Anthem pursuant to those arrangements. Except as may otherwise be set forth in this Agreement, Anthem shall have no obligation to ensure that the Participating Plan is complying with the provider discount arrangements set forth in the Participating Plan Agreement. Any compliance efforts undertaken by Anthem in connection with Participating Plan activity must be agreed to in advance between Employer and Anthem, and the Employer agrees that Anthem shall be reasonably compensated from any such efforts.

c.     Anthem agrees that it shall provide Employer with copies of any information or disclosures that a Participating Plan is required to make to Anthem under the terms of a Participating Plan Agreement.

### ARTICLE 30 – MISCELLANEOUS

a.     The headings and subsections of this Agreement shall be disregarded in its interpretation.

b.     Neither Employer nor Anthem shall be required to perform any term, condition, or covenant in this Agreement as long as such performance is delayed or prevented by any acts of God, strikes, lockouts, material or labor restrictions by any governmental authority, civil riot, floods, acts of terrorists, acts of war or terrorism, or any other cause not reasonably within the control of Employer or Anthem and which by the exercise of due diligence Employer or Anthem is unable, wholly or in part, to prevent or overcome.

c.     Nothing contained herein shall be deemed to constitute Anthem as an agent for service of legal process for the Plan or the Employer.

d.     Anthem shall not use Employer's name and Employer shall not use Anthem's name in any release or printed forms making material representations about the other party's processes or obligations hereunder without the prior written approval of the other party.

e.     Anthem hereby informs Employer that Anthem or its Vendors may have reimbursement contracts with certain Providers or Vendors for payment for services and supplies under which Anthem may be required to pay such Providers or Vendors additional money for either member-management performance, incentives, or other forms of performance compensation ("Performance Arrangements"). In such instances, Anthem, Providers or Vendors will perform a periodic settlement or reconciliation, and the Providers or Vendors may then be required, based on their performance and experience against established targets, to repay a portion of volume discounts or other compensation previously paid by Anthem. Anthem may factor into such calculation the experience of such Providers and Vendors with Members, and consequently such sums returned to Anthem may be based in part on the Provider's or Vendor's experience providing services to Members under the Plan. Employer acknowledges and agrees that it has no responsibility for additional payment to Vendors nor any right in any discounts or excess money refunded, or paid to Anthem from Vendors or Providers pursuant to such Performance Arrangements; and neither it, nor the Plan, nor any Member has any legal right or beneficial interest in such sums, which may be retained by Anthem. In turn, Anthem acknowledges and agrees that if under any such Performance Arrangements Anthem is required following a settlement to pay such Provider or Vendor excess compensation for member-management performance, risk-sharing rewards, or other performance incentives, it shall not seek payment from the Employer, Plan or any Member, and neither the Employer, Plan, or any Member shall have any liability in connection with such amounts. Such Providers or Vendors may include entities affiliated with Anthem including, but not limited to, Anthem Prescription Management. In calculating any Member co-insurance amounts in accordance with the Benefit Booklet, Anthem does not take into account the amount of Performance Arrangement settlements. For Claims processed by Participating Plan's contract with a Provider or Vendor, such settlements shall have no impact on the payments made under the terms of this Agreement, and

CA01215

neither the Employer, nor the Plan, nor any Member shall have any right or beneficial interest in such settlements.

f.  The Parties acknowledge that Anthem is not engaged in the practice of medicine; it merely makes decisions regarding the coverage of services under the terms of the Plan. The Employer acknowledges that under Anthem's contracts with Providers, such Participating Providers acknowledge that they are responsible for all medical judgments regarding the treatment of their patients, regardless of Anthem's coverage determinations, and such Participating Providers further acknowledge that they must exercise independent medical judgment regarding the treatment of their patients, regardless of Anthem's coverage determinations. In exercising medical judgment, physicians and other Providers under contract with Anthem act on their own and not on behalf of or as agents for Anthem or the Plan.

g.  In addition to any other provision providing for survival upon termination of this Agreement, the Parties' rights and obligations under Articles 11a, 11b, 11d, 11g, 13c, 16b, 23a, 23c, 23e, 25c, 25d, 27 and 30e shall survive the termination of this Agreement for any reason.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by affixing the signatures of duly authorized officers.

OGLEBAY NORTON COMPANY                    COMMUNITY INSURANCE COMPANY

By: _J. Gausike - Coopu_                  By: _____

Title: _V. P., HUMAN RESOURCES_           Title: _____

Date: _SEPT. 5, 2006_                     Date: _____

CA01216

## SCHEDULE A
## TO
## ADMINISTRATIVE SERVICES AGREEMENT
## WITH
## OGLEBAY NORTON COMPANY

This Schedule shall govern the Agreement Period from January 1, 2008 through December 31, 2008. For purposes of this Agreement Period, this Schedule shall supplement and amend the Agreement between the Parties. If there are any inconsistencies between the terms of the Agreement and this Schedule A, the terms of this Schedule A shall control.

Section 1.      Effective Date and Eligibility

This Agreement shall be effective at 12:01 a.m. January 1, 2005 and shall automatically terminate at 12:01 A.M. of January 1, 2009, except as otherwise provided in Articles 8 and 11(b) of the Agreement.

