UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

_____

JASON S. WHITE and
AMY WHITE,

                         Plaintiffs,                        Case No. 2:09-cv-265

v.                                        Honorable R. Allan Edgar

CARMEUSE LIME & STONE, INC.,

                    Defendant.

_____/

**<u>MEMORANDUM</u>**

This suit arises out of plaintiff Jason White ("White")'s termination of employment from the

Port Inland Plant in Gulliver, Michigan, by the plant's owner, Defendant Carmeuse Lime & Stone,

Inc. ("Carmeuse").  Following his termination, White and his wife, Amy White, brought this suit

against Carmeuse.  White claims that his termination violated both the Americans with Disabilities

Act of 1990 and the Employee Retirement Income Security Act, and Amy White files a claim for loss

of consortium arising out of Carmeuse's alleged violation of the Americans with Disabilities Act of

1990. [Complaint, Doc. No. 1; Order to Amend Complaint, Doc. No. 14].

Presently before the Court is defendant Carmeuse's Motion for Summary Judgment, pursuant

to Fed. R. Civ. P. 56.  [Doc. No. 47].  Plaintiffs White and his wife, Amy White, oppose the summary

judgment motion.  [Doc. No. 51].

After reviewing the record, the Court concludes that the defendant is entitled to summary judgment on all causes of action.  The motion for summary judgment will be GRANTED, and plaintiffs' complaint will be DISMISSED WITH PREJUDICE in its entirety.

## I. STANDARD OF REVIEW

Summary judgment is proper if there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Van Gorder v. Grand Trunk Western Railroad, Inc.*, 509 F.3d 265, 268 (6th Cir. 2007); *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1245 (6th Cir. 1995).  The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.  The requirement is that there be no genuine issue of material fact.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-8 (1986); *Lovelace v. BP Products North America, Inc.*, 25 Fed. Appx. 33, 39 (6th Cir. 2007); *Talley*, 61 F.3d at 1245.  Material facts are only those facts that might affect the outcome of the action under the governing substantive law.  The applicable substantive law will identify and determine which facts are material.  *Anderson*, 477 U.S. at 248; *Lovelace*, 252 Fed. Appx. at 39; *Talley*, 61 F.3d at 1245.

Defendant bears the initial burden of demonstrating there are no genuine issues of material fact in dispute.  Defendant may satisfy this burden either by presenting affirmative evidence that negates an essential element of plaintiff's claim, or by demonstrating the absence of evidence to support a claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325 (1986); *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003); *Talley*, 61 F.3d at 1245.

Once the defendant meets this initial burden, plaintiff is not entitled to a trial on the basis of mere allegations.  To defeat a summary judgement motion, plaintiff is required to come forward with probative evidence and facts to support his claim and show that a trial is necessary to resolve a

2

genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 322; *Anderson*, 477 U.S. at 249; *Van Gorder*, 509 F.3d at 268; *Rodgers*, 344 F.3d at 595. A scintilla of evidence is insufficient to preclude summary judgment. There must be admissible evidence on which a reasonable jury could find in the plaintiff's favor. *Anderson*, 477 U.S. at 248, 252; *Van Gorder*, 509 F.3d at 268; *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000); *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996); *Talley*, 61 F.3d at 1245; *Mitchell v. Toledo Hospital*, 964 F.2d 577, 581-82 (6th Cir. 1992).

Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322-23. Because plaintiff bears the burden of proving his claims, he must present probative facts and evidence showing there is a genuine issue of material fact for a jury to decide at trial as to each element of his claims. *Id.*; *Van Gorder*, 509 F.3d at 268; *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996); *Hartsel*, 87 F.3d at 799.

The Court's role at the summary judgment stage is to determine whether the record contains sufficient facts and admissible evidence from which a jury could reasonably find in favor of plaintiff. *Anderson*, 477 U.S. at 248; *Rodgers*, 344 F.3d at 595; *National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001); *Talley*, 61 F.3d at 1245. The Court views the facts in the record and all reasonable inferences that can be drawn from the facts in the light most favorable to plaintiff. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Van Gorder*, 509 F.3d at 268; *National Satellite Sports*, 253 F.3d at 907. The Court cannot weigh the evidence, judge credibility of witnesses, or determine the truth of matters reasonably in dispute. *Anderson*, 477 U.S. at 249; *Talley*, 61 F.3d at 1245.

III. FACTS

Jason White began work as a full-time laborer in the Boat End department of the Port Inland Plant of Gulliver/Port Inland, Michigan, in 2002. [White's Deposition, Doc. No. 47, Exhibit A, p. 20]. The plant was then owned by Oglebay Norton Company. [White's Deposition, Doc. No. 47, Exhibit A, p. 21].