Paid Claims shall be administered pursuant to this Agreement when incurred and paid as follows:

[X]      Incurred from January 1, 2005 through December 31, 2008 and
[X]      Paid from January 1, 2008 through December 31, 2008.

Any offer of renewal pertaining to a new Agreement Period shall be provided to Employer by Anthem at least thirty (30) days prior to the end of the Agreement Period.

Eligibility to be determined by the Employer.

The following are all Employer Affiliates covered under this Agreement:

Section 2.      Exceptions to Paid Claim Definition:

[X]      Not Applicable

Section 3.      Claims Reimbursement Method:

[X]      Weekly Reimbursement

Wire Transfer Reimbursement for Paid Claims. Once each week Anthem shall notify Employer of the amount due to Anthem as a result of Claims processed by Anthem. Week shall be determined according to Anthem's regular business practices and systems capabilities. Employer shall deposit the amount due in a designated Anthem bank account. The deposit shall be made in accordance with any policies and regulations of the bank necessary to assure that the deposit is credited to Anthem's account no later than the next business day.

Section 4.      Administrative Services Fee by Lines of Coverage shall be based on the following rates per Subscriber per month:

Blue Access PPO

| | Composite | |
|---|---|---|
| Capitated Administrative Services Fee: | $ 54.35 | Per Subscriber Per Month |
| Less Rebate Credit | $ 8.45 | Per Subscriber Per Month |
| Net Capitated Administrative Services Fee | $ 45.90 | Per Subscriber Per Month |

Blue Traditional

| | Composite | |
|---|---|---|
| Capitated Administrative Services Fee: | $ 54.35 | Per Subscriber Per Month |
| Less Rebate Credit | $ 8.45 | Per Subscriber Per Month |
| Net Capitated Administrative Services Fee | $ 45.90 | Per Subscriber Per Month |

IRIS Care Collaboration

CA01217

Net Capitated Administrative Services Fee     $ <u>2.30</u>   Per Subscriber Per Month

Method of Payment:

[X]     Monthly

<u>Wire Transfer Reimbursement for Administrative Services Fees</u>. Employer shall deposit the amount due in a designated Anthem bank account. The deposit shall be made in accordance with any policies and regulations of the bank necessary to assure that the deposit is credited to Anthem's account no later than the next business day.

Section 5.     <u>Fees on Claims Runout</u>:

Claims Runout Period shall be for the twelve (12) month(s) period following the date of termination of this Agreement.

The Administrative Services Fee applicable to the Claims Runout shall be as follows:

All Coverages            <u>6.82</u> % of Paid Claims

Claims Reimbursement Method for Claims Paid during Claims Runout:

[X]     Weekly

<u>Wire Transfer Reimbursement for Paid Claims</u>. Once each week Anthem shall notify Employer of the amount due to Anthem as a result of Claims processed by Anthem. Week shall be determined according to Anthem's regular business practices and systems capabilities. Employer shall deposit the amount due in a designated Anthem bank account. The deposit shall be made in accordance with any policies and regulations of the bank necessary to assure that the deposit is credited to Anthem's account no later than the next business day.

Section 6.     <u>Other Amendments</u>. The Administrative Services Agreement is otherwise amended as follows:

[X]     Not Applicable

By:     Charles L. Slater

Title:     President
        Anthem Blue Cross and Blue Shield

Date:     October 23, 2007

ID;OglebayNortonCompany2008.aso
10/23/07;MAS:mas

ASO Agreement Midwest Revision: 9/2002

CA01218

**SCHEDULE B**
**TO**
**ADMINISTRATIVE SERVICES AGREEMENT**
**WITH**
**OGLEBAY NORTON COMPANY**

For purposes of this Agreement Period, this Schedule shall supplement and amend the Agreement between the Parties.

**Standard Services**

## Account Management Services:

- Anthem standard Benefits and administration:
    - Standard Plan definitions and administration
    - Standard exclusions
    - Standard complaint and appeals process
    - Calendar year deductible accumulation provided
    - Claims paid if incurred date is effective date of later
    - Accumulation toward plan maximums beginning at zero on effective date

- Account management/enrollment services
    - Anthem Claim forms
    - Standard ID card
    - Standard Explanation of Benefits

- Annual verification of dependent eligibility (age 19 and over)

- Preparation of Benefit Booklet

- Distribution of Benefit Booklet

- Employer eServices
    - Add and delete Employees
    - Add and delete dependents on existing members' plans
    - Download administrative forms
    - View Member Benefits and request ID cards
    - View eligibility
    - View Claim status and detail

## Claims and Customer Services:

- Claims processing services

- Coordination of Benefits

- Subrogation

- Medicare crossover processing

- Complaint and appeals processing

- Employer customer service

- Member customer service

- Account reporting

CA01219

- Anthem comprehensive reporting package
- 1099s prepared and mailed

- Schedule A to ERISA 5500

- NYCRA (New York Claims Reporting) and other legislative reporting requirements

- Plan Design consultation

- Member eServices

## Healthy Solutions – Employee Health Care Management and Education:

- Health Care Management
  - Precertification
  - Referrals
  - Concurrent review
  - Case management
  - Anthem Medical Policy
- Prevention and disease management program Benefits for:
  - Routine exams and screenings
  - Childhood and adolescent immunizations
  - Annual eye and hearing exams
  - Disease management programs (asthma, pulmonary disease, congestive heart failure, coronary artery disease, diabetes, high-risk pregnancy)
- MyHealth@Anthem
- SpecialOffers@Anthem
- Members newsletter
- Health Care Cost Tool Kit