In early 2006, White and his wife, Amy White, learned that their daughter, Savannah, had been diagnosed with leukemia. [White's Deposition, Doc. No. 47, Exhibit A, pp. 12-13, 76-77]. In February of 2006, Oglebay Norton donated $500 to Northwoods Airlifeline in honor of Savannah, and in March of 2006, Oglebay Norton donated $500 towards Savannah's medical expenses at a fundraising event. [Doc. No. 47, Exhibits K, L]. In March of 2006, Savannah's leukemia went into remission, but she had to continue to undergo chemotherapy and radiation treatments until 2008. [Amy White's Deposition, Doc. No. 47, Exhibit B, p. 29].

Jeffrey Himes, the plant's general manager under Oglebay Norton, was made aware of Savannah's illness from people telling him about it, and was aware that Oglebay Norton had donated money to assist with her medical expenses. [Himes' Deposition, Doc. No. 47, Exhibit A, pp. 166, 171]. Himes was also contacted at one point by White's father, Stephen White, and, while neither Stephen nor Himes remember the specifics of the call, they believe that it was about White taking time off for his daughter's illness. [Himes' Deposition, Doc. No. 53, Exhibit 4, p. 166-67; Stephen White's Deposition, Doc. No. 53, Exhibit 5, pp. 75-76]. While the plant was still owned by Oglebay Norton, Himes sat on a committee that reviewed the proposals of various health insurance providers and helped determine the best plan for Oglebay Norton. [Himes' Deposition, Doc. No. 53, Exhibit 4, pp. 167-68, 216-17]. David Mickelson, White's manager at the plant, was also aware of Savannah's illness. [Mickelson's Deposition, Doc. No. 59, Exhibit A, p. 96].

4

Carmeuse Lime and Stone, Inc. acquired Oglebay Norton and its subsidiaries on or around February 13, 2008. [Tunnicliffe's Affidavit, Doc. No. 47, Exhibit E, p. 1]. At this time, White and the other plant employees became employees of Carmeuse. [Doc. No. 47, Exhibit M; White's Deposition, Doc. No. 47, Exhibit A, pp. 33-34]. Jeffrey Himes, whose title changed from general manager to site operations manager once the plant was taken over by Carmeuse, was directed by the Carmeuse management team to revise the plant's yearly budget from the one that had been developed in 2007, while the plant was still owned by Oglebay Norton. The budget was to be revised based on new benchmarks, or key performance indicators, that were provided to Himes by Carmeuse. [Himes' Deposition, Doc. No. 47, Exhibit G, p. 23; Himes' Deposition, Doc. No. 53, Exhibit 4, pp. 41-42]. Himes' performance review was to be tied to the plant's achievement of these key performance indicators. [Himes' Deposition, Doc. No. 53, Exhibit 4, p. 74]. At the time that Himes was told to revise the budget, he was also told by Carmeuse management that "expectations were going to be different," in a meeting that was "focused primarily on profitability, sales, plant performance." [Himes' Deposition, Doc. No. 53, Exhibit 4, pp. 41-42]. When Himes was revising the budget, a consideration he took into account was that the cost-per-ton profitability outcome was expected to be better than had been forecasted in the business plan that was first developed. [Himes' Deposition, Doc. No. 53, Exhibit 4, pp. 75-76]. When developing the plant's budget and business plan (under both Oglebay Norton and Carmeuse), Himes was given an aggregate benefits amount, which would include healthcare cost, to plug in; this number was developed "at corporate" and reported to the plant. [Himes' Deposition, Doc. No.53, Exhibit 4, p. 78, 213-14; Doc. No. 66, Exhibit 16].

In 2005, Oglebay Norton entered into an administrative services agreement and corresponding "Stop Loss" agreement with Anthem Blue Cross Blue Shield. These agreements continued after Carmeuse acquired Oglebay Norton and its subsidiaries and terminated on January 1, 2009. [Doc. No.