## Networks:

- Seamless network throughout IN, KY and OH
- Access to specialty networks
  - Human Organ and Tissue Transplant Network
- Cost Management/Quality improvement program
  - Credentialing
  - Hospital audit program
  - Anthem standard claims bundling edits
- Anthem.com Provider directory
- Hardcopy provider directory for each Subscriber (upon request)
- BlueCard Program / Out-of-Area discounts

## Prescription:

- Prescription services through Anthem Prescription Management

- Mail Order pharmacy
- Prescription eServices
  - Pharmacy locator
  - Online formulary

## **Billing and Banking**:

- Summary and detailed billing and Claims (electronic)
- Funding arrangements
  - Weekly Claims Reimbursement (ACH Wire)
  - Interest charged on past due amounts
  - 15/16 day rule on new hire admin fees
- 60 day refund policy on retro cancellations

CA01221

EXHIBIT "W"

## STOP LOSS AGREEMENT

In consideration of the mutual covenants contained herein, this Agreement is entered into by and between Oglebay Norton Company (hereinafter "Employer") and Community Insurance Company dba Anthem Blue Cross and Blue Shield (hereinafter "Anthem") for the purpose of establishing stop loss coverage.

### ARTICLE 1 - PURPOSE

In consideration of Employer's application, payment of the premiums and compliance with all covenants and provisions as set forth in this Agreement, Anthem shall provide stop loss coverage to Employer, as described in this Agreement. This Agreement shall supersede any and all prior stop loss agreements, or similar stop loss arrangements between the parties for the Agreement Period.

### ARTICLE 2 - EFFECTIVE DATE

This Agreement shall be effective as of the date set forth in the Schedule, and shall continue in force (as amended) for the Agreement Period unless terminated as provided herein.

### ARTICLE 3 - DEFINITIONS

For purposes of this Agreement, the following words and terms have meanings as described in this Article 3, unless the context or use clearly indicates another meaning or intent.

3.1     **AFFILIATE.** An entity which, directly or indirectly, controls, is controlled by, or is under common control with Anthem.

3.2     **AGGREGATE STOP LOSS LIMIT.** The threshold total dollar amount of Paid Claims for which Employer is financially responsible. Anthem is financially responsible for Paid Claims in excess of the Aggregate Stop Loss Limit. Anthem's financial responsibility terminates if and when the Aggregate Stop Loss Maximum is reached. The Aggregate Stop Loss Limit shall be calculated as described in this Agreement. (Also see definition of Aggregate Stop Loss Maximum.)

3.3     **AGGREGATE STOP LOSS MAXIMUM.** The total dollar amount of Anthem's financial responsibility after the Aggregate Stop Loss Limit has been reached. Once the Aggregate Stop Loss Maximum has been reached, Paid Claims again become the financial responsibility of Employer, and are not the financial responsibility of Anthem. (Also see definition of Aggregate Stop Loss Limit.)

3.4     **AGREEMENT.** This Stop Loss Agreement executed by the parties, including any addenda or schedules.

CA01222

-2-

3.5    **AGREEMENT PERIOD.** The time period indicated in Section 1 of the Schedule.

3.6    **CLAIM.** A written or electronic notice of a request for reimbursement of health care services which were provided to a Member under the terms of the Plan.

3.7    **CLAIMS RUNOUT.** Claims which are incurred but unpaid as of the effective date of the termination of this Agreement.

3.8    **EFFECTIVE DATE.** Date on which this Agreement becomes effective, as set forth in Section 1 of the Schedule.

3.9    **ELIGIBLE CLAIM DATE PERIOD.** The dates during which Claims for benefits provided under the terms of the Plan must be incurred and paid in order to be covered by this Agreement. The applicable Eligible Claim Date Period is set forth in Section 2 of the Schedule.

3.10   **GROUP IDENTIFICATION NUMBER (GID).** The identifying number assigned to Employer or subgroups of Employer.

3.11   **INCURRED CLAIM.** The date of the hospital admission if the claim is for in-patient hospital services or the date that the service or supply is provided to a Member if the Claim is for any other service.

3.12   **LINES OF COVERAGE.** The benefit plans available to Members as indicated in the Schedule.

3.13   **MEMBER.** The Subscriber, his or her eligible dependents, or other eligible persons who are entitled to benefits under the terms and conditions of the Plan.

3.14   **MINIMUM AGGREGATE STOP LOSS LIMIT.** Notwithstanding the calculation of the Aggregate Stop Loss Limit, there is an amount established in the Schedule as the Minimum Aggregate Stop Loss Limit. When the calculation of the Aggregate Stop Loss Limit results in a lower amount than the Minimum Aggregate Stop Loss Limit, the Minimum Aggregate Stop Loss Limit becomes the Aggregate Stop Loss Limit.