5

47, Exhibit V, Exhibit W].   The agreements provided that Oglebay Norton, and subsequently Carmeuse, had to reimburse Anthem for all claims submitted to and paid by Anthem from Oglebay Norton/Carmeuse's employees (and their dependents) up to a threshold "Stop Loss Limit" amount. [Doc. No. 47, Exhibit W, Article 4].   The "Specific Stop Loss Limit" amount, which was the amount specified for each individual insured under the plan, was $200,000.00. [Doc. No. 47, Exhibit W, Schedule to Stop Loss Agreement].   Effectively, Oglebay Norton (and subsequently Carmeuse) was self-insured for up to $200,000.00 for each individual, at which point Anthem no longer required reimbursement until a "Specific Stop Loss Maximum" amount of $2,000,000.00 was reached. [Doc. No. 47, Exhibit W, Schedule to Stop Loss Agreement].   From February 2008 through October 2008, Carmeuse generated monthly "Stop Loss" reports to record the names of employees and their dependents who might be reaching the $200,000 limit. [Kathy Wiley's Affidavit, Doc. No. 47, Exhibit X, p. 1].   The "Stop Loss" reports were kept in Cleveland, Ohio, and were not available to anyone at the plant or at Carmeuse's headquarters in Pittsburgh during the time of White's employment. [Wiley's Affidavit, Doc. No. 47, Exhibit X, p. 2].

Savannah, as a dependent of White, was insured by this health insurance plan through Oglebay Norton and subsequently through Carmeuse. [Doc. No. 53, Exhibit 10; White's Deposition, Doc. No. 53, Exhibit 1, p. 100].   The healthcare claims for Savannah paid for under this plan by Blue Cross Blue Shield, from March 21, 2006 through October 20, 2008, exceeded $624,000.00. [Doc. No.53, Exhibit 10, p. 42].   In their briefs, neither White nor Carmeuse point to the exact portion of that amount that was paid by Blue Cross after the plant was purchased by Carmeuse.   At the argument on the summary judgment motion, Carmeuse estimated the number to be around $10,000.00, and White estimated it to be $200,000.00 (a figure that was determined by dividing the total amount paid by the number three to estimate the amount for one year).   Adding up the claims paid for service dates on

or after February 13, 2008, when Carmeuse took over the plant, and before or on August 25, 2008, when White was terminated, reveals that a total of just over $62,000.00 was paid by Blue Cross after Carmeuse took over and before White's termination. [Doc. No. 53, Exhibit 10, pp. 26-30, 36-39]. Savannah did not appear on any "Stop Loss" reports that were generated during the time of White's employment with Carmeuse. [Wiley's Affidavit, Doc. No. 47, Exhibit X, p. 1].

No one from Carmeuse discussed the costs associated with Savannah's illness with White prior to his termination. [White's Deposition, Doc. No. 47, Exhibit A, p. 101, 104]. Himes did not recall ever seeing any documents related to an employee's health care claims or expenses while working for Oglebay Norton, and he never saw any individual claims while working for Carmeuse. [Himes' Deposition, Doc. No. 59, Exhibit B, pp. 225-26]. Mickelson also did not see any documents related to an employee's health care claims or expenses while working for either Oglebay Norton or for Carmeuse. [Mickelson's Deposition, Doc. No. 77, Exhibit 3, p. 130]. Paul Tunnicliffe, Carmeuse's Vice President of Operations, was also unaware of either: (1) the costs of Savannah's health care benefits to Carmeuse or Oglebay Norton or (2) the amount of any Carmeuse employee's health care claims. [Tunnicliffe's Affidavit, Doc. No. 47, Exhibit E, pp. 1-2].

On Friday, August 8, 2008, Mickelson states that he called the Boat End department, and was told that a task could not be done because the crew was shorthanded due to White not being there. [Mickelson's Deposition, Doc. No. 53, Exhibit 2, p. 60]. Mickelson believed that he was speaking to John Chandler [Mickelson's Deposition, Doc. No. 59, Exhibit A, p. 59], though John Chandler denies having a conversation where he told Mickelson that White had not shown up for work on a scheduled shift. [Chandler's Deposition, Doc. No. 53, Exhibit 3, p. 46].

On Monday, August 11, Mickelson states that he was informed by Boat End crew members that a coworker was being dishonest on his time cards. [Mickelson's Deposition, Doc. No. 53,

Exhibit 2, p. 56].[1]  When Mickelson asked for a name, he states that one of the workers, who he believes was Loren Winsor, told him that he had all the information he needed to figure it out. [Mickelson's Deposition, Doc. No. 53, Exhibit 2, p. 57-58].  After looking back through the time cards, Mickelson discovered that White had submitted a time card showing that he had worked on August 8, along with what specific tasks were completed hour by hour during the time period, which he believed to be a discrepancy based on his conversation the previous Friday evening with the crew member of the Boat End department. [Mickelson's Deposition, Doc. No. 53, Exhibit 2, p. 58, 98; Himes' Deposition, Doc. No. 53, Exhibit 4, p. 125; Doc. No. 68, Exhibit 15].[2]

    Mickelson confirmed with the same coworkers that he spoke with before that they had been referring to White, and they indicated that this probably was not the first time he had falsified a time card. [Mickelson's Deposition, Doc. No. 53, Exhibit 2, p. 69, 73].  Mickelson raised the issue with Himes, who told him to look over all of White's 2008 time cards to see if other discrepancies existed. [Mickelson's Deposition, Doc. No. 53, Exhibit 2, p. 73].  Mickelson then reviewed White's other time cards.  He and Himes reviewed the security camera photo recordings, and the two decided that there were two other circumstances where they believed that White had falsified his time card.