3.15   **PAID CLAIM.** A Claim incurred and paid within the Eligible Claim Date Period, for services rendered to a Member under the terms of the Plan, provided such Paid Claim has been invoiced to Employer for the Agreement Period, according to Anthem's regular business practices and systems capabilities. Unless otherwise

Stop Loss Agreement Runin (OH) 6-10-04

-3-

specified in the Schedule, Paid Claims may also include amounts paid to providers for disease state management programs and amounts paid to providers who participate in any program in which incentives or bonuses are paid to the provider. Paid Claim does not include capitated fees, administrative services fees, network access fees or any other service charge under the Blue Cross and Blue Shield Association's BlueCard Program invoiced to Employer for the Agreement Period.

3.16   **PLAN** and **PLAN DOCUMENT**. The plan of benefits established by the Employer, in effect as of the Effective Date of this Agreement, as described in the Plan Document and as it may be subsequently amended.

3.17   **RUN IN PERIOD.** The period of time immediately preceding the Effective Date of this Agreement during which Incurred Claims paid by a third party administrator other than Anthem will be considered for reimbursement under the terms of this Agreement. The Run In Period, if any, shall be included as part of the Eligible Claim Date Period indicated in Section 2 of the Schedule.

3.18   **SPECIFIC STOP LOSS LIMIT.** The threshold total dollar amount of Paid Claims for which Employer is financially responsible with respect to a specific Member or a specific Subscriber and his or her eligible dependents. Anthem is financially responsible for such Paid Claims in excess of the Specific Stop Loss Limit. Anthem's financial responsibility terminates if and when the Specific Stop Loss Maximum is reached. (Also see definition of Specific Stop Loss Maximum,)

3.19   **SPECIFIC STOP LOSS MAXIMUM.** The total dollar amount of Paid Claims beyond which Paid Claims for a specific Member or a specific Subscriber and his or her eligible dependents again become the financial responsibility of Employer and are not the financial responsibility of Anthem. (Also see definition of Specific Stop Loss Limit.)

3.20   **SCHEDULE.** The Schedule attached to this Agreement as periodically amended, containing information specific to this Agreement, the Plan and Employer. Reference to the Agreement shall also include the Schedule, unless the Schedule is also specifically referenced.

3.21   **SUBSCRIBER.** An employee of Employer who is enrolled in the Plan and entitled to benefits under the terms and conditions of the Plan Document. Subscriber may also include other eligible persons as designated by the Plan.

Stop Loss Agreement Runin (OH) 6-10-04

-4-

## ARTICLE 4 - SPECIFIC STOP LOSS COVERAGE

4.1    In the event that the total amount of Paid Claims pertaining to individuals and Lines of Coverage set forth in Sections 3 and 4 of the Schedule exceeds the Specific Stop Loss Limit as set forth in Section 5 of the Schedule, Anthem shall reimburse Employer for such excess not later than 90 days following the end of the Agreement Period. However, Anthem's reimbursement to Employer under this Article 4 shall be limited to the Specific Stop Loss Maximum, less the Specific Stop Loss Limit, for a given Agreement Period.

4.2    In the event that the Specific Stop Loss Limit is reached, no amount in excess of the Specific Stop Loss Limit shall be applied towards attainment of any Aggregate Stop Loss Limit, including any amounts in excess of the Specific Stop Loss Maximum.

4.3    Certain Paid Claims may be excluded from the specific stop loss coverage provided under this Agreement. These exclusions are set forth in Section 6 of the Schedule.

## ARTICLE 5 - AGGREGATE STOP LOSS COVERAGE

5.1    In the event that the total amount of Paid Claims for all Members, for the Lines of Coverage indicated in Section 7 of the Schedule, exceeds the Aggregate Stop Loss Limit, Anthem shall reimburse Employer for such excess following the end of the Agreement Period. All Lines of Coverage and all Group Identification Numbers which are subject to aggregate stop loss coverage shall be combined for purposes of calculating amounts owed under this Agreement, unless otherwise specified in the Schedule. However, Anthem's reimbursement to Employer under this Article 5 shall be limited to the Aggregate Stop Loss Maximum less the Aggregate Stop Loss Limit for a given Agreement Period.

5.2    The Aggregate Stop Loss Limit is the sum of the amounts derived by multiplying the applicable aggregate Stop Loss subscriber amount set forth in Section 8 of the Schedule by the actual number of Subscribers for each subscriber type for all months in the subject Agreement Period. In no event shall the Aggregate Stop Loss Limit fall below the Minimum Aggregate Stop Loss Limit as provided in Section 8 of the Schedule.

Stop Loss Agreement Runin (OH) 6-10-04

5.3  Certain Paid Claims may be excluded from the aggregate stop loss coverage provided under this Agreement. These exclusions are set forth in Section 9 of the Schedule.

## ARTICLE 6 - LIMITATIONS ON COVERAGE

6.1  Unless otherwise noted in the Schedule, only Paid Claims for Members who are eligible for coverage under the terms of the Plan Document, and which were incurred and paid during the Eligible Claim Date Period are covered by this Agreement.