---

[1]White disputes this conversation's occurrence, and points to the depositions of three of his coworkers, John Chandler, Mike Burkholder, and Bill Parrish, all of whom denied participating in a conversation where they complained to Mickelson that White was putting down time that he had not worked. [Chandler's Deposition, Doc. 53, Exhibit 3, p. 46-47; Parrish's Deposition, Exhibit 8, pp. 18-19; Burkholder's Deposition, Exhibit 9, p. 11].  Mickelson explained that he believed that Burkholder, Loren Winsor, an employee with the last name of Turan, and at least one other worker were part of the conversation. [Mickelson's Deposition, Doc. No. 53, Exhibit 2, p. 56].

[2]White points out that Dana Neadow, a plant employee who was responsible for contacting plant employees to correct errors she found on their time cards, was not aware of White's time card incident until after his termination. [Neadow's Deposition, Doc. No. 53, Exhibit 6, p. 46].  Neadow, however, also stated that it was not her responsibility to go back and check whether or not the time cards submitted by an employee correlated with a particular work schedule. [Neadow's Deposition, Doc. No. 53, Exhibit 6, p. 58].

[Himes' Deposition, Doc. No. 53, Exhibit 4, p. 123].  Mickelson believes that he pulled out two time cards that showed White putting down a longer time on his card than the others on his crew put down on theirs. [Mickelson's Deposition, Doc. No. 47, Exhibit H, p. 77].  He states that, on each of the two occasions, the security camera footage for those dates showed two cars leaving, and lights going out in the lunchroom, and yet White's time card stated that he worked an additional two hours past that time for each occasion. [Mickelson's Deposition, Doc. No. 47, Exhibit H, pp. 82-83].  Himes noted that the security camera photos showed one occasion where a vehicle that was similar in type and color to White's had left the plant around midnight, when White's time card had indicated that he stayed well beyond that time, and no other vehicles left around the time White indicated he had left. [Himes' Deposition, Doc. No. 53, Exhibit 4, p. 124].

Mickelson discussed the situation with Himes and other plant management, and they reviewed Carmeuse's policy regarding employee expectations.[3]  [Himes' Deposition, Doc. No. 53, Exhibit 4, pp. 132-33].  Himes then contacted Paul Tunnicliffe, with whom he discussed the situation.  [Himes' Deposition, Doc. No. 53, Exhibit 4, p. 133-34].  Though this fact is disputed, viewing the evidence in the light most favorable to the plaintiff shows that Himes at least played a role in making the final decision to terminate White.[4]  White was confronted about the time card falsification by Himes and

---

[3]The relevant policy provided that the employee "complete company records accurately and honestly (including time cards)" and that "certain offenses, including theft, ... could result in immediate termination." [Doc. No. 47, Exhibit T].  This policy was put in place before Himes began work at the plant in 1995. [Himes' Deposition, Doc. No. 53, Exhibit 4, p. 221].  The requirement that the employee complete time cards accurately and honestly was not originally included in the policy, but was added "a number of years ago." [Himes' Deposition, Doc. No. 53, Exhibit 4, p. 221].

[4]Tunnicliffe states that he informed Himes that Carmeuse considered White's time card falsification to be theft and directed that White be terminated. [Tunnicliffe's Affidavit, Doc. No. 47, Exhibit E, p. 1]. Himes also states that Tunnicliffe was the one who made the decision to terminate White. [Himes' Deposition, Doc. No. 53, Exhibit 4, p. 134].  White states, however, that when he
(continued...)

Mickelson.  He explained that he was unsure if he had worked on that day but that, if he had reported

time where he wasn't at the plant, it had been a mistake.[5]  [White's Deposition, Doc. No. 53, Exhibit

A, p. 81].

White also pointed out during the meeting that time card errors were frequent, and that he had

heard of three other plant employees who had time card issues (one involving an employee putting

time on his card when he was actually out golfing (J.A.), one involving an employee putting time he

worked on his son's card (B.J.), and one involving an employee who took sick time when he was not

sick (Dave Lakosky)) and who had received either no punishment or only light punishment.[6]

Relevant portions of the personnel files of these employees reveal that, in 1996, when the plant was

owned by Specialty Minerals, B.J. violated company policy by "banking" hours for himself and his

son on their time cards, and his punishment was a one-day suspension. [Doc. No. 67, Exhibit 17, p.