6.2  Claims which are covered by another stop loss contract shall not count toward attainment of a stop loss limit under this Agreement, except as otherwise provided in the Schedule. In addition, Paid Claims which are incurred and paid during the Eligible Claim Date Period will not count toward attainment of any stop loss limits of a subsequent Eligible Claim Date Period or subsequent stop loss agreement.

6.3  In the event that Employer exercises its right pursuant to an administrative services agreement to approve coverage of a procedure after exhausting the appeals process described in the Plan Document and/or Benefit Booklet, the cost of the procedure will be Employer's responsibility and shall not be considered an eligible claim for purposes of any stop loss calculation.

## ARTICLE 7 - CHANGES IN TERMS OR CONDITIONS

7.1  In the event that Employer proposes, pursuant to the terms of the administrative services agreement, to makes changes to its Benefit Booklet, Summary Plan Description, or Plan Document at a time other than at the end of an Agreement Period, Anthem, in its sole discretion, may determine whether resulting changes to this Agreement or the Schedule are necessary. In the event that Anthem determines that such changes are necessary, Anthem may make such changes by providing written notice to Employer, effective on the date of such change. In the event that Anthem determines, in its sole discretion, that changes to this Agreement or the Schedule are necessary due to changes in state and/or federal laws or regulations affecting this Agreement or any of the Plan Documents, Anthem may make such changes by providing written notice to Employer, effective as required under such law or regulation.

7.2  In the event that Employer makes any changes in the designation of a claims payer for the Claims that are subject to this Agreement, Employer shall provide

Stop Loss Agreement Runin (OH) 6-10-04

CA01226

-6-

Anthem with at least 30 days advance written notice of such changes. Upon receipt of such notice, Anthem may, in its sole discretion, terminate this Agreement pursuant to Article 10 or make changes to amounts due or limits under this Agreement or the Schedule. No change in designation of a claims payer shall be effective prior to written approval by Anthem.

7.3     If Anthem chooses to offer to renew this Agreement, Anthem shall provide Employer all applicable renewal information at least 30 days prior to the end of the Agreement Period. Employer shall provide written notice to Anthem of its acceptance of the renewal or its selections from among the renewal options in advance of the end of the Agreement Period and Anthem shall confirm such selections by issuing a Schedule. Selections made by Employer for any Agreement Period may not be changed by Employer without the prior written approval of Anthem. Employer's payment of the amount set forth in the new Schedule shall constitute acceptance of the revisions and the new Schedule without the necessity of securing Employer's signature on the Schedule. Such new Schedule shall then become a part of the Agreement, replacing any prior Schedules.

7.4     Anthem may revise this Agreement or the Schedule at any time after the initial Agreement Period with at least 30 days advance, written notice to Employer. In the event that such change is unacceptable to Employer, Employer may terminate this Agreement by giving 15 days advance, written notice of termination to Anthem. Payment by Employer of any amount under the Agreement after such change has been provided to Employer shall constitute acceptance of the change on behalf of Employer, without the necessity of securing Employer's signature on the written notice or any revised Schedule and/or addenda. The written notice or revised Schedule and/or addenda reflecting the change in the written notice shall then become a part of this Agreement.

Notwithstanding the above, if during the initial Agreement Period, the total number of Subscribers covered under the Plan increases or decreases by at least ten percent (10%) of the average number of Subscribers enrolled over the most recent six month period, Anthem shall have the right to revise the rates provided in the Schedule with at least 30 days advance written notice to Employer.

7.5     Notwithstanding anything to the contrary contained herein, no waiver, modification or change to any provision of this Agreement, including but not

Stop Loss Agreement Runin (OH) 6-10-04

-7-

limited to changes at the end of an Agreement Period, shall be effective unless and until approved in writing by an officer of Anthem and evidenced by an addendum attached to this Agreement.

## ARTICLE 8 - PARTIES TO THE AGREEMENT

8.1 This Agreement is for financial indemnification of the Employer only. This Agreement shall not create any right or legal relationship whatsoever between Anthem and any Subscriber or Member under Employer's health benefits plan.

8.2 This Agreement shall in no event be construed in a manner to alter the fact that Employer's health benefits plan is a self-insured plan and, as such, is not subject to the state insurance laws or regulations, due to the application of Section 514(a) of ERISA. Any payments made under this Agreement shall only be for the benefit of Employer. Anthem has no obligation or liability under this Agreement to provide benefits to Subscribers or Members. No Subscriber or Member shall have the right to any of the proceeds of any stop loss insurance obtained by Employer pursuant to this Agreement.

## ARTICLE 9 - STOP LOSS PREMIUM RATES

The premium rates for the specific stop loss coverage provided under this Agreement shall be as set forth in Section 5 of the Schedule. The premium rates for the aggregate stop loss coverage provided under this Agreement shall be as set forth in Section 10 of the Schedule. Employer shall pay Anthem such amounts by the invoice due date.

## ARTICLE 10 - TERMINATION

10.1 This Agreement automatically terminates, without any notice to the other party or action required by any other party, at the end of each Agreement Period unless Anthem offers to renew this Agreement and Employer accepts such offer of renewal pursuant to Article 7.3 of this Agreement. Upon termination of this Agreement, Employer shall remain liable for all payments due to Anthem under this Agreement.