6; Himes' Deposition, Doc. No. 53, Exhibit 4, p. 146-48].  Himes noted that B.J. actually worked the

---

[4](...continued)
asked Himes, Himes explained that he had made the decision to terminate.  [White's Deposition, Doc. No. 53, Exhibit 1, p. 99].  Himes admits, and Stephen White confirms, that, in a conversation with Stephen White following White's termination, Himes said something along the lines of the decision being his, though Himes adds that he stated this because he was the manager of the facility and actions taken at the facility were his responsibility. [Himes' Deposition, Doc. No. 59, Exhibit B, p. 180; Stephen White's Deposition, Doc. No. 53, Exhibit 5, p. 91].

[5]Himes states that the possibility of this being a mistake had been discussed within the management team, and it was found difficult to accept because there was "a detailed description of work done." [Himes' Deposition, Doc. No. 53, Exhibit 4, p. 132].

[6]In his deposition, White stated that he had heard of these incidents through word of mouth, and that he was unsure of when they had occurred, but that he knew none had happened in 2008. [White's Deposition, Doc. No. 53, Exhibit 1, pp. 92-97].  White's father also discussed the three individuals that White named and their alleged time card offenses, which he stated he had also heard about from word of mouth.  [Stephen White's Deposition, Doc. No. 53, Exhibit 5, pp. 59-69].  White's father furthermore stated that "[t]here was lots of [time card mistakes] made, weekly and daily." [Stephen White's Deposition, Doc. No. 53, Exhibit 5, p. 71].

hours that he banked. [Himes' Deposition, Doc. No. 53, Exhibit 4, p. 148].  The personnel files also show that employee  J.A. claimed ten hours worked on a day in 1995 that he did not work, and his punishment for this action was two weeks dismissal without pay. [Doc. No. 67, Exhibit 17, p. 16]. Himes was not part of the decision-making process for J.A.'s discipline. [Himes' Deposition, Doc. No. 53, Exhibit 4, p. 149].  Himes states that he heard through the grapevine that the other employee named by White, Dave Lakosky, had a time card issue, but nothing was substantiated with regard to the rumors, and so no action was taken. [Himes' Deposition, Doc. No. 53, Exhibit 4, pp. 150-51].

Himes and Mickelson explained to White that he was to be terminated from his employment. [White's Deposition, Doc. No. 47, Exhibit A, p. 81].  Himes informed White that he would be sent something in the mail regarding his COBRA medical benefits. [White's Deposition, Doc. No. 53, Exhibit 1, p. 99].  White was terminated from his employment with Carmeuse on August 25, 2008. [Doc. No. 47, Exhibit U].  He and Amy White filed suit against Carmeuse on December 15, 2009. [Complaint, Doc. No. 1].

IV. ADA CLAIM

*1. Elements of the Claim*

White alleges that his termination from employment constituted discrimination under the ADA.  Specifically, White's claim arises from a provision of the ADA that provides that discrimination includes "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association."  42 U.S.C. 12112(b)(4).  When a plaintiff lacks direct evidence of discrimination, which White readily admits is the case here [Doc. No. 53, p. 8], the *McDonnell Douglas* analysis applies. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that analysis, the plaintiff must first make out a prima facie case of discrimination.  *Id*.

While Sixth Circuit case law on this provision is limited, the Sixth Circuit did adopt, in an unreported decision, a four-part test developed by the Tenth Circuit for establishing a prima facie case of association discrimination. *Overley v. Covenant Transport, Inc.*, 178 Fed. Appx. 488, 493 (6th Cir. 2006), *citing Den Hartog v. Wasatch Academy*, 129 F.3d 1076 (10th Cir. 1997). The elements that a plaintiff must show to establish a prima facie association discrimination case under 42 U.S.C. §12112(b)(4) are as follows: "(1) []he was qualified for the position; (2) []he was subject to an adverse employment action; (3) []he was known to have a relative with a disability; and (4) the adverse employment action occurred under a circumstance that raises a reasonable inference that the disability of the relative was a determining factor in the decision." *Id*.

Once a plaintiff has established his prima facie case for an ADA discrimination claim, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Brenneman v. MedCentral Health System*, 366 F.3d 412 (6th Cir. 2004). Once this reason is articulated, the plaintiff must then demonstrate, by a preponderance of the evidence, that the articulated reason was actually a pretext for unlawful disability discrimination. *Id*. at 417-8.