10.2 Notwithstanding any other provision of this Article 10, if Employer fails to make any payment due under this Agreement by the date on which such payment is due this Agreement automatically terminates without notice, effective on the due date of such payment. Any acceptance of a delinquent payment by Anthem shall not be deemed a waiver of this provision for termination of this Agreement. Delivery of

Stop Loss Agreement Runin (OH) 6-10-04

payment to Anthem or Anthem's receipt and negotiation of a tendered payment through its automatic deposit procedures shall not be deemed acceptance or a waiver of such termination.

10.3 Notwithstanding any other provision of this Agreement, if Employer engages in fraudulent conduct or misrepresentation, Anthem may rescind, cancel, or terminate this Agreement, effective on the date of the fraudulent conduct or misrepresentation notwithstanding the date of Anthem's discovery of such conduct. Employer shall be liable to Anthem for any and all payments made and losses or damages sustained by Anthem arising as a result of such Employer conduct.

10.4 This Agreement automatically terminates in the event that the administrative services agreement with Anthem terminates or is terminated. In the event that this Agreement terminates or is terminated prior to the end of an Agreement Period, the stop loss limits under this Agreement shall not be prorated, and Anthem shall not reimburse Employer for any Paid Claims unless the Specific Stop Loss Limit, the Aggregate Stop Loss Limit, or both, as applicable, have been met. Only amounts accumulated towards any stop loss limits under this Agreement through the date of termination will be used in the determination of whether such limits have been met. Anthem shall have no obligation to refund to Employer any stop loss premiums paid by Employer under this Agreement.

10.5 Anthem shall have the discretion to terminate this Agreement in the event that Employer designates or changes its designation of a claims payer for the Claims subject to this Agreement, as described at paragraph 7.2 herein. In the event that Employer makes any changes to the claims payer without prior notice to and written approval by Anthem, this Agreement shall automatically terminate.

### ARTICLE 11 - INTEREST CHARGES

In the event that Employer fails to pay timely any amount due to Anthem under this Agreement, Employer agrees to pay an interest charge for each day the payment is late. The interest charge shall be eighteen percent (18%), simple interest per annum (365 days), and shall be payable by the invoice due date. Any acceptance by Anthem of late payments or interest charges shall not be deemed a waiver of its rights to terminate this Agreement for any future failure of Employer to make timely payments.

### ARTICLE 12 - NOTICES

Stop Loss Agreement Runin (OH) 6-10-04

CA01229

-9-

Any notice or demand under this Agreement shall be deemed sufficient for all purposes hereof, by Anthem to Employer, when such notice or demand is made by Anthem in writing and mailed or delivered to Employer at its principal office shown upon the records of Anthem; and by Employer to Anthem when such notice or demand is in writing and mailed or delivered to the Chief Underwriter, 4361 Irwin Simpson Rd, Mason, Ohio 45040.

## ARTICLE 13 - GENERAL PROVISIONS

13.1    None of the provisions of this Agreement shall have any application to any coverage which is fully insured.

13.2    This Agreement constitutes the entire Agreement between Employer and Anthem regarding the subject matter and supersedes all prior agreements, representations, statements, and negotiations. This Agreement shall be governed by and construed in accordance with the laws of the State of Ohio.

13.3    The failure of either party to enforce or insist upon compliance with any provision of this Agreement shall not be construed as or constitute a waiver of the right to enforce or insist upon compliance with such provision in the future. No failure or delay by Anthem to exercise any right or to enforce any obligation herein, and no course of dealing between Employer and Anthem, shall operate as a waiver thereof.    No single or partial exercise of any right or failure to enforce any obligation hereunder shall preclude any other or further exercise thereof or the right to exercise any other right or enforce any other obligation. No notice to or demand on Employer in any case will entitle Employer to any other or further notice or demand in other circumstances, or constitute a waiver of Anthem's right to any other or further action in any circumstances without notice or demand.

13.4    The headings to the sections of this Agreement are designed merely to assist the reader and shall be disregarded in interpreting the terms hereof.

13.5    Unless it has first obtained the written consent of an officer of the other party, neither party may assign this Agreement or any of its rights or obligations under this Agreement. Anthem may, however, without the consent of or notice to Employer, assign or otherwise transfer its rights and obligations hereunder, in whole or in part, to (i) any Affiliate of Anthem or (ii) any entity surviving a transaction involving the merger, consolidation, or reorganization of Anthem, or in which all or substantially all of Anthem's assets are sold. For purposes of the foregoing, "Affiliate" shall mean an entity which, directly or indirectly, Controls, is

Stop Loss Agreement Runin (OH) 6-10-04

CA01230

-10-

Controlled by, or is under common Control with Anthem, and "Control" shall mean having the power to vote a majority of the voting securities of the entity. Any assignee of rights or benefits under this Agreement shall be subject to all of the terms and provisions of this Agreement. Anthem may subcontract any of its duties under this Agreement without the prior written consent of Employer.

13.6 The payment of reimbursements under this Agreement will not include any taxes which might be paid or payable by Employer; or any tax liability, interest or penalty imposed by any regulatory or taxing authority. Employer agrees to hold Anthem harmless from any tax liability assessed against Anthem on the basis of the coverage provided under the Plan other than any tax levied upon Anthem for the premium due under this Agreement; and reimburse Anthem for the amount of any such tax liability, interest, penalty or cost incurred by Anthem as the result of such tax assessment. Such reimbursement shall be due and payable when Employer receives Anthem's notification that reimbursement is due.