Carmeuse argues that White's ADA claim should be dismissed on summary judgment because White cannot meet his burden of showing the fourth element of his prima facie case. Carmeuse also argues that, even if White is found to have established a prima facie case of discrimination, Carmeuse has articulated a legitimate, non-discriminatory reason for the termination of White's employment, and summary judgment is therefore appropriate. White argues that Carmeuse's articulated reason for his termination is a pretext for unlawful discrimination.

*2. Fourth Element of the Prima Facie Claim*

To show that the adverse employment action occurred under a circumstance that raises a reasonable inference that his daughter's disability was a determining factor in the decision to

12

terminate his employment, White points to the following factors: (1) the high costs of Savannah's healthcare expenses to Carmeuse, (2) the lack of evidence that White engaged in the act that led to his termination (time card fraud), and (3) instances where other employees who engaged in misbehavior involving their time cards were not terminated.  While White appears to argue that all three of these factors help to show that the fourth element of his prima facie case has been met, the second and third factors point instead towards evidence of White's termination being a pretext for unlawful discrimination.[7]  *See Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (*overruled on other grounds, Geiger v. Tower Automotive*, 579 F.3d 614 (6th Cir. 2009)) (to show that an employer's explanation for its actions is actually a pretext for discrimination, a plaintiff's evidence may consist of "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [the plaintiff's] discharge, or (3) that they were insufficient to motivate discharge").

The Sixth Circuit's limited dealings with association discrimination cases have not included any decision where analysis has been given on the fourth element of the plaintiff's prima facie case being based on the "expense" factor.[8]  However, other circuits who apply a similar prima facie test

---

[7]White states in his reply brief that Carmeuse concedes that all the elements of his prima facie case except for the fourth one have been met. [Doc. No. 51, p. 12].  He then states, "This brings us to the *McDonnell Douglas* test-did this employer actually fire employees who committed time card fraud and/or errors?  The answer is clearly, NO."  *Id.*  White appears to misunderstand the *McDonnell Douglas* test, which requires that the fourth prong of the test be met, and then that the defendant produces a legitimate, non-discriminatory reason, before the plaintiff has the opportunity to provide evidence of pretext.

[8]*Overley*, along with several association discrimination cases from the other circuits, reference a Seventh Circuit case which breaks up these types of cases into three categories: expense, disability by association, and distraction.  *Larimer v. IBM*, 370 F.3d 698, 700 (7th Cir. 2004).  "Expense" cases occur when "an employee is fired (or suffers some other adverse personnel action) because ... his spouse has a disability that is costly to the employer because the spouse is covered by the company's (continued...)

have dealt with this issue, and have elaborated on the sufficiency of the evidence with regard to the fourth element of the plaintiff's prima facie case.

The Tenth Circuit, for example, in finding that a plaintiff had presented sufficient evidence with regard to the fourth element of the prima facie case, considered the evidence presented regarding the employer's concerns about the costs of the plaintiff's disabled relative's illness and the temporal proximity between the disabled relative's relapse[9] and the termination of employment. *Trujillo v. Pacificorp*, 524 F.3d 1149, 1156 (10th Cir. 2008). In reaching their decision, the court noted that the plaintiffs had "offered everything from evidence of general concerns about the rising cost of healthcare to the specific facts that [the disabled relative]'s claims were considered high dollar, that there was only one other terminal illness during the relevant time period, and that [the employer] was keeping tabs on those claims." *Id*.

In a decision from another circuit, the Fourth Circuit found that the plaintiff was unable to survive a summary judgment motion due to a failure to establish sufficient evidence regarding the fourth prong of the prima facie case. *Ennis v. NABER, Inc.*, 53 F.3d 55 (4th Cir. 1995). The plaintiff had, as evidence, referenced a document that was given by the employer to all employees that described the employer's insurance coverage. The memo noted that if there were a few expensive

---

[8](...continued)
health plan." *Id*. White's argument is analogous to that type of case.