13.7 No action at law or in equity shall be brought to recover any claim made under this Agreement after the expiration of 3 years from the date on which the claim arose.

13.8 If any provision of this Agreement, or the application of any provision to any person or circumstances, shall be determined to be invalid or unenforceable, such determination shall not affect any other provision of this Agreement.

13.9 Anthem shall not reimburse Employer for any amounts due to Employer under Article 4 or 5 of this Agreement unless and until this Agreement has been executed by Employer.

13.10 Employer on behalf of itself and its participants, hereby expressly acknowledges its understanding that this Agreement constitutes a contract solely between Employer and Anthem, that Anthem is an independent corporation operating under a license with the Blue Cross and Blue Shield Association, an association of independent Blue Cross and Blue Shield Plans, permitting Anthem to use the Blue Cross and Blue Shield Service Marks in the State of Ohio and that Employer further acknowledges and agrees that it has not entered into this Agreement based upon representations by any person other than Anthem and that no person, entity, or organization other than Anthem shall be held accountable or liable to it for any of Anthem's obligations to Employer created under this Agreement. This paragraph shall not create any additional obligations whatsoever on the part of Anthem other than those obligations created under other provisions of this Stop Loss Agreement.

Stop Loss Agreement Runin (OH) 6-10-04

CA01231

-11-

## ARTICLE 14-ARBITRATION

14.1    In the event that any dispute, claim, or controversy relating to this Agreement arises between the parties, the parties agree to meet in person and make a good faith effort to resolve the dispute. If the dispute is not resolved following such meeting, and either party wishes to pursue the dispute further, that party shall commence arbitration by filing an arbitration demand with the American Arbitration Association ("AAA") within twenty (20) days of the meeting. The dispute shall be resolved through arbitration to be heard in, Cincinnati, Ohio unless the parties agree otherwise.

14.2    Any dispute subject to arbitration under this Article 14 shall be settled by binding arbitration, except to the extent that the dispute is required by law to be resolved by a state or federal regulatory authority. The Employer shall not have the right to participate as a member of any class of claimants pertaining to any dispute subject to arbitration hereunder, nor shall there be any authority for disputes arising under this Agreement to be arbitrated on a class action basis. Arbitration shall be limited to disputes between the parties and cannot be consolidated or joined with claims of other persons who may have similar claims.

14.3    The Commercial Arbitration Rules of the AAA shall apply, using a three-(3) member panel of arbitrators. The arbitration panel shall consist of one arbitrator selected by the party demanding arbitration, one arbitrator selected by the other party, and the third independent arbitrator shall be selected and agreed upon by the first two arbitrators. The parties may also use a single arbitrator provided they mutually agree to do so and mutually agree on the choice of the arbitrator. The decision of the arbitrator, if a single arbitrator is used, or the decision of the arbitrators, if a panel is used, shall be binding. Each party shall bear its own costs (including attorneys fees) during the proceedings, and all other costs of the arbitration proceeding shall be shared equally by the parties, except as may be awarded in the discretion of the arbitrator(s) (including an award of attorneys' fees) in accordance with the arbitration decision. Judgment upon the award rendered by the arbitrator(s) may be entered and enforced in any court of competent jurisdiction. In the event a dispute arising under this Agreement is required by law to be resolved by a state or federal regulatory authority, the parties agree to be bound by the findings of such state or federal regulatory authority.

Stop Loss Agreement Runin (OH) 6-10-04

-12-

14.4   This Article 14 shall survive the termination of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in duplicate by affixing the signatures of duly authorized officers.

OGLEBAY NORTON COMPANY          COMMUNITY INSURANCE COMPANY

By _J. Rausiler- Cooper_          By _____

Title_ V. P., HUMAN RESOURCES    Title _____

Date_ SEPT. 5, 2006 _          Date_____

Stop Loss Agreement Runin (OH) 6-10-04

CA01233

SCHEDULE
to the
STOP LOSS AGREEMENT
between
Community Insurance Company
dba
Anthem Blue Cross and Blue Shield
and

## OGLEBAY NORTON COMPANY

Section 1.   Effective Date; Term.  This Agreement shall be effective as of January 1, 2008.
The Agreement Period shall be from January 1, 2008 through December 31, 2008.  For
purposes of this Agreement Period, this Schedule shall supplement and amend the Stop
Loss Agreement between the parties.  By payment of the Stop Loss premium rates set
forth in this Schedule, Employer agrees that this Schedule becomes a part of the Stop
Loss Agreement.

Section 2.  Eligible Claim Date Period.  Claims under the Plan shall be covered by the Stop
Loss Agreement when incurred and paid as follows:

[X]     Incurred from January 1, 2005 through December 31, 2008 and
[X]     Paid from January 1, 2008 through December 31, 2008. *
        *The Eligible Claim Date Period applies only to a full Agreement Period.

SPECIFIC STOP LOSS COVERAGE

Section 3.  Application of Specific Stop Loss Coverage.   Amounts accumulated toward the
Specific Stop Loss Limit shall be calculated as follows:

[X]     Per Subscriber, including Subscriber's eligible dependents.