[9]The 6th Circuit has also found it appropriate to consider temporal proximity in determining whether a plaintiff's discharge was motivated by a desire to interfere with his or his beneficiary's receipt of future benefits. Though the issue has come up in ERISA cases instead of ADA association discrimination cases, the issue in each are analogous to each other. In analyzing these ERISA cases, the 6th Circuit has noted that "temporal proximity between termination of employment and an event signaling increased costs to a benefit program can 'support an inference that the adverse actions were taken with the intent of interfering with future ... benefits." *Smith v. Hinkle*, 36 Fed.Appx. 825, 829 (6th Cir. 2002), *quoting Smith v. Ameritech*, 129 F.3d 857, 865 (6th Cir. 1997).

healthcare cases, the rates could be dramatically affected.  The plaintiff also pointed out that the company's president had recently had the first of these very expensive cases.  *Id*. at 57.  The court noted that this memo, which came out a year before the plaintiff's termination, was "too remote and too tenuous to create a genuine issue of material fact."  *Id*. at 62.  The court went on to state that, for there to be sufficient evidence to survive the summary judgment motion, evidence of a notice informing employees about insurance coverage would have to lead to an inference that the employer wanted to prevent its employees from filing expensive claims, which would have to lead to an inference that the employer knew of the plaintiff's son's disability and his potential for incurring significant medical expenses and that the employer decided to fire the plaintiff as a result.  *Id*.  As the court noted, "[t]he building of one inference upon another will not create a genuine issue of material fact."  *Id*. (citations omitted).

*3. Fourth Element Analysis*

In his response to Carmeuse's motion for summary judgment, White first points out that the plant manager, Jeffrey Himes, knew about Savannah's medical condition, as did David Mickelson.[10] He then argues that Himes knew that Savannah's medical condition had "cost the Port Inland plant a great deal under their stop/loss agreement with Blue Cross Blue Shield in place at the time." [Doc. No. 76, pp. 4-5], and that "it is simply unbelievable that at a small plant . . . the local Plant manager would not have an idea who among his employees was maximizing use of health benefits." [Doc No. 53, p. 9].  These assertions, however, are not supported by any evidence.  The pages in the record that

---

[10]Since viewing the facts in the light most favorable to the plaintiff shows Himes to have at least played a role in the decision to fire White, there is no need to address White's argument [Doc. No. 73], which relies on *Staub v. Proctor Hospital*, 131 S.Ct. 1186 (2011), that an employer can be held liable for the discriminatory animus of an agent or employee who influenced the decision to fire a plaintiff.

White points to in attempting to support his first assertion, along with the rest of the record, do not contain any evidence of statements by Himes showing his knowledge that Savannah's condition had cost the plant a great deal of money. White states that the cost of Savannah's healthcare expenses was never discussed by Carmeuse management with him. The only statements even referencing the plant's payment of money towards Savannah's expenses show merely that Himes was aware that Oglebay Norton (the prior owner) had donated some money to assist with Savannah's healthcare expenses. There is no evidence showing Himes' knowledge of Savannah's healthcare costs to the plant (while owned by Oglebay Norton or by Carmeuse) under the plant's health insurance contracts, or the knowledge of any other Carmeuse management who were involved in White's termination. Furthermore, Carmeuse points to evidence that shows that neither Himes, Mickelson, or Tunnicliffe viewed any stop loss reports or other documents referencing the health care claims of White, White's dependents, or any other plant employees, and that there were no stop loss reports created for Savannah during the relevant time period. White is unable to point to any evidence to dispute these facts. In short, no evidence is found in the record to show that Himes, Mickelson, Tunnicliffe, or any other Carmeuse managers were aware of the amount of Savannah's healthcare expenses or health care claims, or that they were in any respect concerned about those expenses.

White goes on to assert that the plant management had to revise their budget after Carmeuse purchased the plant, and that "[c]hanges in healthcare benefits were part of the equation, lending credibility to the idea that the true reason for Jason White's firing was the prospect of more of the $620,000 of his child's medical expenses had cost the Port Inland Plant in the prior three years." [Doc. No. 53. pp. 2-3]. Again, however, White is unable to provide evidence to support this assertion. The evidence that White references does show that Himes had to revise his budget and business plan after Carmeuse purchased the Plant, based on new expectations and key performance

16

indicators.  Furthermore, Himes was told by Carmeuse that "expectations were going to be different" under Carmeuse's ownership.  However, nothing in the record even indicates that Himes was told to cut costs - the only evidence discussing changes that he had to work with when revising the budget shows that Carmeuse expected the cost-per-ton profitability outcome to be better than had been forecasted in the original Oglebay Norton business plan.  White also points to pages from Himes' deposition that reference healthcare costs, but it appears that Himes only received aggregate numbers from corporate with reference to healthcare that were then factored into the business plan.  White points to evidence indicating that Himes had been on a committee while the Plant was owned by Oglebay Norton that had compared insurance providers to determine the best plan to go with.  This evidence does not indicate that Himes, because of his involvement with the Oglebay Norton committee, was aware of any significant health care claims costs or concerns to Carmeuse, or even to Oglebay Norton.  In fact, nothing even indicates that Carmeuse had significant healthcare concerns. Evidence that (1) Himes had to revise the budget after the plant was taken over by a new owner, (2) an aggregate healthcare cost amount was used to develop this budget, and (3) Himes had been involved with a committee to pick the best health insurance package for the prior owner, does not lead to an inference that Himes, or any of Carmeuse's management, had general concerns with the cost of health insurance coverage to Carmeuse, much less White's contribution to those costs.