Section 4.  Applicable Lines of Coverage.  The specific stop loss coverage shall apply to
the following Lines of Coverage:

[X]     Blue Access PPO (excluding Mental Health)
[X]     Blue Traditional (excluding Mental Health)

Section 5.  Specific Stop Loss Limit, Premium Rates and Specific Stop Loss Maximum.
The Specific Stop Loss Limit and Specific Stop Loss Maximum, and the corresponding
stop loss premium rates, shall be as follows:

[X]     Specific Stop Loss Limit

        [X]     $ 200,000.00

CA01234

-2-

[X]  Specific Stop Loss Maximum

    [X]  $ 2,000,000.00

[X]  Premium Rates

    [X]  Composite          $ 27.19 /mo.

Section 6.  Specific Stop Loss Exclusions.  The provisions of this Agreement shall not apply to Human Organ Transplant coverage benefits, and any amounts paid for such benefits shall not be included in any calculations under this Agreement.

[X]  Mental Health

AGGREGATE STOP LOSS COVERAGE

Section 7.  Applicable Lines of Coverage.  The aggregate stop loss coverage shall apply to the following Lines of Coverage:

[X]  Blue Access PPO (excluding Mental Health)
[X]  Blue Traditional ( excluding Mental Health)

Section 8.  Aggregate Stop Loss Limit and Aggregate Stop Loss Maximum.

[X]  Aggregate Stop Loss Subscriber Amount.  The aggregate stop loss subscriber amount used to determine the Aggregate Stop Loss Limit is:

    [X]  Composite          $ 746.71 /mo.

[X]  Minimum Aggregate Stop Loss Limit

    [X]  $ 6,102,117.00

[X]  Aggregate Stop Loss Maximum

    [X]  $ 2,000,000.00

Section 9.  Aggregate Stop Loss Exclusions

[X]  Mental Health
[X]  Drug

Section 10.  Aggregate Stop Loss Premium Rates.  The aggregate stop loss premium rates shall be as follows:

CA01235

-3-

[X]    Composite              $ 2.61 /mo.

Section 11. Other Amendments. This Agreement is otherwise amended as follows:

[X]    The provisions of this Agreement shall apply to Human Organ Transplant coverage benefits, and any amounts paid for such benefits shall included in any calculations under this Agreement

*Charles L. Slater*

By:    Charles L. Slater

Title: President
       Anthem Blue Cross and Blue Shield

Date: October 23, 2007

ID;OglebayNortonCompany2008.sla
10/23/07;MAS:mas

CA01236

# EXHIBIT "X"

## AFFIDAVIT OF KATHY WILEY

COMMONWEALTH OF PENNSYLVANIA    )

                                          ) SS

COUNTY OF ALLEGHENY               )

The Affiant, Kathy Wiley, being first duly sworn, deposes and states as follows:

1.    I am employed as the Vice President, Human Resources at Carmeuse Lime & Stone, Inc. ("CL&S, Inc.") at its headquarters located in Pittsburgh, Pennsylvania.

2.    In this position, I am responsible for, among others, the Human Resources Department relative to O-N Minerals (Michigan) Company d/b/a Carmeuse Lime and Stone ("Carmeuse"), which operates limestone and dolomite facilities located in Gulliver/Port Inland, Michigan ("Port Inland Plant").

3.    From February 13, 2008 through approximately October 2008, Carmeuse maintained its Human Resources ("HR") Benefits Department at Carmeuse's offices in Cleveland, Ohio.

4.    During this time period, Carmeuse's HR Benefits Department (then located in Cleveland, Ohio as it relates to the Port Inland Plant) generated monthly "Stop Loss" reports to record the names of employees (including eligible dependents) who may be reaching the $200,000 Stop Loss Limit.

5.    Neither Carmeuse's former employee Jason White's name nor Jason White's dependent daughter's name (Savannah White) appeared on any "Stop Loss" reports during the entire term of Jason White's employment with the Carmeuse (i.e., February 13, 2008 through August 25, 2008).

1

6.     During the term of Jason White's employment with Carmeuse, Carmeuse maintained these "Stop Loss" Reports solely at its former Human Resources Benefits Department office located in Cleveland, Ohio.

7.     During the term of Jason White's employment with Carmeuse, the monthly "Stop Loss" reports were <u>not</u> available and/or accessible to anyone located at the Port Inland Plant (in Gulliver, Michigan) or Carmeuse's headquarters (in Pittsburgh, Pennsylvania).

8.     If called upon as a witness, I could competently testify as to the truth and accuracy of the foregoing statements, basing my testimony upon actual knowledge, except as to those statements that are based upon information and belief, and, as to those statements, I have reason to believe that they are true.

Further deponent sayeth not.

KATHY WILEY

Subscribed and sworn to before me
this ___ day of December, 2010

Notary Public, Commonwealth of Pennsylvania, County of Allegheny
Acting in the County of Allegheny
My Commission Expires: _____

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Millicent A. Smith, Notary Public
City of Pittsburgh, Allegheny County
My Commission Expires June 16, 2014
Member, Pennsylvania Association of Notaries

2