Unlike the plaintiffs in *Trujillo*, White does not provide any evidence to show that Himes or any other Carmeuse management was concerned about, or even was keeping track of, his daughter's healthcare costs to Carmeuse, or that Himes or any other Carmeuse management involved in White's termination had general concerns about cost of healthcare to Carmeuse.  Furthermore, there is no evidence of a close temporal proximity between the onset of Savannah's illness and White's termination, or between Carmeuse's purchase of the plant (and subsequent liability for the health care

17

costs associated with Savannah) and White's termination.  Instead, the evidence provided  requires "[t]he building of one inference upon another" to find that Savannah's health care costs were a determining factor in the decision to fire White, as was found to be insufficient for the plaintiff to survive summary judgment in *Ennis*.

White has not pointed to any evidence in the record to show that he was terminated "under a circumstance that raises a reasonable inference that the disability of the relative was a determining factor in the decision."  For that reason, White has failed to show the fourth element required to make his prima facie case of association discrimination, and summary judgment must be granted as to White's ADA claim.

## V. ERISA CLAIM

White next claims that his termination from employment constituted a violation of Section 510 of ERISA.  Under this section, it is illegal for an employer to "discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan."  29 U.S.C. § 1140.  In this case, White argues that he was terminated by Carmeuse for the purpose of interfering with his and his family's access to health insurance benefits under Carmeuse's employee benefit plan, which is covered by ERISA.  In the absence of direct evidence of an intent to violate ERISA (which White does not argue is present here), the plaintiff can state a prima facie case by showing the existence of "(1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled."  *Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1043 (6th Cir. 1992) (citation omitted).  In order to survive a defendant's motion for summary judgment, a plaintiff must show the existence of a causal link; in other words, the plaintiff must "come forward with evidence

from which a reasonable jury could find that the defendants' desire to avoid pension liability was a determining factor in plaintiff's discharge." *Id*. at 1044. Once the plaintiff has stated the prima facie case, the employer can rebut this presumption by introducing evidence of a legitimate, non-discriminatory reason for the termination. *Id*. at 1043. This then shifts the burden back to the plaintiff to show that the employer's preferred reason was mere pretext. *Smith v. Ameritech*, 129 F.3d 857 (6th Cir. 1997).

In arguing that his termination constituted an ERISA violation, White asserts that the reason for his termination was "because the last thing Port Inland's local management wanted was a large liability under its Stop-Loss Agreement with its health insurance carrier . . . going into the first full budget cycle under the ownership of Carmeuse." [Doc. No. 53, p. 14]. To support this assertion, White relies on the same evidence discussed above in his ADA claim. He points out the reworking of the budget by Himes after Carmeuse's purchase of the Plant, and discusses Himes' knowledge of benefits. None of this evidence shows that Himes or other Carmeuse management had concerns about Savannah's healthcare cost to Carmeuse, or even knowledge of such costs, or concerns about Carmeuse's healthcare costs in general. The evidence that White presents fails to show the required "causal link" because a reasonable jury "could not find that the defendants' desire to avoid . . . liability was a determining factor in plaintiff's discharge." *Humphreys*, 966 F.2d at 1044. For this reason, summary judgment must also be granted as to White's ERISA claim.

## VI. LOSS OF CONSORTIUM CLAIM

Carmeuse also seeks summary judgment on Amy White's loss of consortium claim. "The derivative claim of loss of consortium stands or falls on the primary claims in the complaint." *Kohler v. North Star Steel Co., Inc.*, 408 F. Supp. 2d 380 (E.D. Mich. 2005), *quoting Long v. Chelsea*

*Community Hospital*, 219 Mich. App. 578, 557 N.W.2d 157 (1996). Since White's ADA and ERISA

claims are dismissed, Amy White's derivative loss of consortium claim is also dismissed.

## VII. CONCLUSION

A judgment will enter GRANTING the defendant's motion for summary judgment [Doc. No.

47] and DISMISSING this case in its entirety.


Dated: May 31, 2011                          _____*/s/ R. Allan Edgar*_____
                                             R. ALLAN EDGAR
                                             UNITED STATES DISTRICT JUDGE